No. 25-5724

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

―――――――――

**NATIONAL TPS ALLIANCE, et al.,**

*Appellees,*

v.

**KRISTI NOEM, et al.,**

*Appellants.*

―――――――――

On Appeal from the United States District Court
for the Northern District of California
District Court Case No. 3:25-cv-1766

―――――――――

## EMERGENCY MOTION PURSUANT TO CIRCUIT RULE 27-3

## APPELLANTS' MOTION FOR A STAY PENDING APPEAL AND MOTION FOR AN IMMEDIATE ADMINISTRATIVE STAY

(Relief requested by September 22, 2025)

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

WILLIAM H. WEILAND
*Acting Assistant Director*

LAUREN BRYANT
CATHERINE ROSS
ERIC SNYDERMAN
JEFFREY M. HARTMAN
*Trial Attorneys*
Office of Immigration Litigation
Civil Division, U.S. Dep't of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 532-4404
Email: Jeffrey.M.Hartman@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION........................................................................................ 1

BACKGROUND....................................................................................... 2

ARGUMENT ............................................................................................. 5

    THIS COURT SHOULD STAY THE DISTRICT COURT'S ORDER............5

    I.    The Government Is Likely to Succeed on Appeal......................................6

        A.    The Secretary's Actions Are Unreviewable........................................6

        B.    The Secretary Has Inherent Authority to Reconsider Past Actions ........................................................................ 10

        C.    The District Court's APA Analysis Is Erroneous......................... 12

        D.    Section 1252(f)(1) Also Precludes The District Court's Order.....15

    II.    The Equitable Factors Favor a Stay Pending Appeal .............................. 17

    III.    At Minimum, the District Court's Chosen Relief Was Overbroad......... 19

CONCLUSION ....................................................................................... 22

CERTIFICATE OF COMPLIANCE

EXHIBIT 1
    Opinion, *National TPS Alliance, et al.*, *v. Noem, et al.*,
        3:25-cv-01766-EMC (Sept. 5, 2025) (Dkt. 279)

EXHIBIT 2
    Transcript of Proceedings, *National TPS Alliance, et al.*, *v. Noem, et al.*,
        3:25-cv-01766-EMC (Sept. 5, 2025) (Dkt. 290)

EXHIBIT 3
    Plaintiffs' Reply in Support of Motion to Enforce, *National TPS Alliance, et al.*,
        *v. Noem, et al.*, 3:25-cv-01766-EMC (Sept. 5, 2025) (Dkt. 303)

# TABLE OF AUTHORITIES

## Cases

*Al Otro Lado v. EOIR,*
    138 F.4th 1102 (9th Cir. 2025) ....................................................................... 17

*Bd. of Governors v. MCorp Fin., Inc.,*
    502 U.S. 32 (1991) ..................................................................................... 9, 11

*Bouarfa v. Mayorkas,*
    604 U.S. 6 (2024) ............................................................................................ 8

*CASA Inc. v. Noem,*
    2025 WL 2028397 (4th Cir. July 21, 2025) ............................................. 6, 18

*Ctr. for Biological Diversity v. Bernhardt,*
    946 F.3d 553 (9th Cir. 2019) .......................................................................... 9

*Dep't of Commerce v. New York,*
    588 U.S. 752 (2019) ...................................................................................... 13

*Dep't of State v. Munoz,*
    602 U.S. 899 (2024) ...................................................................................... 19

*DHS v. D.V.D.,*
    145 S. Ct. 2627 (2025) .................................................................................. 18

*E. Bay v. Biden,*
    993 F.3d 640 (9th Cir. 2021) ........................................................................ 16

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ................................................................................. 13, 14

*China Unicom (Ams.) Ops. Ltd. v. FCC,*
    124 F.4th 1128 (9th Cir. 2024) ..................................................................... 10

*Galvez v. Jaddou,*
    52 F.4th 821 (9th Cir. 2022)* ....................................................................... 15

*Garcia v. USCIS,*
    146 F.4th 743 (9th Cir. 2025) ......................................................................... 9

*Garland v. Aleman Gonzales*,
  596 U.S. 543 (2022) ........................................................................ 10, 15, 16, 17

*Garland v. Ming Dai*,
  593 U.S. 357 (2021) ........................................................................ 14

*Immigrant Defenders v. Noem*,
  145 F.4th 972 (9th Cir. 2025) ........................................................ 16

*In re Pattullo*,
  271 F.3d 898 (9th Cir. 2001) .......................................................... 8

*INS v. Legalization Assistance Project*,
  510 U.S. 1301 (1993) ...................................................................... 18

*Ivy Sports Medicine, LLC v. Burwell*,
  767 F.3d 81 (D.C. Cir. 2014) ......................................................... 11

*Mallinckrodt Chem. Works v. Missouri ex rel. Jones*,
  238 U.S. 41 (1915) .......................................................................... 20

*Maryland v. King*,
  567 U.S. 1301 (2012) ...................................................................... 17

*Massachusetts v. Mellon*,
  549 U.S. 447 (1923) ........................................................................ 20

*McNary v. Haitian Refugee Center, Inc.*,
  498 U.S. 479 (1991) ........................................................................ 8

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .......................................................................... 13

*Nat'l TPS All. v. Noem*,
  --- F.4th ---, 2025 WL 2487771 (9th Cir. Aug. 29, 2025) (published) ........... 4, passim

*Nken v. Holder*,
  556 U.S. 418 (2009) ...................................................................... 2, 17, 19

*Noem v. Nat'l TPS Alliance*,
  --- S. Ct. ---, 2025 WL 1427560 (May 19, 2025) ............................... 1, passim

*Patel v. Garland*,
  596 U.S. 328 (2022) ...................................................................... 6, 7, 9, 10

*Poursina v. USCIS*,
    936 F.3d 868 (9th Cir. 2019) ................................................................ 13

*Ramos v. Wolf*,
    975 F.3d 872 (9th Cir. 2020), *vacated upon rehearing en banc*, 59 F.4th 1010 (9th Cir.
    2023) ................................................................................................... 8

*Sagana v. Tenorio*,
    384 F.3d 731 (9th Cir. 2004) ................................................................ 19

*Trump v. Boyle*,
    145 S. Ct. 2653 (2025) ................................................................ 2, 5, 8, 18

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) ................................................................ 10, 21

*United States v. Texas*,
    599 U.S. 670 (2023) ................................................................ 16, 20

*United States v. Tohono O'odham Nation*,
    563 U.S. 307 (2011) ................................................................ 7

*Washington v. U.S. Dep't of State*,
    996 F.3d 552 (9th Cir. 2021) ................................................................ 9

## Statutes

5 U.S.C. §701(a)(2) ................................................................ 12

5 U.S.C. §703 ................................................................ 20

5 U.S.C. §706 ................................................................ 16, 17

5 U.S.C. §706(2) ................................................................ 20

5 U.S.C. § 702(2) ................................................................ 8

8 U.S.C. 1254a(b)(5)(A) ................................................................ 3, passim

8 U.S.C. 1254a(b)(3)(B) ................................................................ 11, 12

## Regulations

*Designation of Venez. for [TPS]*, 86 Fed. Reg. 13,574 (Mar. 9, 2021) .................................. 3

*Extension of the 2023 Designation of Venez. for [TPS]*,
    90 Fed. Reg. 5,961 (Jan. 17, 2025) ................................................................... 3

*Vacatur of 2025 TPS Decision for Venez.*,
    90 Fed. Reg. 8,805 (Feb. 3, 2025) ..................................................................... 4

*Termination of the October 3, 2023 Designation of Venez. for [TPS]*,
    90 Fed. Reg. 9,040, 9,041 (Feb. 5, 2025) .......................................................... 4

*Reconsideration and Rescission of Termination of the Designation of El Salvador for,
[TPS]*, 88 Fed. Reg. 40,282 (June 21, 2023) ........................................................ 11

## Other Authorities

Executive Order 14159,
    *Protecting the American People Against Invasion* (Jan. 29, 2025) ......................... 14

vi

## INTRODUCTION

In March, the district court in this action granted preliminary relief postponing the determination by the Secretary of Homeland Security to vacate former Secretary Mayorkas's consolidation of Venezuela's separate 2021 and 2023 temporary protected status (TPS) designations and terminate the 2023 designation as contrary to the national interest. This Court declined to stay that order pending appeal, but the Supreme Court granted that relief, with only one Justice noting dissent. *Noem v. Nat'l TPS Alliance*, --- S. Ct. ---, 2025 WL 1427560 (May 19, 2025) (*NTPSA I*). The Secretary's actions were therefore permitted to take effect.

Last week, however, the district court entered a new order, this time granting final judgment on Plaintiffs' Administrative Procedure Act (APA) claims and vacating the Secretary's actions. As a technical matter, that decision moots the ongoing appellate proceedings over the preliminary relief. But the district court's decision rested on the same grounds as the earlier order that the Supreme Court stayed. And the balance of harms has not changed either. The court's order displaces the Secretary's judgment on a matter committed to her unreviewable discretion by law, impedes the government from implementing important immigration enforcement policies, and does so to benefit aliens with no legal entitlement to remain in this country.

The district court apparently made the judgment that the Supreme Court was wrong in predicting that the government would prevail on the merits. On the question of whether to stay that new order pending appeal, however, this Court has no flexibility:

1

It is "squarely controlled" by the Supreme Court's stay order in this very case. *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). That order reflected the Supreme Court's judgment that the stay factors weighed in favor of allowing the Secretary's actions relative to TPS for Venezuela to take effect during the pendency of this litigation. *See Nken v. Holder*, 556 U.S. 418, 534 (2009). Nothing about that stay calculus has changed, and so the Supreme Court's determination about the proper interim status quo remains binding in this case. This Court must accordingly grant a stay pending appeal.[1]

## BACKGROUND

**The TPS Mechanism.** The Secretary, "after consultation with appropriate agencies[,]" may designate a country for TPS if, among other grounds, there are "extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." §1254a(b)(1)(C).

TPS designations are discretionary, and the Secretary must conduct periodic reviews to determine whether the conditions underlying a TPS designation continue to be met. §1254a(b)(2), (b)(3)(A). If the Secretary "does not determine" that the foreign

---

[1] The district court also granted judgment against the Secretary's determination to vacate and then terminate the TPS designation for Haiti. Because Haiti's designation is already scheduled to expire naturally in the next few months, the government does not currently seek to stay the portion of the district court's judgment related to Haiti.

2

state "no longer meets the conditions for designation," then "the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)." §1254a(b)(3)(C).  But if the Secretary decides that the foreign state "no longer continues to meet the conditions for designation," the Secretary "shall terminate the designation." §1254a(b)(3)(B).

The TPS statute leaves sensitive judgments about the government's national interest in the Secretary's hands.  It bars judicial review of her TPS determinations, in express and plain terms: "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." §1254a(b)(5)(A).

**Venezuela TPS Determinations.**  Venezuela was initially designated for TPS in 2021 based on extraordinary and temporary conditions that prevented its citizens from safely returning. *Designation of Venez. for [TPS]*, 86 Fed. Reg. 13,574 (Mar. 9, 2021).

In 2023, Secretary Mayorkas extended the 2021 Designation through September 2025, and at the same time redesignated Venezuela for TPS until April 2025. *Extension and Redesignation of Venez. for [TPS]*, 88 Fed. Reg. 68,130 (Oct. 3, 2023).

On January 17, 2025, just a few days before leaving office, Secretary Mayorkas extended the not-yet-expired 2023 Designation for 18 months and established a consolidated filing process that allowed all Venezuela TPS beneficiaries to obtain TPS through the expiration of that extension (*i.e.*, until October 2, 2026).  *Extension of the 2023 Designation of Venez. for [TPS]*, 90 Fed. Reg. 5,961 (Jan. 17, 2025).

3

On January 28, after taking office, Secretary Noem vacated that late-breaking 2025 extension, before it was even scheduled to take effect, reasoning that both the consolidation of the two tracks and the premature extension failed to "acknowledge the novelty of its approach" or "explain how it is consistent with the TPS statute." *Vacatur of 2025 TPS Decision for Venez.*, 90 Fed. Reg. 8,805 (Feb. 3, 2025).

On February 5, Secretary Noem then terminated Venezuela's 2023 designation because it was "contrary to the national interest to permit the covered Venezuelan nationals to remain temporarily in the [U.S.]." *Termination of the October 3, 2023 Designation of Venez. for [TPS]*, 90 Fed. Reg. 9,040, 9,041 (Feb. 5, 2025).

**This Litigation.**  The National TPS Alliance and seven individual plaintiffs challenged the Secretary's Venezuela TPS determinations under the APA and moved to postpone those determinations. Dkt. 1. The district court granted their motion, and this Court denied the government's stay motion. On May 19, the Supreme Court granted the government's motion for a stay pending appeal and through any certiorari process. *NTPSA I*, 2025 WL 1427560 at *1.

On August 29, this Court affirmed the district court's preliminary relief. *Nat'l TPS All. v. Noem*, --- F.4th ---, 2025 WL 2487771, at *2 (9th Cir. Aug. 29, 2025). On September 5, without waiting for this Court's mandate to issue (or any rehearing or certiorari petition), the district court entered final judgment setting aside the Secretary's vacatur of Venezuela's TPS extension and termination of the Venezuela designation, as well as her vacatur of Haiti's TPS extension. Dkt. 279. The next day, the government

4

moved to stay the district court's judgment. Dkt. 281. The district court declined to stay its judgment. Dkt. 296.

On September 9, Plaintiffs moved for the district court's judgment to take immediate effect and for the government take concrete steps so that the government's website to reflect the court's ruling and provide an additional opportunity for Venezuelans to re-register for TPS. Dkt. 286. The district court granted that relief. Dkt. 304. The government now seeks a stay of the district court's judgment with respect to Venezuela. The government now seeks a stay of the district court's judgment with respect to Venezuela.

## ARGUMENT

## THIS COURT SHOULD STAY THE DISTRICT COURT'S ORDER.

The Supreme Court has already concluded in this case that the Secretary's actions with respect to Venezuela's TPS designation should be in effect while the litigation unfolds. *NTPSA I*, 2025 WL 1427560, at *1. That decision requires this Court to grant a stay here, because it reflects the Supreme Court's assessment that the merits and the equitable factors—none of which has changed—favor the government. *Boyle*, 145 S. Ct. at 2654. Although the Court's "interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases," and they "squarely control[]" here. *Id.* Reflecting as much, two courts of appeals (including this Court) have considered the interim status quo in other TPS cases since the Supreme Court's stay issued, and each court concluded that the Secretary's decisions should take

effect pending appeal.  *Nat'l TPS Alliance v. Noem*, No. 25-4901 (9th Cir. Aug. 20, 2025); *CASA Inc. v. Noem*, 2025 WL 2028397 at *1 (4th Cir. July 21, 2025).  This case is even more directly on point as the Supreme Court already concluded in connection with this precise case that the government is likely to succeed in challenging the district court's intrusion into the Secretary's administration of TPS by terminating Venezuela's TPS designation.   That is particularly true here, where the district court largely reincorporated its previously stayed rationale.

Although this Court need not—and should not—independently weigh the stay factors in this case after the Supreme Court has already done so, those factors support granting a stay pending appeal for the reasons below.

## I.    The Government Is Likely to Succeed on Appeal.

### A.    The Secretary's Actions Are Unreviewable.

The district court's order will not survive appellate review. The Secretary's TPS determinations implicate sensitive "national interest" and foreign policy judgments. §1254a(b)(1), (b)(3).  Congress therefore unambiguously barred courts from second-guessing her: "*There is no judicial review* of *any* determination of the [Secretary] *with respect to* the designation, or termination or extension of a designation, of a foreign state" for TPS.  §1254a(b)(5)(A) (emphasis added).

The judicial-review bar is broad.  First, Congress prefaced "determination" with the term "any."  As the Supreme Court explained, "the word 'any' has an expansive meaning."  *Patel v. Garland*, 596 U.S. 328, 338 (2022) (cleaned up).  The provision thus

6

captures determinations "of whatever kind." *Id.* Second, the phrase "with respect to" likewise has "a broadening effect," as it "ensur[es] that the scope of [the] provision covers not only its subject but also matters relating to that subject." *Id.* at 339. When Congress has stripped a court of jurisdiction "in respect to" certain claims, the Court has construed that as a "broad prohibition." *United States v. Tohono O'odham Nation*, 563 U.S. 307, 312 (2011). The TPS statute thus commits to the Secretary's unreviewable authority "any" and all determinations "with respect to" any TPS determination. *Id.*

Plaintiffs' APA claims fall squarely within §1254a(b)(5)(A)'s bar. Judicial review of the Secretary's Venezuela termination is foreclosed because it is a "determination ... with respect to ... the termination" of a prior TPS extension. Likewise, the Secretary's vacatur of Venezuela's 2023 TPS extension is literally a "determination ... with respect to the ... extension" of TPS—*i.e.*, a determination that an extension was improper and should have no legal effect. Indeed, the Supreme Court held that materially similar jurisdiction stripping language in the INA precludes a whole category of judicial review. *Patel*, 596 U.S. at 337-40 (recognizing that statutes barring review of "any judgment regarding the granting of relief" covers "any authoritative decision" on the matter). Because the Secretary's determinations are fully encompassed by §1254a(b)(5)(A), the district court lacked jurisdiction to review them under the APA.[2]

---

[2] The government recognizes that the Court held, in upholding the district court's preliminary relief order, that §1254a(b)(5)(A) does not apply to determinations that exceed the Secretary's statutory authority. *Nat'l TPS Alliance*, 2025 WL 2487771, (continued . . .)

This Court has already held that the statute "preclude[s] direct review of the Secretary's country-specific TPS determinations." *Ramos v. Wolf*, 975 F.3d 872, 889 (9th Cir. 2020), *vacated upon rehearing en banc*, 59 F.4th 1010, 1011 (9th Cir. 2023). In doing so, it rejected the analogy that the district court (Op. 25) drew to *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), given that "the TPS statute … differs in both text and context" from the statute at issue there. *Ramos*, 975 F.3d at 890. And *McNary* itself emphasized that Congress could bar judicial review of collateral challenges if it used more expansive language than in the statute at issue in *McNary*. 498 U.S. at 494. Congress did so here: barring any challenge to "any determination of the [Secretary] with respect to the determination, or termination or extension of a designation" of TPS. §1254a(b)(5)(A).

The district court's reliance on the presumption of judicial review (Op. 25) is misplaced because Congress unequivocally barred judicial review here. *See Bouarfa v. Mayorkas*, 604 U.S. 6, 19 (2024) (explaining that INA provisions limiting judicial review provide "clear and convincing evidence of congressional intent to preclude judicial review"); 5 U.S.C. § 702(2) (no judicial review is available where another statute

---

at *9-10. That decision, however, is likely to be vacated as moot given the district court's final judgment that superseded its earlier order, *see In re Pattullo*, 271 F.3d 898, 900-01 (9th Cir. 2001), so it should not control the Court's assessment of the government's likelihood of success in this appeal. In any event, the government does not need to prevail on this argument to prevail on the stay, as the Supreme Court's stay decision in this very case controls any subsequent stay requests, including this one. *Boyle*, 145 S. Ct. at 2654.

"expressly or impliedly forbids the relief" sought); *Garcia v. USCIS*, 146 F.4th 743, 754 (9th Cir. 2025). Courts have routinely found that analogous statutes clearly and convincingly bar judicial review. *See Bd. of Governors v. MCorp Fin., Inc.*, 502 U.S. 32, 42, 44 (1991) (12 U.S.C. §1818(i)(1)); *Washington v. U.S. Dep't of State*, 996 F.3d 552, 560-64 (9th Cir. 2021) (22 U.S.C. §2278(h) and 50 U.S.C. §4821(a)); *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 563 (9th Cir. 2019) (5 U.S.C. §805). The same result should obtain here.[3]

The district court also reasoned (Op. 25-26, 29) that §1254a(b)(5)(A) bars only review of "substantive TPS decisions based on country conditions," but that reading cannot be squared with the text of the bar, which does not distinguish between substantive or procedural challenges and nowhere mentions country conditions. Instead, it bars any review of "any" "determination" "with respect to" a TPS "termination." §1254a(b)(5)(A). The district court thought that the word "determination" referred to only certain kinds of decisions: "the substantive assessment of country conditions in reaching a decision whether to extend or terminate TPS," Op. 28. But it ignored that the text says what kinds of determinations it covers: *any* determinations—that is, determinations "of whatever kind," *Patel*, 596 U.S. at 338—*with*

---

[3] The district court also reasoned (Op. 30) that §1254a(b)(5)(A) was inapplicable because Plaintiffs asserted constitutional claims. But the court did not reach or grant relief on any constitutional claims. Op. 69. That non-sequitur provides no basis to ignore Congress's judicial review bar as to claims where it clearly applies.

*respect to* TPS terminations. The district court rendered those broadening terms superfluous. *See Patel*, 596 U.S. at 338. It would also create a bizarre loophole wherein the Secretary's rationale for an "extension" is unreviewable, but the Secretary's rationale for vacating that same extension would be subject to full arbitrary-and-capricious review. Nothing in the statutory text supports such a disparity.

In short, Congress clearly and convincingly precluded any review here. And to have any meaning, judicial bars must apply even where the challenging party believes an action is unlawful. *See Garland v. Aleman Gonzales*, 596 U.S. 543, 552-53 (2022); *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562 (2025) ("When a court concludes that the Executive Branch has acted unlawfully, the answer is not for the court to exceed its power, too."). The district court erred in concluding otherwise; the government is likely to prevail on this ground on appeal; and the district court's decision should therefore be stayed pending appeal (just as the Supreme Court concluded).

## B. The Secretary Has Inherent Authority to Reconsider Past Actions.

Even if this Court concludes that §1254a(b)(5)(A) allows judicial review of the Secretary's vacatur authority, the district court's order will be reversed on appeal because its rationale—that the Secretary lacks inherent authority to reconsider Venezuela's TPS extension—is flawed.

Statutory authorization to issue a benefit "must be understood as carrying with it an implied incidental authority" to revoke the benefit, *China Unicom (Ams.) Ops. Ltd. v. FCC*, 124 F.4th 1128, 1143 (9th Cir. 2024), especially because the TPS statute gives

10

the Secretary discretion over both the length of a TPS designation and the timing of periodic review. *See* §1254a(b)(3)(A)-(C); *Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (collecting cases and explaining that "administrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion.").

Here, Secretary Noem promptly reconsidered Secretary Mayorkas's last-minute TPS extension for Venezuela—less than two weeks later—and did so months before the extension's effective date of April 3, 2025. This was a classic exercise of an agency's inherent power to reconsider past decisions. Underscoring the point, the Executive Branch—including Secretary Mayorkas—has long understood the Secretary's power to implement the TPS program to include the power to reconsider decisions. *See Reconsideration and Rescission of Termination of the Designation of El Salvador for [TPS]*, 88 Fed. Reg. 40,282, 40,285 & n.16 (June 21, 2023). In revisiting the Trump administration's previous termination decisions, Secretary Mayorkas likewise invoked the agency's "inherent (that is, statutory implicit) authority to revisit its prior decisions."). *Id.* at 40,285.

Contrary to the district court's reasoning (Op. 40-41), nothing in the TPS statute forecloses this inherent reconsideration authority. Section 1254a(b)(3)(B) speaks only to "termination of [a] designation" that is in effect. 8 U.S.C. 1254a(b)(3)(B). When a Secretary terminates an existing designation, the statute species that her action "shall not be effective earlier than 60 days after the date the notice is published, or, if later,

11

the expiration of the most recent previous extension." *Id.* (emphasis added). The statute says nothing about whether or how a Secretary can vacate an extension (or designation) that has not yet taken effect. The Secretary therefore appropriately relied on her inherent, undisturbed authority to vacate Secretary Mayorkas's extension before its April 3, 2025, effective date. *See* 90 Fed. Reg. at 8806. The district court's contrary view, meanwhile, would instead reward gamesmanship with a one-way ratchet: Earlier administrations could preemptively extend or terminate TPS and tie the hands of any incoming administration, which (under plaintiffs' view) would be unable to undo those actions for more than a year even if the actions did not take legal effect until months into the new administration.[4] The statute does not require that result and a stay is warranted.

## C.   The District Court's APA Analysis Is Erroneous.

Even putting aside §1254a(b)(5)(A) aside, the district court's APA analysis will not survive appeal. To begin, the district court (Op. 34-36) erroneously concluded that it had jurisdiction to review and second-guess whether a TPS termination is in the "national interest" of the United States. 5 U.S.C. §701(a)(2). Even apart from the

---

[4] For purposes of seeking a stay, the government does not address whether the Secretary lacks authority to revoke already-issued TPS documents because the Supreme Court has concluded that a stay pending appeal in favor of the government is appropriate and would not prejudice the rights of individuals to challenge the Secretary's vacatur "insofar as it purports to invalidate EADs, Forms I-797, Notices of Action, and Forms I-94 issued with October 2, 2026 expiration dates." *NTPSA I*, 2025 WL 1427560 at *1; Op. 42-43.

judicial review bar, this question is not subject to APA review because there is no judicially manageable standard to review it. §1252(a)(2)(B)(ii); *see Poursina v. USCIS*, 936 F.3d 868, 872 (9th Cir. 2019) ("[T]he invocation of 'national interest' is a core example of a consideration that lacks a judicially manageable standard."). Here, the Secretary made a public-interest determination for Venezuela, *requiring* her to terminate TPS. §1254a(b)(1)(C), (b)(3)(B); *see* Op. 36 (noting that Plaintiffs failed to challenge the Secretary's national interest determination).

In all events, the district court's decision lacks merit because "[j]udicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). There is nothing improper about Secretary Noem's prompt vacatur of Secretary's Mayorkas's consolidation and extension of Venezuela's TPS. *See* Op. 47-49, 55-56, 57-58. "A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part). And "a court may not set aside an agency's policymaking decision solely because it may have been … prompted by Administration priorities." *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019). The Secretary was not required to consult with country conditions experts (Op. 47-48, 50-52) to make a threshold vacatur determination which would *enable* her

13

to make a reasoned decision about the proper length of any extension of TPS for Venezuela.

Relying on an extra-record GAO report, the district court (Op. 44-46, 51-52) also impermissibly substituted its preference for TPS extensions for Secretary Noem's goal of ensuring that TPS aligns with its *temporary* purpose. *See FCC*, 592 U.S. at 423; *see also* §1254a(b)(3)(A). A GAO report is not law, and it does not bind agencies to use policy processes forever. The district court never identified any statutory criteria relevant to TPS consolidations or extensions that the Secretary overlooked. And although the district court erroneously concluded (Op. 50-51) that inadequate consultation occurred, the Secretary's TPS terminations rested on reasoned decision making based on her review of relevant country conditions evidence. Dkt. 103 (Venezuela record). Thus, most fundamentally, the district court violated the settled principle that judges are not "free to impose additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel." *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021).

Finally, the district court's conclusion (Op. 46-47) that the 2025 Vacatur is impermissible due to the failure to account for alternatives short of termination was erroneous. The Secretary explained that the decision to vacate provided "an opportunity for informed determinations regarding the TPS designations and clear guidance." 90 Fed. Reg. at 8,807 (citing E.O. 14159). Thus, deconsolidating the re-registration periods is not an available alternative because it would not meet the

14

vacatur's stated objectives.  The Secretary's vacatur of Venezuela's 2023 TPS extension complied with the statute, was issued in accordance with her authority to reconsider a prior determination, and was consistent with her continuing obligations to safeguard the border and national security and to administer and enforce the immigration laws.

### D.    Section 1252(f)(1) Also Precludes The District Court's Order.

The district court's judgment also violates the specific restrictions on relief found in §1252(f)(1).  There, Congress provided that

> [r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 [(IIRIRA)], other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

§1252(f)(1).  Accordingly, the Supreme Court has explained that §1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 596 U.S. at 550.

As this Court recognized, *National TPS Alliance*, 2025 WL 2487771, at *11, the TPS statute is a covered provision because Congress placed it in in Chapter 4 of Title II of the INA—the chapter covered by §1252(f)(1).  IIRIRA, div. C, Pub. L. No. 104-208, §§306, 308, 110 Stat. 3009-546; *see Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022) ("[T]he text of the United States Code cannot prevail over the Statutes at Large when

15

the two are inconsistent.") (cleaned up).  And it is undisputed that the district court's sweeping order falls outside §1252(f)(1)'s "individual proceedings" exception.

The district court's reasoning that a vacatur order is different from an injunction missed the key point: §1252(f)(1) is not limited to injunctions, but instead also prohibits orders that "restrain" the Executive Branch's operation of covered provisions even if it does not "enjoin" the Executive.  Op. 32-33.  The district court's vacatur judgment undoubtedly "interfere[s] with the Government's efforts to operate" the TPS statute, so that judgment was barred by §1252(f)(1).  *Aleman Gonzalez*, 596 U.S. at 550-54; *see United States v. Texas*, 599 U.S. 670, 690-701 (2023) (Gorsuch, J., concurring) (agreeing that a district court cannot use vacatur under 5 U.S.C. §706 to "sidestep" §1252(f)(1)); *accord Black's Law Dictionary* 1314 (defining "[r]estrain" as meaning to "limit" or "put compulsion upon") (emphasis omitted).  The district court never addressed that language.[5]

To evade §1252(f)(1), the district court (Op. 30-34) relied on this Court's decision in *Nat'l TPS All.*, 2025 WL 2487771, at *11, affirming the district court's postponement, and *Immigrant Defenders v. Noem*, 145 F.4th 972, 989-90 (9th Cir. 2025), *reh'g petition filed* (Aug. 7, 2025).  But a stay-stage decision does not control here.  *See E. Bay v. Biden*, 993

---

[5] In seeking an immediate enforcement order in the district court, Plaintiffs conceded that the district court's order under 5 U.S.C. §706 operates as an injunction. Ex. 3, Pl. Mot. to Enfor. Reply at 3-4 (Sept. 11, 2025).  Plaintiffs' position—that a §706 order has injunctive effects that restrains the TPS statute only when it benefits them—is illogical.

F.3d 640, 660 (9th Cir. 2021).  Those decisions addressed orders issued under §705, not §706.  And the pre-*Aleman Gonzalez* decisions the Court relied upon in *Nat'l TPS Alliance* did not survive *Aleman Gonzalez*, which held that §1252(f)(1)'s applicability is not "dependent upon the merits of the claim," and it applies even if "the Government was misinterpreting and misapplying a covered statutory provision" so that it acted without statutory authority.  596 U.S. at 554; *see also Al Otro Lado v. EOIR*, 138 F.4th 1102, 1125 (9th Cir. 2025) ("[A]n injunction is barred even if a court determines that the Government's 'operation' of a covered provision is unlawful or incorrect."), *cert. petition docketed* (July 1, 2025) (No. 25-5).

In short, a stay pending appeal is warranted because Congress barred inferior courts from enjoining or restraining the operation of the TPS statute.  §1252(f)(1); *Aleman Gonzalez*, 596 U.S. at 550-54.

## II.    The Equitable Factors Favor a Stay Pending Appeal.

The remaining factors favor a stay, too, as the Supreme Court concluded in this case just a few months ago.  *See Nken*, 556 U.S. at 435.  Most fundamentally, in granting a stay, the Supreme Court has already concluded that the Government's equities warrant a stay pending appeal here.  *NTPSA I*, 2025 WL 1427560 at *1.  That is because the government and public share an interest in ensuring adherence to the process established by Congress, under which the Secretary has unreviewable authority over TPS designations.  *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted

17

by representatives of its people, it suffers a form of irreparable injury.").  The Supreme Court's conclusion as to the equities in *NTPSA I* controls here.  *Boyle*, 145 S. Ct. at 2654.

Indeed, no court of appeals has allowed a district court to interfere with the Secretary's TPS authority since the Supreme Court's decision.  *See* Dkt. No. 19, *Nat'l TPS All.*, No. 25-4901 (9th Cir. Aug. 20, 2025) (granting a government stay pending appeal); *CASA Inc.*, 2025 WL 2028397 at *1 (denying Plaintiffs' motion for postponement pending appeal).  This court should not be the first in the very case in which the Supreme Court already issued a stay.  *Cf. DHS v. D.V.D.*, 145 S. Ct. 2627, 2630 (2025) (Kagan, J. concurring in the stay of a district court's order) ("I do not see how a district court can compel compliance with an order that this Court has stayed.").

Declining to issue a stay would result in "an improper intrusion by a federal court into the workings of a coordinate branch of the Government."  *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers).  Here, the harm to the government is especially acute: The Secretary determined that an extension of the 2023 TPS designation would harm "national security" and "public safety," imperil the United States' foreign policy interests, and strain police stations, city shelters, and aid services in local communities that had reached a breaking point.  90 Fed. Reg. at 9044.  Permitting these TPS designations to continue would override the Secretary's considered judgment that TPS must be terminated because there is not a "substantial, but temporary, disruption of living conditions" that prevent aliens from returning to those countries. §1254a(b)(3)(B).

18

Plaintiffs maintain that termination could lead to the loss of employment or health benefits, possible removal, and family separation.  But the end of TPS's inherently *temporary* protection is not equivalent to a removal order, and the loss of associated benefits is inherent in the temporary status Congress crafted.  *See Sagana v. Tenorio*, 384 F.3d 731, 743 (9th Cir. 2004) (rejecting due-process challenge to temporary worker program).  Moreover, "removal alone cannot constitute the requisite irreparable injury" to justify a stay and the possibility of family separation is an unfortunate possible consequence of *any* removal proceeding, as aliens have no constitutional right to live in the United States.  *Nken*, 556 U.S. at 435; *see Dep't of State v. Munoz*, 602 U.S. 899, 915-16 (2024) ("it is a fallacy to leap … to the conclusion that United States citizens have a fundamental right that can limit how Congress exercises the Nation's sovereign power to admit or exclude foreigners.") (cleaned up).  Where it has deemed it appropriate, Congress has crafted alternative immigration remedies.  Plaintiffs cannot substitute their preference for the judgments of Congress and the Executive that TPS must be temporary.

## III.   At Minimum, the District Court's Chosen Relief Was Overbroad.

The universal scope of the district court's order (Op. 63-68) was also impermissible.  In imposing universal relief (Op. 63-68), the district court cited no binding authority for the proposition that universal vacatur is the "default remedy" for

19

unlawful agency action under 5 U.S.C. §706(2). That remedy is inconsistent with the APA's text, structure, and history.

5 U.S.C. §706(2) provides that a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions" found to be unlawful. But the term "set aside" in subsection §706(2) does not pertain to remedies at all. Instead, it has historically encompassed "put[ting] to one side" or "reject[ing] from consideration." *See, e.g.*, *Webster's New International Dictionary of the English Language* 2291 (2d ed. 1958); *accord* Act of Aug. 24, 1937, ch. 754, §50 Stat. 752-753; *Massachusetts v. Mellon*, 549 U.S. 447, 488 (1923); *Mallinckrodt Chem. Works v. Missouri ex rel. Jones*, 238 U.S. 41, 54 (1915). Statutory context confirms that reading, as 5 U.S.C. §703 points *outside* the APA for the available remedies, specifying that "[t]he form of proceeding" is a traditional "form of legal action," such as "actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." There is no reason to think that, after "nodd[ing] to traditional standing rules and remedial principles" in Section 703, "Congress proceeded just a few paragraphs later to plow right through those rules and empower a single judge to award a novel form of relief affecting parties and nonparties alike." *Texas*, 599 U.S. at 698 (Gorsuch, J., concurring). And the legislative history likewise confirms that §706 was not intended to create a novel remedy like universal vacatur. *See, e.g.*, APA, S. Doc. No. 248, 79th Con., 2d Sess. 36-37 (1946 (referring to governing remedies); 92 Con. Rec. 2159 (1946) (same); S. Rep. No. 752, 79th Cong.,

1st Sess. 27 (1945) (Senate Report) (omitting any commentary as to "set aside"); H.R. Rep. No 1980, 79th Cong., 2d Sess. 44 (1946) (same).

The Supreme Court has already held that "universal injunctions" are unlawful because that relief was unavailable at the founding and "falls outside the bounds of a federal court's equitable authority under the Judiciary Act [of 1789]." *CASA*, 145 S. Ct. at 2554. Universal vacatur similarly falls outside of what is authorized by the APA.

## CONCLUSION

The Court should grant an immediate administrative stay and, ultimately, a stay pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

WILLIAM H. WEILAND
*Acting Assistant Director*

/s/ Jeffrey M. Hartman
JEFFREY M. HARTMAN
ERIC SNYDERMAN
LAUREN BRYANT
CATHERINE ROSS
LUZ MARIA RESTREPO
*Trial Attorneys*
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4404
Email: Jeffrey.M.Hartman@usdoj.gov

22

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 27, I certify that the text of this motion is in double-spaced, proportionally spaced 14-point Garamond type, and the motion contains 5,321 words in compliance with Ninth Circuit Rule 27-1(d).

/s/ Jeffrey M. Hartman
JEFFREY M. HARTMAN
Trial Attorney
Office of Immigration Litigation
Dated: September 12, 2025        Attorney for Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2025, counsel for Appellants electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system and that service will be accomplished via the ACMS system.

/s/ Jeffrey M. Hartman
JEFFREY M. HARTMAN
Trial Attorney
Office of Immigration Litigation
Attorney for Appellants

**EXHIBIT 1**

District Court Decision (Sept. 5, 2025)

1

2

3

4                    UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7    NATIONAL TPS ALLIANCE, et al.,              Case No.  25-cv-01766-EMC

8                    Plaintiffs,
                                                 **ORDER GRANTING PLAINTIFFS'**
9            v.                                  **MOTION FOR SUMMARY**
                                                 **JUDGMENT AND DENYING**
10   KRISTI NOEM, et al.,                        **DEFENDANTS' MOTION FOR**
                                                 **SUMMARY JUDGMENT; AND**
11                   Defendants.                 **DENYING DEFENDANTS' MOTIONS**
                                                 **TO DISMISS**
12

13                                               Docket Nos. 122, 165, 199, 172, 262

14

15          At issue in this case are the rights of hundreds of thousands of nationals from Venezuela

16   and Haiti who temporarily reside legally in the United States under a law passed by Congress in

17   1990.  That law, the Temporary Protected Status ("TPS") statute, affords temporary relief to

18   nationals from designated countries who cannot safely return to their home countries due to

19   extraordinary and temporary conditions such as armed conflict, earthquakes, floods, drought, and

20   epidemics.  For 35 years, the TPS statute has been faithfully executed by presidential

21   administrations from both parties, affording relief based on the best available information obtained

22   by the Department of Homeland Security ("DHS") in consultation with the State Department and

23   other agencies, a process that involves careful study and analysis.  Until now.  This case arose

24   from action taken post haste by the current DHS Secretary, Kristi Noem, to revoke the legal status

25   of Venezuelen and Haitian TPS holders, sending them back to conditions that are so dangerous

26   that even the State Department advises against travel to their home countries.  The Secretary's

27   action in revoking TPS was not only unprecedented in the manner and speed in which it was taken

28   but also violatates the law.  For the reasons explained below, the Court find that the Secretary's

1    actions in vacating the orders of the prior administration and terminating TPS exceeded the

2    Secretary's statutory authority and was arbitrary and capricious, and thus must be set aside under

3    the Administrative Procedure Act ("APA").

4    **I.**      <u>**INTRODUCTION**</u>

5        In 1990, Congress enacted the TPS statute, codified at 8 U.S.C. § 1254a, to bring

6    coherence, discpline, and predicatability to the extended voluraty departure process that existed

7    prior to 1990. *See National TPS Alliance v. Noem*, No. 25-2120, 2025 U.S. App. LEXIS 22269, at

8    *10 (9th Cir. Aug. 29, 2025) [hereinafter *NTPSA*] (emphasizing that "Congress designed a system

9    of temporary status that was predictable, dependable, and insulated from electoral politics"). Prior

10    to 1990, extended voluntary departure was "the primary mechanism by which the federal

11    government allowed groups of nationals to remain in the United States for humanitarian reasons."

12    *Ramos v. Wolf*, 975 F.3d 872, 879 (9th Cir. 2020), *vacated for rehearing en banc*, 59 F.4th 1010

13    (9th Cir. 2023); *see also NTPSA*, 2025 U.S. App. LEXIS 22269, at *11 (noting that, for about

14    three decades before the enactment of the TPS statute, "presidential administrations exercised

15    prosecutorial discretion to grant protection from deportation to certain groups of noncitizens on an

16    ad hoc basis," which was called extended voluntary departure). "Because administrations granted

17    [extended voluntary departure] on an *ad hoc* basis without 'any specific criterion or criteria,' the

18    practice led to arbitrary results and drew widespread criticism." *Ramos*, 975 F.3d at 879.

19    Accordingly, Congress prescribed in the TPS statute the criteria and the process that the Secretary

20    of DHS is to follow in deciding whether to designate a country for TPS, thus allowing residents of

21    such country to remain temporarily in the United States.[1] Congess specified the kind of country

22    conditions severe enough to warrant a designation under the statute. *See* 8 U.S.C. § 1254a(b)(1).

23    It also prescribed the specific time frame for any such designation. *See id.* § 1254a(b)(2). And it

24    prescribed with specificity the process for periodic review of a TPS designation, *i.e.*, whether to

25

---

26    [1] The TPS statute "originally provided the Attorney General with this authority," but, "[w]ith the
Homeland Security Act of 2002, the former Immigration and Naturalization Service was
27    transferred to the Department of Homeland Security, and the responsibiltiy for administering the
TPS was transferred from the Attorney General to the Secretary of DHS." *Ramos*, 975 F.3d at 879
28    n.1.

2

United States District Court
Northern District of California

United States District Court
Northern District of California

1    terminate or extend such a designation.  *See id.* § 1254a(b)(3).  Significantly, in both the original

2    designation and periodic review process, Congress expressly required the Secretary of DHS to

3    engage in "consultation with appropriate agencies."  *Id.* § 1254a(b)(1); *id.* § 1254a(b)(3)(A).

4          In view of the gravity of TPS decisions – which profoundly affect the lives of non-U.S.

5    citizens faced with the risk of dangerous or extraordinary conditions were they to return to their

6    home countries – past administrations have for years engaged in a methodical process to carry out

7    the TPS program.  This process, consistent with the express directive of the statute, has long

8    included consultation with agencies that have information and expertise on country conditions

9    which inform the designation criteria under the statute – agencies such the Department of State.

10   As described in a 2020 report prepared by the U.S. Government Accountability Office, which was

11   tasked with reviewing the TPS decisionmaking process, *see* MacLean Decl., Ex. 16 (GAO TPS

12   Rpt. at 18) (in reviewing the collection of information by DHS, taking into account "26 TPS

13   decisions for . . . eight selected countries"), DHS collects country conditions information from

14   both USCIS (an internal DHS agency) and the Department of State.  The State Department

15   process for collecting information in turn involves getting input from the relevant regional bureau

16   of the Bureau of Population, Refugees, and Migration, as well as from the relevant overseas post,

17   which has "on-the-ground" information on the country at issue.  As is evident from this brief

18   description, this process is deliberative and takes time.  *Cf.* 8 U.S.C. § 1254a(b)(3) (providing that

19   the Secretary shall conduct the periodic review "at least 60 days before end of the initial period of

20   designation, and any extended period of designation," which is "*after* consultation with

21   appropriate agencies") (emphasis added).

22         For the first time in the 35-year history of the TPS program, the Trump Administration and

23   DHS Secretary Noem took the extraordinary and unusual act of vacating TPS extensions that had

24   already been granted – specifically, extensions given by the prior administration to Venezuela and

25   Haiti.  *See NTPSA*, 2025 U.S. App. LEXIS 22269, at *54 (emphasizing that "the Government has

26   never, in the thirty-five-year history of TPS, sought to vacate a prior extension of TPS").  They did

27   so even though this action is not, as the Ninth Circuit has strongly indicated, statutorily authorized.

28   *See id.* at *39 (stating that "Plaintiffs are likely to succeed in their claim that Congress has

3

displaced any inherent revocation authority by explicitly providing the procedure by which a TPS designation is terminated").  And they did so so that they could then terminate the TPS designations on an unprecedentedly rapid timeline.  The decisionmaking process was highly truncated and condensed, taking place over a short period of time (in the case of Venezuela, just days) and, apparently, without the consultation of the appropriate agencies.

Specifically:

- In January 2025, days after the second Trump Administration took over, Secretary Noem vacated a TPS extension for Venezuela that had been given by her predecessor, Secretary Alejandro Mayorkas of the Biden Administration.  As discussed below, the decision to vacate the extension was made and steps towards implementation were put in place even before Secretary Noem took office.  No meaningful review process took place.  Days later, Secretary Noem terminated Venezuela's TPS designation.

- In February 2025, following on the heels of the Venezuela termination decision, Secretary Noem partially vacated a TPS extension/redesignation for Haiti that had been given by Secretary Mayorkas – shortening the TPS period from 18 to 12 months.  As discussed below, this decision appeared to be pre-ordained without any real review of whether there was a basis for vacatur.  Subsequently, in July 2025, Secretary Noem terminated the TPS designation for Haiti.

Plaintiffs have filed suit challenging each of the above decisions by Secretary Noem.  Plaintiffs allege that, in issuing her decisions, the Secretary violated both the APA and the Equal Protection Clause of the U.S. Constitution.

Now pending before the Court are several motions: (1) two motions to dismiss filed by the government; (2) Plaintiffs' motion for summary judgment on the APA claims only; and (3) the government's motion for summary judgment on both the APA and Equal Protection claims.  In addition, in conjunction with their summary judgment briefs, Plaintiffs have filed a motion to consider extra-record evidence.  Having considered the papers submitted as well as the oral argument of counsel, the Court hereby **GRANTS** Plaintiffs' motion to consider extra-record

4

1    evidence; **GRANTS** Plaintiffs' motion for summary judgment on the APA claims; **DENIES** the

2    government's motion for summary judgment on the APA and Equal Protection claims; and

3    **DENIES** the government's motions to dismiss.

## II.    BACKGROUND ON TPS

5        As part of the Immigration Act of 1990, Congress created the TPS program.  The TPS

6    program is a humanitarian program.  The governing statute is codified at 8 U.S.C. § 1254a.  Under

7    § 1254a,

8      [t]he [DHS Secretary], after consultation with the appropriate
     agencies of the Government, may designate any foreign state [for
9      TPS] only if

10     (A)   the [Secretary] finds that there is an ongoing armed conflict
         within the state and, due to such conflict, requiring the return
11          of aliens who are nationals of that state to that state (or to the
         part of the state) would pose a serious threat to their personal
12          safety;

13     (B)   the [Secretary] finds that –

14         (i)   there has been an earthquake, flood, drought,
            epidemic, or other environmental disaster in the state
15             resulting in a substantial, but temporary, disruption of
            living conditions in the area affected,
16         (ii)  the foreign state is unable, temporarily, to handle
            adequately the return to the state of aliens who are
17             nationals of the state, and
        (iii) the foreign state officially has requested designation
18             under this subparagraph; or

19     (C)   the [Secretary] finds that there exist extraordinary and
         temporary conditions in the foreign state that prevent aliens
20          who are nationals of the state from returning to the state in
         safety, unless the [Secretary] finds that permitting the aliens
21          to remain temporarily in the United States is contrary to the
         national interest of the United States.

22

23    8 U.S.C. § 1254a(b)(1).  The initial period of a TPS designation "is the period, specified by the

24    [Secretary], of not less than 6 months and not more than 18 months."  *Id.* § 1254a(b)(2).

25        Once a foreign country is designated for TPS, individuals from that country may apply for

26    immigration status.  If granted, they may not be removed from the United States; in addition, they

27    are given authorization to work in the United States.  *See id.* § 1254a(a)(1).

28        For individuals to become TPS holders, there are specific requirements that must be met.

United States District Court
Northern District of California

1    For example, an individual must have "been continuously physically present in the United States

2    since the effective date of the most recent designation of that [foreign] state." *Id.* §

3    1254a(c)(1)(A)(i). In addition, an individual must be "admissible as an immigrant." *Id.* §

4    1254a(c)(1)(A)(iii). An individual is not admissible if, *e.g.*, they have been convicted of certain

5    crimes (such as a crime involving moral turpitude or drugs) or are a member of a terrorist

6    organization. *See id.* § 1182(a)(2)-(3). Moreover, an individual is expressly deemed ineligible for

7    TPS if they have "been convicted of any felony or 2 or more misdemeanors committed in the

8    United States." *Id.* § 1254a(c)(2)(B). The Secretary "shall withdraw [TPS] granted to an alien . . .

9    if [the Secretary] finds that the alien was not in fact eligible for such status." *Id.* § 1254a(c)(3)(A).

10       After a foreign country has been designated for TPS, that designation is subject to periodic

11   review to determine if the designation should be terminated or extended. The TPS statute

12   provides as follows with respect to periodic review.

13           (A)    Periodic review

14           At least 60 days before end of the initial period of designation, and
             any extended period of designation, of a foreign state . . . under this
15           section the [Secretary of DHS], after consultation with appropriate
             agencies of the Government, shall review the conditions in the
16           foreign state . . . for which a designation is in effect under this
             subsection and shall determine whether the conditions for such
17           designation under this subsection continue to be met.

18   *Id.* § 1254a(b)(3).

19       The options of termination and extension are then described in the TPS statute as follows:

20           (B)    Termination of designation

21           If the [Secretary of DHS] determines under subparagraph (A) that a
             foreign state . . . no longer continues to meet the conditions for
22           designation under [§ 1254a(b)(1)], the [Secretary] shall terminate
             the designation by publishing notice in the Federal Register of the
23           determination under this subparagraph (including the basis for the
             determination). Such termination is effective in accordance with [§
24           1254a(d)(3)[2]], but shall not be effective earlier than 60 days after the

25       ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26   [2] Section 1254a(d)(3) provides:

27           If the [DHS Secretary] terminates the designation of a foreign state .
             . . under [§ 1254a(b)(3)(B)], such termination shall only apply to
28           documentation and authorization issued or renewed after the
             effective date of the publication of notice of the determination under

                                      6

United States District Court
Northern District of California

1    date the notice is published or, if later, the expiration of the most
     recent previous extension under [§ 1254a(b)(3)(C)].

2    (C)    Extension of designation

3    If the Attorney General does not determine under [§ 1254a(b)(3)(A)]
     that a foreign state . . . no longer meets the conditions for
4    designation under paragraph (1), the period of designation of the
     foreign state is extended for an additional period of 6 months (or, in
5    the discretion of the Attorney General, a period of 12 or 18 months).

6    *Id.*

7        There is no dispute that a country may be given more than one TPS designation.  A TPS

8    designation for a country that is already designated for TPS is called a redesignation.  When a

9    redesignation is given, that "'generally has the effect of expanding the pool of potential

10   beneficiaries to include individuals who came to the United States after the country was first

11   designated for TPS.'"  Docket No. 93 (Order at 5).

12       There is also no dispute about the general process that DHS has long followed when a TPS

13   designation is subject to periodic review.  In or about 2020, the U.S. Government Accountability

14   Office ("GAO") was asked to review the TPS decision-making process and, after reviewing

15   documentation and data related to TPS decisions and interviewing agency officials, published a

16   report titled "Temporary Protected Status, Steps taken to Inform and Communicate Secretary of

17   Homeland Security's Decisions."  *See* MacLean Decl., Ex. 6 (GAO TPS Rpt.).  As explained in

18   the GAO TPS Report, DHS's practice is to collect four documents to inform each TPS decision

19   (whether the initial designation or review of an existing designation):

20       (1)  a country conditions report compiled by USCIS (an agency within DHS);

21       (2) a memo with a recommendation from the USCIS Director to the DHS Secretary;

22       (3) a country conditions report compiled by the State Department; and

23       (4) a letter with a recommendation from the Secretary of State to the Secretary of DHS.

24

25                that subsection (or, at the [Secretary's] option, after such period
26                after the effective date of the determination as the [Secretary]
                  determines to be appropriate in order to provide for an orderly
27                transition).

28   8 U.S.C. § 1254a(d)(3).

United States District Court
Northern District of California

1    *See* GAO TPS Rpt. at 18.[3]  Each document is generally compiled as follows:

2    •   *USCIS country conditions report.*  The Office of Policy & Strategy ("OP&S") (a

3        division within USCIS) reaches out to the Refugee, Asylum, and International

4        Operations Directorate ("RAIO") (another division in USCIS) to get input on

5        country conditions.  RAIO prepares a country conditions report after collecting

6        information from, *e.g.*, other U.S. agencies, foreign governments, international

7        organizations, nongovernmental organizations, and news articles.  The country

8        conditions report is then given to OP&S.  *See* GAO TPS Rpt. at 20-22.

9    •   *State Department country conditions report and recommendation from the*

10       *Secretary of State to the DHS Secretary.*  USCIS reaches out to the State

11       Department's Bureau of Population, Refugees, and Migration ("PRM").  *See* GAO

12       TPS Rpt. at 21.  PRM asks the relevant regional bureau to communicate with the

13       overseas post to get information about country conditions.  The regional bureau has

14       a questionnaire on country conditions for the post to fill out, and the post provides

15       responses to the questionnaire, plus a recommendation, to the regional bureau.

16       Other agencies represented at the overseas post (*e.g.*, the U.S. Agency for

17       International Development) may also provide information to the post to include as

18       part of its input on country conditions.  After the regional bureau gets the

19       information from the post, it drafts a country conditions report and

20       recommendation and then works with PRM to compile a joint action memo.  PRM

21       provides the joint action memo, which includes a country conditions report, to the

22       Secretary of State.  After the Secretary of State determines what the State

23       Department will recommend, a final country conditions report and recommendation

24       letter is provided to the DHS Secretary and OP&S.  *See* GAO TPS Rpt. at 22-23.

25

26   _____

27   [3] *See also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) (describing the same
     general process).  The government provides no evidence suggesting the GAO TPS Report or
     *Ramos* was inaccurate.  It cites no instance, prior to the current Administration taking office,

28   where the general procedure of reviewing TPS deviated in any substantial way from that described
     by the GAO.

8

United States District Court
Northern District of California

- *USCIS recommendation to the DHS Secretary.* After USCIS receives the input from both RAIO and the State Department, USCIS finalizes its country conditions report and prepares a recommendation memo for the DHS Secretary. *See* GAO TPS Rpt. at 21.

Before the four documents above are given to the DHS Secretary, the documents are reviewed by other components within DHS as part of the standard departmental clearance process. This includes the Office of Strategy, Policy, and Plans; the Office of the General Counsel; and the Management Directorate. *See* GAO TPS Rpt. at 26. In addition, input from other agencies or other entities may be provided to the Secretary or USCIS. *See* GAO TPS Rpt. at 25 (providing as examples U.S. Customs and Border Protection, the Department of Defense, the Centers for Disease Control and Prevention, members of Congress, foreign government officials, and nongovernmental organizations).

Before making a final decision, the DHS Secretary may hold briefings or meetings on TPS reviews, both internally and externally (*e.g.*, with White House officials, foreign government officials, nongovernmental organizations, and advocacy groups). *See* GAO TPS Rpt. at 25-26.

Below is a flow chart from the GAO TPS Report that summarizes the above process.

/ / /



Figure 6: Information Collected for the Secretary of Homeland Security's Review for Initial or Existing Designation of Temporary Protected Status (TPS)

GAO TPS Rpt. at 20.

Finally, there is no dispute that a "key factor motivating Congress at the time of the passage of the TPS was the shortcomings of the Extended Voluntary Departure program," which "allowed the Executive to use its discretion to grant administrative stays of removal for nationals of designated countries." *Nat'l TPS Alliance v. Noem*, No. C-25-5687 TLT (N.D. Cal.) (Docket No. 73) (Order at 9); *see also NTPSA*, 2025 U.S. App. LEXIS 22269, at *13-14 (taking note of legislators' concern "about granting unbridled deference to the Executive branch in determining the country designations and time periods for relief" and the TPS statute's "explicit guidelines, specific procedural steps, and time limitations" that replaced the "prior ad hoc framework"); *Ramos*, 975 F.3d at 879 (noting that "[t]he impetus for the establishment of the TPS program stemmed from concerns with the 'extended voluntary departure' (EVD) process, which was the primary mechanism by which the federal government allowed groups of nationals to remain in the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    United States for humanitarian reasons prior to TPS"). "Because administrations granted EVD on

2    an *ad hoc* basis without 'any specific criterion or criteria,' the practice led to arbitrary results and

3    drew widespread criticism." *Id.*; *see also NTPSA v. Noem*, No. C-25-5687 TLT (Docket No. 73)

4    (Order at 9) (noting that "members of Congress were unhappy with the wide discretion EVD gave

5    to the executive and the arguably arbitrary standards for which EVD designation could be

6    withheld"). The point of the TPS statue was to bring coherence and discipline to the previous

7    process which was ad hoc and undisciplined.

8    ### III.    VACATUR AND TERMINATION DECISIONS FOR VENEZUELA

9    As noted above, Plaintiffs challenge two decisions made by Secretary Noem with respect

10   to Venezuela's TPS designation: (1) a decision to vacate and (2) a decision to terminate. As

11   demonstrated below, these decisions were made with incredible haste and without any meaningful

12   consultation with appropriate agencies. The relevant events leading up to those decisions are as

13   follows.

14   In **March 2021**, Secretary Mayorkas first designated Venezuela for TPS (the "2021 TPS

15   Designation" or "2021 Designation"). See Docket No. 93 (Order at 5). The 2021 Designation

16   was extended two times. The second extension gave TPS holders under the 2021 Designation

17   legal status and work authorization through September 10, 2025. *See* Docket No. 93 (Order at 5-

18   6).

19   In **October 2023**, Secretary Mayorkas redesignated Venezuela for TPS (the "2023 TPS

20   Designation" or "2023 Designation"). *See* Docket No. 93 (Order at 6). The redesignation gave

21   TPS holders under the 2023 Designation legal status and work authorization through April 2,

22   2025. "While the 2021 Designation allowed individuals who had been in the United States since

23   March 2021 to apply, [the 2023] [D]esignation . . . allowed individuals to apply if they had

24   continuously resided in the United States since July 31, 2023, and had continuously been

25   physically present since October 3, 2023." Docket No. 93 (Order at 6).

26   On **January 17, 2025**, shortly before the second Trump Administration was to begin,

27   Secretary Mayorkas extended the 2023 Designation by 18 months, through October 2, 2026. *See*

28   Docket No. 93 (Order at 7). In the extension, Secretary Mayorkas also streamlined the filing

                                                11

1    processes for the 2021 and 2023 Designations by consolidating them.  This meant that 2021 TPS

2    holders also had the opportunity to register and get the benefit of the same October 2, 2026, date.

3    *See* Docket No. 93 (Order at 7-8).

4          On **January 20, 2025**, President Trump began his second administration.  *See* Docket No.

5    93 (Order at 8).

6          Just four days later, on **January 24, 2025**, DHS began drafting the decision to vacate the

7    TPS extension that had been given by Secretary Mayorkas.  *See* Bansal Reply Decl., Ex. 1 (email)

8    ("We are drafting the TPS vacatur notice [for Venezuela] this evening.  We need some input from

9    you, especially operational matters related to TPS.  [¶] . . . Joseph Mazzara asked that we submit

10   the document to him by 1pm on Sunday [i.e., within two days].")[4]  The draft of the vacatur

11   decision was begun before Secretary Noem was confirmed as the DHS Secretary.

12         On **January 25, 2025**, Secretary Noem was confirmed.  That same day, the Office of

13   General Counsel within DHS stated that it was "not at all interested in revisiting the substance of

14   whether [the vacatur] should go forward."  Bansal Reply Decl., Ex. 2 (email).  In effect, the

15   decision to vacate was already made.

16         The following day, **January 26, 2025**, DHS began to prepare and/or circulate the decision

17   to *terminate* Venezuela's TPS.  *See* MacLean Decl., Ex. 5 (privilege log) (NTPSA-DHS 211); *see*

18   *also* Bansal Reply Decl., Ex. 7 11 (email, dated 1/27/2025) ("I created a shell for a termination

19   notice.  Can you start drafting?  (I'm going to work on the memo for the vacatur notice.)").  In

20   other words, even before the decision to vacate was finalized, DHS was preparing to terminate

21   Venezuela's TPS.  Furthermore, the draft on the termination decision was being prepared before

22   any country conditions analysis was conducted.  *See* Bansal Reply Decl., Ex. 15 (email)

23   (providing the "DOS [Department of State] country report" for Venezuela – one prepared in

24   September 2024 during the Biden Administration – on January 29, 2025, *i.e.*, three days after the

25   above email).

26

27   _____

28   [4] The email was from Christina McDonald, who appears to be part of the Office of General
     Counsel to, *inter alia*, Joseph Edlow.  At the time, Mr. Edlow was a Senior Advisor (nominated to
     be, and as of mid-July 2025, USCIS Director).  *See* Docket No. 132-1.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    On **January 27, 2025**, the vacatur decision was put into final form.  *See* MacLean Decl.,

2  Ex. 2 (email).

3    On **January 28, 2025**, Secretary Noem signed off on the vacatur decision.  *See* Docket No.

4  103-1 (ECF Page 5) (administrative record for vacatur); MacLean Decl., Ex. 3 (email); *see also*

5  MacLean Decl., Ex. 4 (DHS Clearance Record).  *That same day*, DHS staff was asked to "focus

6  on any improvements in Venezuela," implicitly to advance and support termination of

7  Venezuela's TPS.  *See* Bansal Reply Decl., Ex. 17 (email).

8    On **January 30, 2025**, DHS staff exchanged email indicating that it was urgent to finalize

9  the termination decision.  *See* MacLean Decl., Ex. 9 (email)[5]; *see also* Bansal Reply Decl., Ex. 14

10  (email) (in response to email noting upcoming publication of the vacatur notice in the Federal

11  Register, stating: "Great.  Where are we with [Venezuela] termination?").

12    On **January 31, 2025**, Secretary of State Rubio sent a one-and-a-half page letter to

13  Secretary Noem, recommending termination of TPS for Venezuela on the basis that "permitting

14  nationals of Venezuela to remain temporarily in the United States under 8 U.S.C. 1254a is

15  contrary to the national interest of the United States."  Docket No. 104-4 (ECF Page 75)

16  (administrative record for termination).  The letter stated in relevant part:

17       Under Executive Order 14150, "the foreign policy of the United
18       States shall champion core American interests and always put
         America and American citizens first."  Designating Venezuela under
19       8 U.S.C. 1254a(b)(l) does not champion core American interests or
         put America and American citizens first, therefore it is contrary to
20       the foreign policy and the national interest of the United States.

21       In particular, I have determined that the first priority of the foreign
         policy of the United States is that "we must curb mass migration and
22       secure our borders.  The State Department will no longer undertake
         any activities that facilitate or encourage mass migration.  Our
23       diplomatic relations with other countries, particularly in the Western
         Hemisphere, will prioritize securing America's borders, stopping
24       illegal and destabilizing migration, and negotiating the repatriation
         of illegal immigrants."

25       The designation of Venezuela under 8 U.S.C. 1254a(b)(l) facilitates
26       and encourages mass migration because it causes more than 600,000

27  _____

28  [5] The title of the email was: "VZ Draft FRN – Due by 3pm TODAY [*i.e.*, January 30, 2025]."
     One email, timestamped 4:21 p.m., stated: "For your viz, here is the version I am submitting to
     OGC now."

                                         13

> Venezuelan beneficiaries to remain in the United States.
>
> Moreover, organizations like the Venezuelan transnational criminal organization Tren De Aragua commit "campaigns of violence and terror in the United States and internationally" that "are extraordinarily violent, vicious," and "threaten the stability of the international order in the Western Hemisphere." Under Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, "it is the policy of the United States to ensure the total elimination of these organizations' presence in the United States and their ability to threaten the territory, safety, and security of the United States."

Docket No. 104-4 (ECF Pages 75-76). Secretary Rubio's letter did *not* address country conditions, nor did the State Department provide any country conditions report to USCIS.

Also on **January 31, 2025**, USCIS recommended termination to Secretary Noem. *See* Dichter Decl., Ex. 2 (memo). The memo stated in relevant part as follows:

> Conditions in Venezuela remain challenging, but notable improvements indicate that the conditions that precipitated the initial TPS designation no longer continue. Venezuela no longer continues to meet the statutory requirements for its TPS designation. As such, the statute requires that the TPS designation be terminated. Additionally, USCIS believes that it may be contrary to the national interest of the United States to permit Venezuelan TPS beneficiaries to remain in the United States. This determination differs from the [Department of State] recommendation [provided in September 2024, during the Biden Administration]. Given the noted criminal activity of some Venezuelan nationals, we recommend the Secretary terminate the TPS designation of Venezuela.

Dichter Decl., Ex. 2 (Memo at 5). The memo did *not* explain how USCIS could rely on the Biden Administration country conditions report – which led Secretary Mayorkas to *extend* TPS for Venezuela – to conclude that conditions had improved to such an extent that TPS should be terminated.

On **February 1, 2025** – just three days after Secretary Noem signed off on the vacatur decision – Secretary Noem signed off on the termination decision. *See* Docket No. 104-1 (administrative record for termination) (ECF Page 6).

On **February 3, 2025**, the vacatur decision was published in the Federal Register. *See* 90 Fed. Reg. 8805 (Feb. 3, 2025).

On **February 5, 2025**, the termination decision was published in the Federal Register. *See*

14

90 Fed. Reg. 9040 (Feb. 5, 2025). As a formal matter, only the 2023 Designation for Venezuela was terminated – specifically, as of April 7, 2025. The 2021 Designation was not terminated but will expire on September 10, 2025. As noted above, the termination of the 2023 Designation was possible at that time only because Secretary Noem had vacated the extension given by Secretary Mayorkas.

The reason for the vacatur of the extension was stated in the Federal Register as follows: "The Mayorkas Notice adopted a novel approach of implicitly negating the 2021 Venezuela TPS designation by effectively subsuming it within the 2023 Venezuela TPS designation." 90 Fed. Reg. at 8807.

> The Mayorkas Notice did not acknowledge the novelty of its approach or explain how it is consistent with the TPS statute. *See* INA 244(b)(2)(B), 8 U.S.C. 1254a(b)(2)(B) (providing that a TPS country designation "shall remain in effect until the effective date of the termination of the designation under [INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B)]"). This novel approach has included multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions happening in a single document. While the Mayorkas Notice may have made attempts to address these overlapping populations, the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, are thin and inadequately developed. Given these deficiencies and lack of clarity, vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance.

*Id.*

As for the termination of the 2023 Designation, the reason therefor was stated in the Federal Register as follows: "Overall, certain conditions for the 2023 TPS designation of Venezuela may continue; however, there are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned to their home country." 90 Fed. Reg. at 9042. But, "even assuming the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States." *Id.*

> [First,] TPS has allowed a significant population of inadmissible or illegal aliens without a path to lawful immigration status to settle in the interior of the United States, and the sheer numbers have

15

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

resulted in associated difficulties in local communities where local resources have been inadequate to meet the demands caused by increased numbers.  Among these Venezuelan nationals who have crossed into the United States are members of the Venezuelan gang known as Tren de Aragua.  Tren de Aragua has been blamed for sex trafficking, drug smuggling, police shootings, kidnappings, and the exploitation of migrants.  The United States has sanctioned the gang and placed it on a list of transnational criminal organizations.  In Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, the President determined that Tren de Aragua's campaign of violence and terror poses threats to the United States.  The Secretary accordingly has considered these important immigration and national interests in terminating the Venezuela parole process.

Second, President Trump observed, referring to CHNV [the parole program known as the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans"] and other policies and processes, that "[o]ver the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States," including millions who crossed U.S. borders or were allowed to fly to a U.S. airport of entry and allowed to settle in American communities.  The prolonged presence of these aliens in the United States "has cost taxpayers billions of dollars at the Federal, State, and local levels."  For example, over 180,000 illegal aliens have settled in New York City, approximating that this will cost the city $10.6 billion through the summer of 2025.  Additionally, although mayors from cities across the United States are attempting to accommodate Venezuelan illegal aliens, city shelters, police stations, and aid services are at a maximum capacity.

. . . .

Third, President Trump declared a national emergency at the southern border.  As the Attorney General and DHS have long understood, the potential "magnet effect" of a TPS determination is a permissible factor under the TPS statute, especially with respect to a redesignation.  The same is true for Venezuela. . . . Fourth, as the President directed in Executive Order 14150, "the foreign policy of the United States shall champion core American interests and always put America and American citizens first."  Continuing to permit Venezuelans under the 2023 TPS designation to remain in the United States does not champion core American interests or put American interests first.  U.S. foreign policy interests, particularly in the Western Hemisphere, are best served and protected by curtailing policies that facilitate or encourage illegal and destabilizing migration.

*Id.* at 9042-43.

The government has not submitted any evidence substantiating "there are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned to their home country."  And, as this Court found in its

16

1    postponement order, the government failed to provide any evidence that Venezuelan TPS holders

2    constitute a threat to national security.  *See* Docket No. 93 (Order at 41-44); *see also NTPSA*, 2025

3    U.S. App. LEXIS 22269, at *53 n.13 (in affirming postponement order, taking note of the absence

4    of evidence to support the government's claimed national security concerns).  Since that order, the

5    government has submitted zero additional evidence in this regard.

### IV.    VACATUR AND TERMINATION DECISIONS FOR HAITI

7         As with Venezuela's TPS, Plaintiffs challenge two decisions made by Secretary Noem

8    with respect to Haiti's TPS: (1) a decision to partially vacate and (2) a decision to terminate.  The

9    relevant events leading up to those decisions are as follows.

10        In **January 2010**, Haiti was first designated for TPS (based on an earthquake).  *See* 75

11   Fed. Reg. 3476 (Jan. 21, 2010).

12        Thereafter, through **2018**, Haiti's TPS was extended or there was a redesignation of its

13   TPS.  *See* Opp'n at 5 n.9 (identifying notices published in the Federal Register).

14        In **January 2018**, the first Trump Administration terminated the TPS designation for Haiti.

15   *See* 83 Fed. Reg. 2648 (Jan. 18, 2018).  However, the termination did not take effect because of

16   litigation that was brought thereafter challenging the termination.

17        In **August 2021**, following the assassination of the Haitian President, Haiti was given a

18   new TPS designation by the Biden Administration.  *See* 86 Fed. Reg. 41863 (Aug. 3, 2021).

19        In **January 2023**, Secretary Mayorkas extended and redesignated TPS for Haiti.  *See* 88

20   Fed. Reg. 5022 (Jan. 26, 2023).

21        In **July 2024**, Secretary Mayorkas again extended and redesignated TPS for Haiti.  Under

22   that decision, Haiti's TPS designation would last for 18 months, *i.e.*, until February 3, 2026.  *See*

23   89 Fed. Reg. 54484 (July 1, 2024).

24        Approximately six months later, on **January 20, 2025**, President Trump began his second

25   administration.

26        On **January 25, 2025**, Secretary Noem was confirmed as DHS Secretary.

27        On **February 7, 2025** – just two days after the Venezuela termination was published in the

28   Federal Register – DHS prepared and/or circulated a draft decision partially vacating Secretary

17

1   Mayorkas's most recent extension/redesignation of TPS for Haiti. See MacLean Decl., Ex. 6

2   (privilege log) (NTPSA-DHS 2112).

3          Approximately a week later, from **February 14-17, 2025**, high-level staff within DHS

4   signed off on the partial vacatur. See Docket No. 110-3 (ECF Page 27) (administrative record for

5   partial vacatur) (DHS Clearance Record).

6          On **February 18, 2025**, Secretary Noem approved the partial vacatur. See Docket No.

7   110-2 (ECF Page 6) (administrative record for partial vacatur).

8          On **February 20, 2025**, DHS issued a press release announcing the partial vacatur. See

9   MacLean Decl. ¶ 16 & Ex. 15 (press release). The language in the press release implicitly pointed

10  to an anticipated termination of Haiti's TPS, stating, e.g., that the partial vacatur was "part of

11  President Trump's promise to rescind policies that were magnets for illegal immigration and

12  inconsistent with the law"; that, "[f]or decades the TPS system has been exploited and abused";

13  and that, "[l]ast month, Secretary Noem similarly rescinded the previous administration's

14  Venezuela TPS extension." MacLean Decl., Ex. 15.

15         On **February 24, 2025**, the partial vacatur decision was published in the Federal Register.

16  Under the decision, the length of Haiti's TPS designation was shortened from 18 months to 12

17  months; i.e., the designation would now expire on August 3, 2025, instead of February 3, 2026.

18  See 90 Fed. Reg. 10511 (Feb. 24, 2025). Secretary Noem did not have the option of shortening

19  the designation to 6 months because that would have put the expiration date on February 3, 2025 –

20  a date that had already passed.

21         On **July 1, 2025**, Secretary Noem terminated the TPS designation for Haiti. See 90 Fed.

22  Reg. 28760 (July 1, 2025). Under that decision, Haiti's TPS designation will terminate on

23  September 2, 2025.

24         The reason for the partial vacatur of Secretary Mayorkas's extension/redesignation was

25  stated in the Federal Register as follows:

26              First, there is no discussion in the July 1, 2024, Federal Register
                notice of why the 18-month period was selected in lieu of a 6- or 12-
27              month period. Nor does the administrative record underlying the
                June 3, 2024, decision and July 1, 2024, notice bear any discussion
28              of why the 18-month period was chosen. Allowing aliens from a

                                          18

United States District Court
Northern District of California

1
2
3
4
5
6
7
8

given country, including aliens who entered the United States illegally or overstayed their authorized period of admission, to remain in the United States temporarily with employment authorization is an extraordinary act. Congress recognized the gravity of such action under the TPS statute by setting the default extension period at 6 months, underscoring the uniqueness of this authority, and limiting its own authority to enact legislation allowing TPS recipients to adjust to lawful permanent resident status. Accordingly, determinations of how long a new designation should remain in effect and whether to depart from the default six-month period for an extension of an existing designation should take into account important considerations relating to the purpose of the statute and specific country and country conditions at issue and should not rest alone on administrative convenience. Here, there was no explanation whatsoever of why the 18-month period was selected.

9
10
11
12
13
14
15
16
17
18
19

Second, and similarly, the July 1, 2024, notice is bereft of any justification of why permitting the ever-increasing population of Haitian TPS recipients, particularly those who entered the country unlawfully, to remain temporarily in the United States is not contrary to the U.S. national interest. The notice simply states that "it is not contrary to the national interest of the United States." The administrative record underlying Secretary Mayorkas' June 4, 2024, decision likewise lacks any discussion of the critical national interest criterion. Such conclusory determinations do not accord with the gravity of TPS decisions under the INA. "National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (e.g., potential nexus to criminal gang membership), national security, migration factors (e.g., pull factors), immigration policy (e.g., enforcement prerogatives), and economic considerations (e.g., adverse effects on U.S. workers, impact on U.S. communities). Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment, informed by her consultations with appropriate U.S. Government agencies.

20
21
22
23
24
25
26
27
28

Third, although the July 1, 2024, notice cites some country conditions reports that are relatively proximate to the June 4, 2024, decision, several others date back to early 2023, 2022, or even earlier. And certain sources upon which DHS relied indicated that significant developments were taking place in 2024 that might result in an improvement in conditions. For example, as stated in the July 1, 2024, Federal Register notice, the United Nations had recently authorized a Multinational Security Support (MSS) mission to deploy in Haiti in 2024 and support the Haitian National Police in capacity building, combatting gang violence, and provide security for critical infrastructure. The Department of State likewise underscored that significant development. Thus, both DHS and the Department of State contemplated the real possibility of an improvement in conditions with the deployment of the United Nations MSS mission, yet that important development was not expressly factored into the determination of the length of the extension and designation period.

19

United States District Court
Northern District of California

> Eighteen months is the maximum period of designation or extension
> authorized under the TPS statute.  Neither the 2021 new designation,
> the 2023 extension and new designation, nor the 2024 extension and
> new designation contained any discussion of national interest
> considerations or why the 18-month (vs. 6 or 12-month) periods
> were granted.  Given the protracted duration of the "extraordinary
> and temporary conditions"-based designation for Haiti, the absence
> of any meaningful appraisal of national interest factors or
> justification for the 18-month extension, and the fact that eligible
> Haitians were able to register for TPS under the July 1, 2024, notice
> for over seven months, the Secretary has determined that a 12-month
> period is warranted.  Abbreviating the period from 18 to 12 months
> will allow for a fresh review of country conditions in Haiti and of
> whether such conditions remain both "extraordinary" and
> "temporary," whether Haitian may return in safety, and whether it is
> contrary to the U.S. national interest to continue to permit the
> Haitian nationals to remain temporarily in the United States.

90 Fed. Reg. at 10513-14.  Other than this notice contained in the Federal Register, the

government has submitted no evidence about the "real possibility of an improvement in conditions

with the deployment of the United Nations MSS mission," or what has transpired in Haiti since

that deployment described nearly a year before, in July 2024.

As for the termination of Haiti's TPS, the reason given in the Federal Register was as

follows:

> President Trump clearly articulated policy imperatives bearing upon
> the national interest in his immigration and border-related executive
> orders and proclamations.  In Proclamation 10888 ''Guaranteeing
> the States Protection Against Invasion,'' President Trump
> emphasized that Congress has established a complex and
> comprehensive framework under the INA to regulate the entry and
> exit of aliens and goods across U.S. borders.  Under normal
> conditions, this framework supports national sovereignty by
> enabling the admission of aliens whose presence serves the national
> interest and excluding those who may pose risks to public health,
> safety, or national security.  However, in a high-volume border
> environment – particularly when the system is overwhelmed – this
> screening process can become ineffective.  Limited access to critical
> information and significant processing delays hinder the ability of
> federal officials to reliably assess the criminal histories or national
> security threats posed by aliens attempting to enter the U.S. illegally.
> As a result, public safety and national security risks are significantly
> heightened in such conditions.
>
> In Executive Order (E.O.) 14161 "Protecting the United States From
> Foreign Terrorists and Other National Security and Public Safety
> Threats," President Trump instructed the Secretary of State,
> Attorney General, Secretary of Homeland Security, and Director of
> National Intelligence to jointly submit to the President a report that
> identified countries throughout the world "for which vetting and

20

1   screening information is so deficient as to warrant a partial or full
2   suspension on the admission of nationals from those countries." In
    Proclamation "Restricting the Entry of Foreign Nationals to Protect
    the United States from Foreign Terrorists and Other National
3   Security and Public Safety Threats," President Trump determined to
    fully restrict and limit the entry of nationals from Haiti following his
4   review of the requested report. In support of this decision, President
    Trump outlined that "according to the overstay report, Haiti had a B-
5   1/B-2 visa overstay rate of 31.38 percent and an F, M, and J visa
    overstay rate of 25.05 percent . . . as is widely known, Haiti lacks a
6   central authority with sufficient availability and dissemination of
    law enforcement information necessary to ensure its nationals do not
7   undermine the national security of the United States."

8   . . . .

9   Prior to FY2025, U.S. Border Patrol recorded a consistent year-
    over-year increase in encounters with Haitian nationals: 56,596 in
10  FY2022, 163,781 in FY2023, and 220,798 in FY2024. . . . [A]
    report states: "the continuation of a devastating political,
11  environmental, social, and economic situation . . . in Haiti
    guarantees an unbroken chain migration, particularly to the United
12  States and Canada; and when combined with already heavy backlogs
    in processing resident status changes, a large and growing flow of
13  Haitians will persist." This pattern of large-scale irregular migration
    as a result of "pull factors" has continued for years. . . .

14  90 Fed. Reg. at 28762.

15      In addition to the above, the Secretary claimed that, per DHS records, "there are Haitian

16  nationals who are TPS recipients who have been the subject of administrative investigations for

17  fraud, public safety, and national security." *Id.* The Secretary called out gang members in

18  particular.

19  Widespread gang violence in Haiti is sustained by the country's lack
    of functional government authority. This breakdown in governance
20  directly impacts U.S. national security interests, particularly in the
    context of uncontrolled migration. As previously outlined, when
21  immigration flows exceed our capacity to properly vet aliens at the
    border, the risks are compounded by the inability to access reliable
22  law enforcement or security information from the alien's country of
    origin. The joint assessment by the Secretary of State, Secretary of
23  Homeland Security, and Director of National Intelligence has found
    that Haiti lacks a functioning central authority capable of
24  maintaining or sharing such critical information. Coupled with the
    serious threat posed by Haitian gangs – such as those designated by
25  the State Department as Foreign Terrorist Organizations –
    continuing TPS for Haiti is not in the national interest. This lack of
26  government control has not only destabilized Haiti internally but has
    also had direct consequences for U.S. public safety. Haitian gang
27  members have already been identified among those who have
    entered the United States and, in some cases, have been
28  apprehended by law enforcement for committing serious and violent

21

1    crimes.

2    *Id.*  Again, other that the notice itself, there is nothing else in the public record supporting its

3    stated reasons.

4    ## V.    PROCEDURAL BACKGROUND

5        Plaintiffs initiated this lawsuit on February 19, 2025.  *See* Docket No. 1 (complaint).  At

6    the time, Plaintiffs challenged only the vacatur and termination decisions that Secretary Noem had

7    made with respect to Venezuela.  (The Secretary had not yet made her vacatur and termination

8    decisions on Haiti.)  The following day, Plaintiffs moved to postpone the decisions on Venezuela

9    pursuant to § 705 of the APA.  *See* 5 U.S.C. § 705 ("On such conditions as may be required and to

10   the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary

11   and appropriate process to postpone the effective date of an agency action or to preserve status or

12   rights pending conclusion of the review proceedings.").

13       On March 31, 2025, this Court granted Plaintiffs' motion to postpone.  *See* Docket No. 93

14   (order).  The government promptly appealed the postponement order to the Ninth Circuit.  *See*

15   Docket No. 94 (notice of appeal).  After the Court denied the government's motion to stay the

16   postponement order pending appeal, *see* Docket No. 102 (order), the government sought a stay

17   from the Ninth Circuit.  The appellate court denied the request for a stay.  *See* Docket No. 113

18   (Order at 1) ("Appellants have not demonstrated that they will suffer irreparable harm absent a

19   stay.").

20       The government then sought relief from the Supreme Court.  On May 19, 2025, the

21   Supreme Court granted the government's request for a stay of the postponement order.  The

22   Supreme Court did not provide any specific rationale for its decision but did state that

23       [t]his order is without prejudice to any challenge to Secretary
          Noem's February 3, 2025 vacatur notice [on Venezuela] insofar as it
24        purports to invalidate EADs [employment authorization documents],
          Forms I-797, Notices of Action, and Forms I-94 issued with October
25        2, 2026 expiration dates [*i.e.*, the date provided for by Secretary
          Mayorkas's extension].  *See* 8 U.S.C. § 1254a(d)(3).[6]
26

27   ───────────────────────
     [6] Section 1254a(d)(3) provides in relevant part as follows: "If the [Secretary] terminates the
28   designation of a foreign state . . . under subsection (b)(3)(B), such termination shall only apply to
     documentation and authorization issued or renewed *after* the effective date of the publication of

United States District Court
Northern District of California

Based on the paragraph above, Plaintiffs filed with this Court a motion to preserve status and rights for certain Venezuelan TPS holders pursuant to § 705. The Court granted in part and denied in part the motion to preserve. The Court held that the Secretary had exceeded her authority when, on February 3, 2025 (as part of the vacatur decision), she effectively canceled TPS-related documentation that had *already* been issued based on Secretary Mayorkas's extension of Venezuela's TPS to October 2, 2026. *See* 90 Fed. Reg. 8805 (Feb. 3, 2025) (vacatur decision for Venezuela). The Court granted relief for "those Venezuelan TPS holders who received TPS-related documentation based on the Mayorkas extension anytime up to and including February 5, 2025 – when the Secretary published notice that the 2023 TPS Designation was being terminated." Docket No. 162 (Order at 10).

Meanwhile, on March 20, 2025, Plaintiffs had amended their complaint to include the partial vacatur decision on Haiti. *See* Docket No. 74 (FAC). This was about a week after a case was filed in the Eastern District of New York, also challenging the partial vacatur decision for Haiti. Several months later, on July 1, 2025, the New York court granted the plaintiffs' motions for summary judgment and for postponement of agency action. The court addressed only part of the plaintiffs' APA claims – *i.e.*, that the Secretary lacked the authority to vacate Secretary Mayorkas's extension/redesignation. The court did not adjudicate the constitutional claims asserted by the plaintiffs (based on the Due Process and Equal Protection Clauses). *See Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-cv-1464 (BMC), 2025 U.S. Dist. LEXIS 125511 (E.D.N.Y. July 1, 2025). Subsequently, the New York court entered a final judgment in favor of the plaintiffs, thus staying the partial vacatur decision on Haiti. *See Haitian Evang.*, No. 25-cv-1464 (BMC) (Docket No. 65) (final judgment).

On July 8, 2025, Plaintiffs filed an amended/supplemental complaint. This complaint added allegations and claims challenging Secretary Noem's decision to terminate Haiti's TPS.

Now pending before the Court are (1) two 12(b)(6) motions filed by the government and (2) two motions for summary judgment, one filed by each party. Both the motions to dismiss and

notice of the determination under that subsection . . . ." 8 U.S.C. § 1254a(d)(3) (emphasis added).

United States District Court
Northern District of California

1    the motions for summary judgment address the Venezuela vacatur and termination decisions.

2    Both the motions to dismiss and the motions for summary judgment also address the Haiti partial

3    vacatur decision.  Only one motion to dismiss addresses the Haiti termination decision.

4         The Court held a hearing on the above motions on August 1, 2025.  Subsequently, the

5    Court temporarily stayed adjudication of the motions because of the pending appeal of the

6    postponement order before the Ninth Circuit.  *See* Docket No. 276 (order).  On August 29, 2025,

7    the Ninth Circuit issued its decision.  The Ninth Circuit affirmed the Court's postponement order,

8    holding, *inter alia*, that it had jurisdiction to hear the appeal and that Plaintiffs were likely to

9    succeed on their claim that Secretary Noem lacked the authority to issue the Venezuela vacatur.

10   *See generally NTPSA*, 2025 U.S. App. LEXIS 22269.

## VI.    JURISDICTION

12        As noted above, pending before the Court are two motions to dismiss filed by the

13   government and two summary judgment motions, one filed by each party.  In both the 12(b)(6)

14   and summary judgment motions, the government argues that the Court lacks jurisdiction to

15   consider Plaintiffs' claims, whether brought under the APA or the Equal Protection Clause.  As it

16   did before (when opposing Plaintiffs' motion to postpone under § 705), the government argues

17   there are several jurisdictional bars to Plaintiffs' suit, including 8 U.S.C. § 1254a(b)(5)(A) and §

18   1252(f)(1).  The government also adds a new jurisdictional argument based on § 701(a)(2) of the

19   APA.  For the reasons stated below, the Court rejects each of the government's contentions that

20   jurisdiction is lacking.

21   A.    Section 1254a(b)(5)(A)

22        Section 1254a(b)(5)(A) is part of the TPS statute.  It provides as follows: "There is no

23   judicial review of any determination of the Attorney General with respect to the designation, or

24   termination or extension of a designation, of a foreign state under this subsection."  8 U.S.C. §

25   1254a(b)(5)(A).  The government argues that the vacatur and termination decisions, both for

26   Venezuela and Haiti, are subject to § 1254a(b)(5)(A).

27        The Court addressed this issue in its postponement order, holding that § 1254a(b)(5)(A) is

28

United States District Court
Northern District of California

1    not a bar to either Plaintiffs' APA claims or their Equal Protection claims.[7]  The Court's views

2    remain the same, particularly in light of the Ninth Circuit's ruling affirming the postponement

3    order.

4            First, as the panel herein held, there is a strong presumption of judicial review of agency

5    action.  *See NTPSA*, 2025 U.S. App. LEXIS 22269, at *29 (stating that "Courts strongly presume

6    that Congress intends judicial review of administrative actions"; also stating that the government's

7    claim that § 1254a(b)(5)(A) bars "substantial statutory and constitution claims is . . . extreme")

8    (internal quotation marks omitted); *see also* Docket No. 93 (Order at 24) (citing, *inter alia*, *KOLA,*

9    *Inc. v. United States*, 882 F.2d 361, 363 (9th Cir. 1980), and *Abbott Labs. v. Gardner*, 387 U.S.

10   136, 141 (1967)).  This presumption applies whether Plaintiffs have sought relief under the APA

11   or the Constitution.  As the panel decision herein noted, the presumption of judicial review is

12   particularly strong "[w]here, as here, [there is a] claim . . . that 'agency action [was] taken in

13   *excess* of delegated authority."  *NTPSA*, 2025 U.S. App. LEXIS 22269, at *29 (emphasis added).

14   Indeed, the panel underscored that barring judicial review where there is a claim that the Secretary

15   exceeded her authority would lead to absurd results.  *See id.* at *32 n.7 ("[H]olding that we lack

16   jurisdiction to review questions of statutory interpretation would make unreviewable a Secretary's

17   decision to authorize a statutorily prohibited thirty-year TPS period.").

18           Second, even if Secretary Noem did not exceed her statutory authority in deciding to

19   vacate, her decisions to vacate are still subject to judicial review because § 1254(a)(b)(A) bars

20   judicial review of substantive TPS decisions only.  As this Court noted in its postponement order,

21   "§ 1254a(b)(5)(A) was narrowly designed to bar judicial review of substantive country-specific

22   conditions in service of TPS designations, terminations, or extensions of a foreign state – not [*e.g.*]

23   judicial review of general procedures or collateral practices related to such."  Docket No. 93

24   (Order at 25) (citing, *inter alia*, *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991)

25   (individual denials on the merits were not challenged but rather the process under which denials

26

27   ───────────────
     [7] The Court's postponement order technically addressed only the vacatur and termination
     decisions for Venezuela.  However, the jurisdictional analysis is the same, whether Venezuela or

28   Haiti is at issue.

United States District Court
Northern District of California

1    were determined).  Courts have consistently held such, including the panel in *Ramos*, 975 F.3d at

2    872, *vacated for rehearing en banc*, 59 F.4th at 1010, and multiple district courts.  *See* Docket No.

3    93 (Order at 25-26) (citing decisions).  Judge Cogan of the Eastern District of New York recently

4    held the same as well.  *See Haitian Evangelical Clergy Ass'n*, No. 25-cv-1464 (BMC), 2025 U.S.

5    Dist. LEXIS 125511, at *16 (holding that § 1254a(b)(5)(A) "does not prevent courts from

6    reviewing and setting aside agency action that is procedurally deficient[;] . . . 'it is clear from

7    context that the judicial review provision in the TPS statute refers to an individual designation,

8    termination, or extension of a designation with respect to a particular country, not to Defendants'

9    determination practices or adoption of general policies or practices employed in making such

10   determinations'").  The challenge here is directed in the first instance to procedural actions taken

11   by the Secretary in vacating orders issued by the prior administration.

12          That is, Plaintiffs' challenge to the Secretary's vacatur decisions is based solely on

13   procedural arguments: that the Secretary did not have the authority, statutory or otherwise, to

14   vacate a prior extension of TPS and that her vacatur decision was arbitrary and capricious for

15   procedural reasons, *e.g.*, in failing to consult with the appropriate agencies.  These are matters

16   which are entirely collateral to the substantive decision to designate, extend, or terminate a

17   particular country's TPS based on statutory conditions.  *See* Docket No. 93 (Order at 24) (noting

18   that, even in the panel decision in *Ramos*, the Ninth Circuit held that "the scope of §

19   1254a(b)(5)(A)'s bar on judicial review was limited to 'inquiring into the underlying

20   considerations and reasoning employed by the Secretary in reach[ing] her country-specific TPS

21   determinations'[;] [i]t does not apply to, *e.g.*, a pattern or practice that is 'collateral to and distinct

22   from the specific [country] TPS decisions and their underlying rationale'").  Moreover, it is worth

23   noting that Secretary Noem's vacatur decisions themselves were based purely on procedural

24   concerns: for Venezuela, Secretary Noem criticized Secretary Mayorkas for, *e.g.*, taking a novel

25   approach and causing confusion, *see* Docket No. 93 (Order at 26); for Haiti, she criticized

26   Secretary Mayorkas for, *e.g.*, not explaining why he extended TPS for 18 months (as opposed to 6

27   or 12), not explaining why it was not contrary to the U.S. national interest to give an extension,

28

United States District Court
Northern District of California

1    and not explaining why he could rely on older country conditions reports.[8]

2            Third, the Secretary's termination decisions are subject to judicial review because

3    Plaintiffs are not challenging the *substance* of those decisions (based, *e.g.*, on an assessment of

4    country conditions) *per se*, but rather the *procedure* by which those decisions were reached.  For

5    example, Plaintiffs contend that the terminations were predicated on unlawful vacaturs; that, per

6    the text of the TPS statute, "national interest" is a consideration only at the time of the initial TPS

7    designation and not on periodic review; and that the Secretary failed to consult, meaningfully or

8    otherwise, with government agencies or conduct a meaningful country conditions review.

9            In its papers, the government largely makes the same arguments that it did previously in

10   conjunction with the postponement proceedings.  There is, in the motions now pending, one slight

11   variation.  Instead of focusing solely on the use of the word "any" in § 1254a(b)(5)(A), the

12   government now points to the use of the phrase "with respect to."  *See* 8 U.S.C. § 1254a(b)(5)(A)

13   ("There is no judicial review of any determination of the Attorney General *with respect to* the

14   designation, or termination or extension of a designation, of a foreign state under this subsection.")

15   (emphasis added).  The government emphasizes that the phrase "with respect to" has an expansive

16   meaning, similar to "related to."  *See, e.g.*, *Lamar, Archer & Cofrin LLP v. Appling*, 584 U.S. 709,

17   716-17 (2018) (considering the use of the term "respecting" in a bankruptcy statute; noting that,

18   "[a]s a matter of ordinary usage, 'respecting' means 'in view of: considering; with regard or

19   relation to: regarding; concerning,'" and "[u]se of the word 'respecting' in a legal context

20   generally has a broadening effect, ensuring that the scope of a provision covers not only its subject

21   but also matters relating to that subject").  According to the government, a vacatur is literally a

22   determination "with respect to" – *i.e.*, related to – an extension or designation since in this case, it

23   is a procedural predicate thereto.  The government notes that Congress could have used narrower

24   language in § 1254a(b)(5)(A) – *e.g.*, "[t]here is no judicial review of a determination to designate,

25   or terminate or extend" – but it did not.  *See* Docket No. 190 (Reply at 4) (omitting use of the

26

27   ――――――――――――――――

28   [8] As the Court stated in its postponement order, it is also clear that Plaintiffs' challenge to the
     vacatur decisions is collateral in nature based on the factors identified in *Mace v. Skinner*, 34 F.3d
     854 (9th Cir. 1994).  *See* Docket No. 93 (Order at 26-27).

1  phrase "with respect to").

2  The government's position gives short shrift to how the word "determination" or

3  "determine" is used in the TPS statute. When "determination" or "determine" is used in

4  connection with periodic review, the term describes the *substantive assessment of country*

5  *conditions in reaching a decision on whether to extend or terminate TPS*. For example:

6  - The provision on periodic review provides as follows: "Periodic review. At least

7  60 days before end of the initial period of designation, and any extended period of

8  designation, of a foreign state (or part thereof) under this section the [Secretary],

9  after consultation with appropriate agencies of the Government, shall review the

10  conditions in the foreign state (or part of such foreign state) for which a designation

11  is in effect under this subsection and shall **determine** whether the conditions for

12  such designation under this subsection continue to be met. The [Secretary] shall

13  provide on a timely basis for the publication of notice of each such **determination**

14  (including the basis for the determination, and, in the case of an affirmative

15  determination, the period of extension of designation under subparagraph (C)) in

16  the Federal Register." 8 U.S.C. § 1254a(b)(3)(A) (emphasis added).

17  - The provision on termination states: "Termination of designation. If the

18  [Secretary] **determines** under subparagraph (A) that a foreign state (or part of such

19  foreign state) no longer continues to meet the conditions for designation under

20  paragraph (1), the [Secretary] shall terminate the designation by publishing notice

21  in the Federal Register of the **determination** under this subparagraph (including

22  the basis for the determination). Such termination is effective in accordance with

23  subsection (d)(3), but shall not be effective earlier than 60 days after the date the

24  notice is published or, if later, the expiration of the most recent previous extension

25  under subparagraph (C). *Id.* § 1254a(b)(3)(B) (emphasis added).

26  - And the provision on extension states: "Extension of designation. If the [Secretary]

27  does not **determine** under subparagraph (A) that a foreign state (or part of such

28  foreign state) no longer meets the conditions for designation under paragraph (1),

28

1    the period of designation of the foreign state is extended for an additional period of

2    6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)." *Id.*

3    § 1254a(b)(3)(C) (emphasis added).

4    • Finally, the provision on the effective date of a termination provides: "Effective

5    date of terminations. If the [Secretary] terminates the designation of a foreign state

6    (or part of such foreign state) under subsection (b)(3)(B), such termination shall

7    only apply to documentation and authorization issued or renewed after the effective

8    date of the publication of notice of the **determination** under that subsection (or, at

9    the [Secretary's] option, after such period after the effective date of the

10   **determination** as the [Secretary] determines to be appropriate in order to provide

11   for an orderly transition." *Id.* § 1254a(d)(3) (emphasis added),

12        As reflected by the above, the term "determination" is used repeatedly to describe the

13   substantive TPS decision on the status of a given country based on the statutory criteria. *See also*

14   *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1102 (N.D. Cal. 2018) ("The statute does not define

15   'determination,' but it is evident from the statutory context that this provision refers to the

16   designation, termination, or extension of a country for TPS. The statute uses the word

17   'determines' or 'determination' in connection with the Secretary's initial designation, periodic

18   review, and termination of a TPS foreign-state designation."). So understood, the vacaturs at issue

19   here are not covered by § 1254a(b)(5)(A) because they did not render substantive TPS decisions

20   based on country conditions. A "decision to vacate is, literally and textually, not a 'designation, or

21   termination or extension of a designation, of a foreign state.'" Docket No. 93 (Order at 25)

22   (quoting § 1254a(b)(5)(A)). As noted above, the Secretary's vacaturs were based on *procedural*

23   concerns (allegedly, a use of a novel and confusing process or an insufficiently explained

24   extension by the prior administration).

25        The government suggests that this interpretation of "determination" makes the phrase

26   "with respect to" redundant. However, given context, it is clear that "with respect to" is simply a

27   connector – *i.e.*, the phrase simply points to what is being "determined." *See* 8 U.S.C. §

28   1254a(b)(5)(A) ("There is no judicial review of any determination of the Attorney General with

29

1  respect to the designation, or termination or extension of a designation, of a foreign state under

2  this subsection.").

3       The distinction between the propriety of judicial review of the Secretary's substantive

4  assessment of country conditions and judicial review of procedural errors makes common sense

5  and accords with the purpose and structure of the TPS statute.  To shield any procedural

6  nonconformity from any judicial review would undermine the purpose of the statute of imposing

7  coherence and discipline to the process.  Furthermore, under the government's position, there

8  could be no judicial review even if the government were to blatantly violate the statute, *e.g.*, by

9  granting an extension exceeding 18 months or failing to provide the minimum 60 days' notice of a

10  termination decision.  Each of these violations would, in the government's view, be "with respect

11  to" an extension of termination decision.  The government's interpretation of "with respect to" is

12  thus too sweeping.  In short, the purpose of § 1254a(b)(5)(A) is "not to render all aspects of the

13  TPS program unreviewable."  *NTPSA*, 2025 U.S. App. LEXIS 22269, at *32.

14       Finally, the Court notes that, to the extent Plaintiffs are asserting constitutional violations,

15  the presumption of judicial review is particularly strong.  *See* Docket No. 93 (Order at 27) (citing

16  *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 317 (D. Md. 2018)).

17       For the reasons previously stated in the postponement order and herein, § 1254a(b)(5)(A)

18  does not preclude judicial review of Plaintiffs' claims herein.

19  B.    <u>Section 1252(f)(1)</u>

20       Section 1252 is titled "Judicial review of orders of removal."  Section 1252(f) specifically

21  is titled "Limit on injunctive relief."  It provides in relevant part as follows:

22          In general.  Regardless of the nature of the action or claim or of the
        identity of the party or parties bringing the action, *no court (other*
23          *than the Supreme Court) shall have jurisdiction or authority to*
        *enjoin or restrain the operation of the provisions of chapter 4 of title*
24          *II [8 U.S.C. §§ 1221 et seq.], as amended by the Illegal Immigration*
        *Reform and Immigrant Responsibility Act of 1996*, other than with
25          respect to the application of such provisions to an individual alien
        against whom proceedings under such chapter have been initiated.
26

27  8 U.S.C. § 1252(f)(1) (emphasis added).

28       In its papers, the government makes some of the same arguments that it did previously.

United States District Court
Northern District of California

30

1   The government, however, now spends more time arguing that a vacatur order under §706 of the

2   APA would *functionally* be equivalent to an injunction is subject to § 1252(f)(1).  *See* Mot. at 13

3   ("Regardless of how Plaintiffs frame the relief sought, an order that would have the effect of

4   enjoining or restraining DHS's implementation of the TPS provisions in § 1254a, is

5   jurisdictionally barred under § 1252(f)(1)."); Docket No. 262 (Mot. at 14) (same).

6        The Court's postponement order addressed the government's attempt to equate an

7   injunction with an APA vacatur (*i.e.*, setting aside of agency action).  *See* Docket No. 93 (Order at

8   16-22).  The Court rejected the government's position, noting first that there is a strong

9   presumption of judicial review of agency action.  *See* Docket No. 93 (Order at 17).  The Court

10  then pointed out that every court to consider the issue (including the Fifth Circuit and multiple

11  district courts) had also rejected the government's position.  *See* Docket No. 93 (Order at 16, 18).

12  The Court expressed agreement with the Fifth Circuit's analysis that invalidation of agency action

13  is a less drastic remedy than an injunction because it does not compel nor restrain further agency

14  decision making.  *See* Docket No. 93 (Order at 18).  The Court also pointed out other differences

15  between a vacatur and an injunction: among other things, "[w]hile a court may only enter a

16  vacatur to re-establish the status quo absent the unlawful agency action, it has 'broad latitude in

17  fashioning equitable relief [through an injunction] when necessary to remedy an established

18  wrong.'"  Docket No. 93 (Order at 19).  Also, injunctions may apply not just to parties but also

19  nonparties (specifically, those who act in concert with parties), and both parties and nonparties

20  may be held in contempt for violating an injunction.  *See* Docket No. 93 (Order at 19).

21  Furthermore, injunctions may prohibit lawful conduct (not just unlawful conduct) and may evolve

22  and change over time.  *See* Docket No. 93 (Order at 20).  In short, there are material differences

23  between APA vacaturs and conventional injunctions.

24        Since the Court issued its postponement order, both the Supreme Court and Ninth Circuit

25  have issued decisions supporting the conclusion that there is a difference between injunctions and

26  vacaturs of agency action under the APA.  In *Trump v. CASA, Inc.*, 156 S. Ct. 2540 (2025), the

27  Supreme Court indicated in a footnote that its holding on nationwide or universal injunctions did

28  not resolve the distinct question of whether the APA authorizes courts to vacate federal agency

United States District Court
Northern District of California

action.  *See id.* at --- n.10 (stating that "[n]othing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action"; citing 5 U.S.C. §706(2) which authorizes courts to "'hold unlawful and set aside agency action'"); *see also Haitian Evangelical*, 2025 U.S. Dist. LEXIS 125511, at *20 (taking note of the same).

Following *Trump v. CASA*, the Ninth Circuit held in *Immigrant Defenders Law Center v. Noem*, No. 25-2581, 2025 U.S. App. LEXIS 17884 (9th Cir. July 18, 2025) [hereinafter *IDL*], that § 1252(f)(1) does not bar a court from staying agency action under § 705 of the APA.  The Ninth Circuit pointed out that, in *Biden v. Texas*, 597 U.S. 785 (2022), the Supreme Court stated that § 1252(f)(1) is narrow in scope.  *See IDL*, 2025 U.S. App. LEXIS 17884, at *26.  Furthermore, the court noted that the Supreme Court has "distinguished stays from injunctive relief":

> "When a court employs 'the extraordinary remedy of injunction,' it directs the conduct of a party, and does so with the backing of its full coercive powers." . . . A stay, by contrast, "achieves this result by temporarily suspending the source of authority to act – the order or judgment in question – not by directing an actor's conduct."  A stay "simply suspend[s] judicial alteration of the status quo.'"

*Id.* at *27 (also noting the Fifth Circuit's comment in *Texas v. United States*, 40 F.4th 205 (5th Cir. 2022), that vacatur is a less drastic remedy compared to an injunction).  The court also took into account that § 1252(f)(1) refers to injunctive relief only and

> makes no mention of stays nor other forms of relief under the APA.  Congress knows . . . how to limit relief under the APA in other statutory schemes such as the Magnuson-Stevens Act and the Clean Air Act.  *See Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 668 n.4 (D.C. Cir. 2016) ("The review provision of the Magnuson-Stevens Act also expressly makes § 705 of the APA 'not applicable.'" (quoting 16 U.S.C. § 1855(f)(1)(A)); *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 562 n.1 (D.C. Cir. 2015) (Kavanaugh, J., dissenting in part) ("The Clean Air Act expressly provides that several provisions of the APA – 5 U.S.C. § 553-557 and 706 – 'shall not, except as expressly provided in this subsection, apply . . . .'" (quoting 42 U.SC. § 7607(d)(1)).  Congress made no mentioning of limiting APA claims in § 1252(f)(1) and instead only explicitly limits injunctive relief.

United States District Court
Northern District of California

1    *Id.* at *27-28.[9]

2    Should there be any doubt, the Ninth Circuit, in its recent decision affirming this Court's

3    postponement order, reaffirmed its holding in *IDL*. *See NTPSA*, 2025 U.S. App. LEXIS 22269, at

4    *33-34 (pointing out that, in *IDL*, the Ninth Circuit "held that section 1252(f)(1) does not prohibit

5    relief in the form of a stay or postponement of agency action under the APA").

6    Though *IDL* technically addressed a stay of agency action under § 705, such a ruling as to

7    stays under § 705 applies equally, and indeed with even more force, to a final judgment of vacatur

8    setting aside agency action (whether under § 706 of the APA or another statute or law).  As

9    discussed in greater detail below, a vacatur under §706 is, if anything, less akin than postponement

10    under §705 to the equitable remedy of a preliminary injunction.  Hence, the holding of *IDL* and

11    the Ninth Circuit's decision in this case that § 1252(f)(1) does not bar relief applies *a fortiorari* to

12    vacaturs.  In sum, *IDL* and *NTPSA* constitute binding precedent on this Court – a point that the

13    government conceded at the hearing with respect to *IDL*.[10]  Accordingly, the Court holds that §

14    _____

15    [9] In this regard, it is worth noting that § 1252(f)(1) was enacted well after § 706 of the APA,
      which provides for the setting aside of agency action. *See Garland v. Gonzalez*, 596 U.S. 543, 562

16    (2022) (noting that Congress enacted § 1252(f)(1) in 1996); 80 Stat. 378, 392-93 (1966) reflecting
      addition of § 706 of the APA in 1966).  If Congress had intended § 1252(f) to bar a vacatur of

17    agency action under § 706, it could easily have used language to that effect, but it did not do so,
      instead limiting the reach of the statute to injunctive relief only.

18    [10] In its papers, the government cited to *Abberdeen & Rockfish R.R. v. Students Challenging*

19    *Regulatory Agency Procs.*, 422 U.S. 289 (1975), in support of its position, but that case is
      distinguishable.  There, the issue was whether the Supreme Court had jurisdiction over an appeal

20    based on 28 U.S.C. § 1253, which allows for an appeal of a preliminary or permanent injunction.
      The Supreme Court found that the lower court had issued an injunction because the agency (the

21    Interstate Commerce Commission) had been directed to perform certain acts.  *See id.* at 307-08.
      That is not the situation here.  Although there was language in *Aberdeen* that suggested the

22    Supreme Court read § 1253 broadly to afford appellate jurisdiction, *see id.* at 308 n.11, § 1253 is
      not at issue in the case at bar.  More on point is the more recent decision in *Monsanto Co. v.*

23    *Geertson Seed Farms*, 561 U.S. 139 (2010), which this Court cited in its postponement order.
      There, the Supreme Court stated that

24                [a]n injunction is a drastic and extraordinary remedy, which should
                  not be granted as a matter of course.  If a less drastic remedy (*such*

25                *as partial or complete vacatur* of APHIS's deregulation decision)
                  was sufficient to redress respondents' injury, no recourse to the

26                additional and extraordinary relief of an injunction was warranted.

27    *Id.* at 165-66 (emphasis added).  *Monsanto* thus makes a distinction between an injunction and a
      vacatur (or set aside), a distinction now crystalized in the Ninth Circuit's decision in *IDL*.

28

33

1     1252(f)(1), which limits injunctive relief in some circumstances,[11] does not preclude this Court

2     from ordering a vacatur setting aside of agency action under the APA.

3          Even if a court were to disagree with *IDL* and find that § 1252(f)(1) could limit review of

4     actions under §§ 705 and 706 of the APA, § 1252(f)(1)'s reach would not bar Plaintiffs' suit in its

5     entirety.  Rather, as recognized by the Ninth Circuit in its recent decision affirming this Court's

6     postponement order, § 1252(f)(1) has no impact on Plaintiffs' claim that the Secretary's actions

7     exceeded her statutory authority.  *See NTPSA*, 2025 U.S. App. LEXIS 22269, at *34 (stating that,

8     "even if the district court's [postponement] order does 'enjoin or restrain,' it is not barred by

9     section 1252(f)(1) if it affects only agency actions that exceed the agency's statutory authority").

10    C.     Section 701(a)(2)

11         In moving for summary judgment, the government makes a new jurisdictional argument

12    based on § 701(a)(2) of the APA.  The full text of § 701(a) is as follows:

> This chapter applies, according to the provisions thereof, except to
> the extent that –
>
> (1)    statutes preclude judicial review; or
>
> (2)    *agency action is committed to agency discretion by law*.

17    5 U.S.C. § 701(a) (emphasis added).

18         Here, the government invokes § 701(a)(2).  The Supreme Court has commented on that

19    provision as follows:

> The APA provides that "[a] person suffering legal wrong because of
> agency action, or adversely affected or aggrieved by agency action
> within the meaning of a relevant statute, is entitled to judicial review
> thereof," 5 U.S.C. § 702, and we have read the APA as embodying a
> "basic presumption of judicial review," *Abbott Laboratories v.*

---

[11] Notably, Section 1252(f)(1) focuses on *individual* orders of removal, as indicated by the title of § 1252 ("Judicial review of orders of removal.").  It appears to bar judicial review of other *individualized* determinations such as (1) cancellation of removal and adjustment of status for a noncitizen who is determined to be of good moral character and for whom removal would pose an exceptional and extremely unusual hardship, *see* 8 U.S.C. § 1229b(b); and (2) voluntary departure for a noncitizen of good moral character.  *See id.* § § 1229c(b).  TPS differs from such individualized determinations; it is a broader systemic decision, similar to a regulation.  Plaintiffs also advance additional arguments as to why §1252(f)(1) does not apply here, arguments the Court need not reach.

United States District Court
Northern District of California

34

> *Gardner*, 387 U.S. 136, 140 (1967).  This is "just" a presumption, however, *Block v. Community Nutrition Institute*, 467 U.S. 340, 349 (1984), and under § 701(a)(2) agency action is not subject to judicial review "to the extent that" such action "is committed to agency discretion by law."  As we explained in *Heckler v. Chaney*, 470 U.S. 821, 830 (1985), § 701(a)(2) makes it clear that "review is not to be had" in those *rare* circumstances where the relevant statute "is drawn so that a court would have *no meaningful standard against which to judge the agency's exercise of discretion*."  *See also Webster v. Doe*, 486 U.S. 592, 599-600 (1988); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).  "In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely."  *Heckler, supra*, at 830.

*Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (emphasis added).

According to the government, § 701(a)(2) precludes judicial review of the Secretary's decisions on Venezuela and Haiti's TPS  inasmuch as those decisions were predicated on what was in the "national interest" of the United States.[12]  *See* 8 U.S.C. § 1254(b)(1)(C) (providing that a country may be given TPS if the Secretary "finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States").  The government asserts that "[t]he determination of 'national interest' is one that calls upon the Secretary's 'expertise and judgment' and is not a manageable legal standard."  Mot. at 12.

In support, the government cites, *inter alia*, *Poursina v. USCIS*, 936 F.3d 868 (9th Cir. 2019), where the Ninth Circuit stated that "the invocation of the 'national interest' is a core example of a consideration that lacks a judicially manageable standard of review."  *Id.* at 871; *see also Webster v. Doe*, 486 U.S. 592, 600 (1988) (noting that § 102(c) of the National Security Act "allows termination of an Agency employee whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States,' not simply when the dismissal *is* necessary or advisable to those interests[;] [t]his standard fairly exudes deference to the Director, and appears to us to foreclose the application of any meaningful judicial standard of review")

---

[12] *See* Docket No. 12 (Mot. at 12) ("The determination of 'national interest' is one that calls upon the Secretary's 'expertise and judgment' and is not a manageable legal standard.").

United States District Court
Northern District of California

1    (emphasis in original).

2          There are several problems with the government's argument.  First, § 701(a)(2) would at

3    most apply to Plaintiffs' APA claims; it would not apply to their Equal Protection claims.[13]  *See*

4    *San Francisco Unified Sch. Dist. v. AmeriCorps*, No. 25-cv-02425-EMC, 2025 U.S. Dist. LEXIS

5    77652, at *15-16 (N.D. Cal. Apr. 23, 2025) (stating that, "absent clear congressional intent to

6    preclude review of a constitutional claim, § 701(a)(2) does not bar review of colorable

7    constitutional claims arising from agency actions 'committed to agency discretion by law'"; citing

8    *Webster* in support); *see also Webster*, 486 U.S. at 601, 603 (stating that "the language and

9    structure of § 102(c) [of the National Security Act] indicate that Congress meant to commit

10   individual employee discharges to the Director's discretion, and that § 701(a)(2) accordingly

11   precludes judicial review of these decisions under the APA"; but then going on to state that "[w]e

12   do not think § 102(c) may be read to exclude review of constitutional claims").

13         Second, as to the APA claims, Plaintiffs have not asserted that the Secretary made an

14   erroneous finding that the national interest weighed against extending TPS.  Rather, Plaintiffs have

15   made legal or procedural arguments – *e.g.*, that "national interest" is a factor that may be

16   considered only at the time of initial designation, and not as part of the periodic review used to

17   determine whether to extend or terminate TPS.  *See* Opp'n at 7 (arguing that "[t]he APA's

18   provision limiting review of discretionary decisions does not bar claims that challenge the

19   agency's failure to apply the proper statutory criteria"); *cf.* Docket No. 93 (Order at 24)

20   (concluding that § 1254a(b)(5)(A) "does not apply to, *e.g.*, a pattern or practice that is 'collateral

21   to and distinct from the specific [country] TPS decisions and their underlying rationale'").  In

22   other words, Plaintiffs have brought legal challenges to the Secretary's action that are independent

23   of the Secretary's assertion of national interest in justifying her termination decisions.  Moreover,

24   the Secretary has not asserted national interest whatsoever in justifying her vacatur decisions.

25         Therefore, § 701(a)(2) is not a bar to judicial review of the claims asserted here.

26   _____

27   [13] And, at most, it would only apply to the extent the termination decisions were at issue, as the
     Secretary invoked national interest in those decisions alone, and not in the vacatur decisions.  As
28   discussed below, the infirmity of the Secretary's decision to terminate TPS for Venezuela does not
     hinge on the correctness of her determination of national interest.

United States District Court
Northern District of California

# VII.     MOTIONS FOR SUMMARY JUDGMENT

Having rejected the government's jurisdictional arguments, the Court now turns to the merits of Plaintiffs' case. The Court first addresses the parties' motions for summary judgment. Plaintiffs have moved for summary judgment on their APA claims only. The government has moved for summary judgment on both the APA claims and the Equal Protection claims.[14]

## A.    Legal Standard

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Where a plaintiff moves for summary judgment on claims that it has brought (*i.e.*, for which it has the burden of proof), it "must prove each element essential of the claims . . . by undisputed facts." *Cabo Distrib. Co. v. Brady*, 821 F. Supp. 601, 607 (N.D. Cal. 1992); *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (stating that, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor") (emphasis omitted).

---

[14] The Court acknowledges that the government has filed two 12(b)(6) motions. In a typical case, the Court would address a motion to dismiss before a motion for summary judgment. In this case, however, the motions to dismiss largely overlap with the motions for summary judgment, with one notable exception. Specifically, the second motion to dismiss discusses the Haiti termination; the other motions do not because, at the time they were filed, the Secretary had not yet terminated Haiti's TPS. Given the significant overlap between the motions to dismiss and the motions for summary judgment, the Court evaluates the merits of Plaintiffs' case through the lens of summary judgment, at least for the vacatur and termination decisions for Venezuela and the partial vacatur decision for Haiti.

United States District Court
Northern District of California

1    Where a defendant moves for summary judgment based on a claim for which the plaintiff

2    bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a

3    showing sufficient to establish the existence of an element essential to [the plaintiff's] case."

4    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

5    B.    Motion to Consider Extra-Record Evidence

6    In conjunction with summary judgment, Plaintiffs have filed a motion asking that the

7    Court extra-record evidence. In the motion, Plaintiffs implicitly acknowledge that an APA claim

8    is usually adjudicated based on the administrative record. *See Cty. of Amador v. United States*

9    *DOI*, 872 F.3d 1012, 1020 (9th Cir. 2017) ("'In general, a court reviewing agency action under the

10   APA must limit its review to the administrative record.'"). However, Plaintiffs contend, it is

11   appropriate to consider evidence outside the administrative record because (1) they have made a

12   showing of bad faith on the part of DHS/Secretary Noem and (2) such evidence is necessary to

13   determine whether DHS/the Secretary considered all relevant factors and explained the TPS

14   decisions. *See Lands Council v. Powell*, 395 F.3d 1019, 1029-30 (9th Cir. 2005) (noting that there

15   are "narrow exceptions" to the "general rule that courts reviewing an agency decision are limited

16   to the administrative record"; "district courts are permitted to admit extra-record evidence: (1) if

17   admission is necessary to determine 'whether the agency has considered all relevant factors and

18   has explained its decision,' (2) if 'the agency has relied on documents not in the record,' (3) 'when

19   supplementing the record is necessary to explain technical terms or complex subject matter,' or (4)

20   'when plaintiffs make a showing of agency bad faith'").

21   As Plaintiffs point out, this Court previously allowed Plaintiffs to take extra-record

22   discovery precisely because of the *Lands Council* standard and Plaintiffs' "significant evidence

23   that the [TPS] decisions were made in bad faith, including repeated discriminatory statements by

24   Secretary Noem and President Trump, the short timeframe in which decisions were made, the lack

25   of legal and/or evidentiary support for the decisions, and the unprecedented nature of the

26   decisions." Docket No. 129 (Order at 5); *see also* Docket No. 129 (Order at 4) ("If any extra-

27   record evidence is admissible under the circumstances [identified in *Lands Council*], then extra-

28   record discovery should be permitted under the same circumstances."); Docket No. 135 (Order at

United States District Court
Northern District of California

38

1    5) ("In the Court's prior order, it did not categorically bar extra-record discovery for Plaintiffs'

2    APA claim precisely because there was a factual basis for Plaintiffs' assertion that Secretary

3    Noem had acted in bad faith and/or with a discriminatory animus.").

4           The extra-record evidence that Plaintiffs seek to introduce here falls within this scope.  The

5    Court, therefore, does not limit Plaintiffs to the administrative record in evaluating the APA

6    claims.  This is especially true given that the government did not file a formal opposition to

7    Plaintiffs' motion, simply stating in its cross-motion for summary judgment that "Plaintiffs'

8    reliance on the Court-ordered extra-record discovery is unavailing, as the existing administrative

9    record already makes clear that the agency acted within its legal authority."  Opp'n at 2.

10          Relevant evidence outside the administrative record is admissible to assess the Equal

11   Protection claims.

12   C.     APA Claim – Venezuela Vacatur

13          Plaintiffs have asserted APA claims challenging the Secretary's vacatur and termination

14   decisions for both Venezuela and Haiti.  The Court addresses first the APA claim related to the

15   vacatur decision for Venezuela.

16          For this decision, Plaintiffs argue that (1) Secretary Noem did not have the authority to

17   vacate the extension that had been given by Secretary Mayorkas; (2) even if she did, she exceeded

18   her authority to vacate; and (3) even if she did have the authority to vacate and did not exceed her

19   authority to vacate, her decision was arbitrary and capricious.

20          1.     Lack of Authority to Vacate

21          In her decision vacating Secretary Mayorkas's extension of the 2023 Designation,

22   Secretary Noem asserted that she had the authority to vacate.  *See* 90 Fed. Reg. at 8806.  Plaintiffs

23   argue that the Secretary lacked the authority.  In its decision upholding this Court's issuance of the

24   postponement order, the Ninth Circuit held that Plaintiffs were likely to succeed on the merits of

25   this claim.  *See generally NTPSA*, 2025 U.S. App. LEXIS 22269.  This Court is guided by the

26   Ninth Circuit's analysis and reaffirms its reasoning in its postponement order.

27          "It is well settled that an agency may only act within the authority granted to it by statute.

28   This principle is a recognition of the nature of an administrative agency as a 'creature of statute,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    having no constitutional or common law existence or authority, but only those authorities

2    conferred upon it by Congress.'"  *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 108

3    (2d Cir. 2018) (emphasis omitted).  Where an agency is given the power to decide, that power is

4    "*normally* accompanied by the power to reconsider," *NRDC v. Regan*, 67 F.4th 397, 401 (D.C.

5    Cir. 2023) (emphasis added); that is, generally speaking, "administrative agencies are assumed to

6    possess at least some inherent authority to revisit their prior decisions, at least if done in a timely

7    manner." *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014).  However,

8    "'Congress . . . undoubtedly can limit an agency's discretion to reverse itself.'"  *NRDC*, 67 F.4th

9    at 401.  "[W]here Congress has spoken as to the proper procedure for reversing a decision,

10   agencies lack the inherent authority to circumvent the statute." *NTPSA*, 2025 U.S. App. LEXIS

11   22269, at *37; *see also Ivy Sports*, 767 F.3d at 86 (noting that "an agency may not rely on inherent

12   reconsideration authority 'when Congress has provided a mechanism [in the governing statute that

13   is] capable of rectifying mistaken actions'").

14           Whether an agency has the power to reconsider and revoke prior agency action turns on

15   what the governing statute provides, either expressly or implicitly; this is a matter of statutory

16   construction.  Or, as the Court stated in its postponement order, "[t]o determine whether an agency

17   has the statutorily implicit authority to reconsider an earlier action depends on the statute and

18   whether such legislative intent to confer such authority can be inferred."  Docket No. 93 (Order at

19   47).

20           Here, Secretary Noem's contention that she has the implicit authority to reconsider a TPS

21   decision lacks merit.  As the Ninth Circuit indicated in its decision affirming the postponement

22   order herein,

23           Congress has displaced any inherent revocation authority by
             explicitly providing the procedure by which a TPS designation is
24           terminated.  The Secretary's assertion of such a power is, as the
             district court noted, "at odds with the structure of the TPS statute."
25           The TPS statute specifically addresses the time frame within which
             a TPS designation may be terminated.  Section 1254a(b)(3)(B)
26           provides that a termination "shall not be effective earlier than 60
             days after the date the notice is published or, if later, the expiration
27           of the most recent previous extension."  It expressly provides that
             the termination of a TPS designation can be no earlier than the
28           expiration of the most recent extension.  The statute does not permit

                                                    40

> the Secretary to terminate a designation "midstream," but that is
> exactly what the Secretary purports to do here. And while the
> statute expressly sets forth in detail procedures for "designation,"
> "extension," and "termination," it nowhere mentions a process for
> "vacatur," which, in this case, has the practical effect of a
> "termination" of a TPS designation.

*NTPSA*, 2025 U.S. App. LEXIS 22269, at *39-40; *see also* Docket No. 93 (Order at 50-51)

(providing the same reasoning). "A reading of the [TPS] statute that allows for vacatur would

render [the above] terms – and Congress's design – meaningless." *NTPSA*, 2025 U.S. App.

LEXIS 22269, at *10; *see also id.* at *41 (explaining that "allowing rescission or vacatur of the

TPS designation here, would empower the agency to indirectly take three separate actions that are

prohibited by statute: designating countries for TPS for a time period under six months, 8 U.S.C. §

1254a(b)(2)(B), (b)(3)(C), terminating TPS before the expiration of the last extension, §

1254a(b)(3)(B), and terminating TPS with less than sixty days' notice").

      The Ninth Circuit's decision in *China Unicom (Ams.) Ops. Ltd. v. FCC*, 124 F.4th 1128

(9th Cir. 2024) [hereinafter *CUA*], underscores that the Secretary does not have the inherent

authority to vacate here. In *CUA*, the Ninth Circuit emphasized that, where a statute provides for a

right or benefit for a fixed term, such as a license, "[t]he use of a fixed term is . . . *affirmatively

inconsistent* with positing an implied power to revoke [that] license at any time." *Id.* at 1147-48

(emphasis added). Here, the TPS statute has "clear stated terms for extensions and terminations of

TPS designations," which are "likewise 'affirmatively inconsistent with positing an implied power

to revoke . . . at any time.'" Docket No. 93 (Order at 51); *see also Haitian Evangelical*, 2025 U.S.

Dist. LEXIS 125511, at *26 (noting that the TPS statute "provides specific instructions for how to

reconsider a TPS designation, and it provides a timeline for doing so"). Furthermore, "[t]o permit

the Secretary unconstrained discretion to revoke, at any time, a prior TPS designation would not

be consistent with Congress's general intent to cabin such discretion." Docket No. 93 (Order at

52); *see also Ramos*, 975 F.3d at 890 (stating that "Congress enacted the TPS statute to curb and

control the executive's previously unconstrained discretion under the [extended voluntary

departure] process"); *Nat'l TPS Alliance v. Noem*, No. C-25-5687 TLT (N.D. Cal.) (Docket No.

73) (Order at 9) (taking note of "congressional dissatisfaction with EVD" – *e.g.*, "members of

Congress were unhappy with the wide discretion EVD gave to the executive and the arguably

United States District Court
Northern District of California

United States District Court
Northern District of California

1    arbitrary standards for which EVID designation could be withheld").

2         In its papers, the government suggests that the statutory scheme implicitly gives the

3    Secretary broad discretion to act (which would include the ability to reconsider) because the TPS

4    statute gives her discretion in (1) deciding how long an extension/designation should last and (2)

5    deciding when to conduct the periodic review (so long as it is done at least 60 days in advance of

6    the expiration of the designation).  The government's argument is not convincing.  These facts

7    underscore that the Secretary does have discretion, but only in limited areas.  That the Secretary

8    has discretion on these limited matters – in deciding prospectively the length of an extension and

9    whether to make that decision (but not actual termination) earlier than 60 days in advance of the

10   current expiration date – does not say anything about whether the Secretary has the authority to

11   revoke an existing TPS designation or extension, a much more significant act.  Inferring broader

12   authority based on the limited discretion would be inconsistent with the statute's express directive,

13   and would have a retrospective effect, potentially upsetting reliance interests of those affected.

14   Indeed, the panel decision in the instant case expressly noted that "[t]he structure and temporal

15   limitations of the TPS statute protect the important reliance interests of individual TPS holders."

16   *NTPSA*, 2025 U.S. App. LEXIS 22269, at *41.

17        The Court thus holds, consistent with the Ninth Circuit's decision in *NTPSA* upholding the

18   postponement order, that Secretary Noem lacked the statutory authority to vacate Secretary

19   Mayorkas's extension.[15]

20        2.    Exceeding Statutory Authority to Vacate as to Documents Already Issued

21        As to the subset of Venezuelan TPS beneficiaries who were issued documentation under

22   the Mayorkas extension, Secretary Noem clearly exceeded the scope of her authority.  This Court

23   so held in its preservation order.  *See generally* Docket No. 162 (order).

24        As previously explained, in her decision to vacate issued on February 3, 2025, Secretary

25

26   _____

27   [15] In upholding this Court's postponement order, the Ninth Circuit analyzed only the claim that the
     Secretary lacked authority to vacate and did not address Plaintiffs' other arguments.  This Court
     does address many of Plaintiffs' arguments placed at issue by the cross-motions for summary
28   judgment, particularly because it is now evaluating whether Plaintiffs are entitled to permanent
     relief.

1    Noem stated that "USCIS will invalidate EADs [employment authorization documents]; Forms I-

2    797, Notice of Action (Approval Notice); and Forms I-94, Arrival/Departure Record (collectively

3    known as TPS-related documentation) that have been issued with October 2, 2026 expiration dates

4    under the Mayorkas Notice [issued on January 17, 2025]."  90 Fed. Reg. at 8805.  But the TPS

5    statute does not contain any provision allowing the Secretary to invalidate already-issued TPS

6    documentation.  In fact, "§ 1254a(d)(3), the provision in the TPS statute cited by the Supreme

7    Court in its stay order, underscores that such action is not permissible because the provision

8    recognizes that TPS holders have reliance interests when issued TPS-related documentation."

9    Docket No. 162 (Order at 4); *cf. NTPSA*, 2025 U.S. App. LEXIS 22269, at *41 ("The structure

10   and temporal limitations of the TPS statute protect the important reliance interests of individual

11   TPS holders, and the Government must adhere to these statutory constraints."); *id.* at *46 ("TPS

12   holders began to rely upon the extension of their protected status at the opening of this registration

13   period, giving rise to the strong reliance interests here at stake.").

14        Therefore, even if Secretary Noem had some implicit authority to vacate, she clearly

15   exceeded the scope of any such authority by effectively canceling TPS documentation that had

16   already issued under the Mayorkas extension.  *See also* Docket No. 162 (Order at 6) (holding that

17   the cancelation of already-issued TPS documentation was also arbitrary and capricious: TPS

18   holders "had a protectible reliance interest or vested right").  That being said, only a subset of

19   Venezuelan TPS holders were so affected by the Secretary's unlawful conduct in this regard.  *See*

20   Docket No. 162 (Order at 10) ("grant[ing] relief to those Venezuelan TPS holders who received

21   TPS-related documentation based on the Mayorkas extension up to and including February 5,

22   2025 – when the Secretary published notice that the 2023 TPS Designation was being

23   terminated").[16]

24

25   [16] The Court acknowledges that Plaintiffs have offered a separate argument as to how the
     Secretary exceeded any authority she had under the TPS statute.  Specifically, Plaintiffs contend
26   that the Secretary exceeded her authority because reconsideration is not permitted simply because
     a new administration wants to adopt new policies.  *See Am. Trucking Ass'ns v. Frisco Transp. Co.*,
27   358 U.S. 133, 145-46 (1958) (stating that "the power to correct ministerial errors may not be used
     as a guise for changing previous decisions because the wisdom of those decisions appears doubtful
28   in the light of changing policies").  Ultimately, the Court views this argument as a variant of
     Plaintiffs' arguments that the Secretary lacked the implicit authority to vacate and/or that she did

43

United States District Court
Northern District of California

3.    Arbitrary and Capricious

Finally, Plaintiffs challenge the Venezuela vacatur decision on the ground that, even assuming arguendo the Secretary had the authority to vacate and did not exceed her statutory authority to vacate, her decision was still arbitrary and capricious under the APA. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (stating that the APA "requires agencies to engaged in 'reasoned decisionmaking' and directs that agency actions be 'set aside' if they are 'arbitrary' or 'capricious'").

a.    Asserted Novelty, Confusion, and "Thin" Explanation

Plaintiffs assert that Secretary Noem's vacatur decision was not reasoned decision making. When Secretary Mayorkas extended the 2023 Designation for Venezuela, he also streamlined the filing processes for the 2021 and 2023 Designations by consolidating them. This meant that 2021 TPS holders, not just 2023 TPS holders, could get the benefit of the October 2, 2026, extension date. In her decision vacating the Mayorkas extension, Secretary Noem characterized the extension as "novel" because of the consolidation. According to Secretary Noem, Secretary Mayorkas had "implicitly negat[ed] the 2021 Venezuela designation by effectively subsuming it within the 2023 Venezuela TPS designation." 90 Fed. Reg. at 8807. Secretary Noem maintained that

> [t]he Mayorkas Notice did not acknowledge the novelty of its approach or explain how it is consistent with the TPS statute. *See* INA 244(b)(2)(B), 8 U.S.C. 1254a(b)(2)(B) (providing that a TPS country designation "shall remain in effect until the effective date of the termination of the designation under [INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B)]"). This novel approach has included multiple notices, overlapping populations, overlapping dates, and sometimes multiple actions happening in a single document. While the Mayorkas Notice may have made attempts to address these overlapping populations, the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, are thin and inadequately developed. Given these deficiencies and lack of clarity, vacatur is warranted to untangle the confusion, and provide an opportunity for informed determinations regarding the TPS designations and clear guidance.

*Id.*

---
not engage in reasoned decisionmaking.

United States District Court
Northern District of California

1    Plaintiffs assert that the Secretary's decision was arbitrary and capricious because the

2 Mayorkas extension, which included the consolidation of the 2021 and 2023 Designation filing

3 processes, was not novel, did not engender confusion, and was not "thin" in explanation.  For the

4 reasons stated in its postponement order, the Court agrees.

5    First, "[a]s a factual matter, it was not 'novel' for different tracks to be streamlined as part

6 of a TPS process.  Plaintiffs have pointed out that there has been similar streamlining for both the

7 Sudan and Haiti TPS designations."  Docket No. 93 (Order at 57).

8    Second, as a legal matter, consolidation was not novel because – as Secretary Noem failed

9 to recognize –

10    a TPS beneficiary under the 2021 Designation was necessarily a
      TPS beneficiary under the 2023 Designation.

11
      [E]very earlier designation is "subsum[ed]" by a later one because
12    redesignation expands the pool of potential beneficiaries to include
      not only those who qualified under an earlier designation, but also
13    those who arrived after their country was first designated.

14 Docket No. 93 (Order at 56) (emphasis omitted).

15    Third, "streamlining the two tracks for the two designations into one . . . would tend to

16 eliminate, not create, confusion – *i.e.*, confusion that could arise based on the fact that there are

17 two tracks."  Docket No. 93 (Order at 57).  Notably, the panel decision affirming this Court's

18 postponement order agreed with this Court on this very point.  As it explained, "Secretary Noem

19 'failed to recognize that a TPS beneficiary under the 2021 Designation was necessarily a TPS

20 beneficiary under the 2023 Designation.'  Secretary Mayorkas's extension thereof consolidated the

21 two designations, combining the two tracks, thus lessening confusion rather than 'creating'

22 confusion as Secretary Noem apparently believed."  *NTPSA*, 2025 U.S. App. LEXIS 22269, at *47

23 n.12.  Indeed, evidence that the *government* submitted in conjunction with the summary judgment

24 proceedings demonstrates that the Biden Administration consolidated the process for the 2021 and

25 2023 TPS holders precisely to *avoid* confusion.  *See* Opp'n, Ex. 1 (Biden Administration's

26 "Options for Venezuela TPS Extension and Redesignation – September 23, 2023") (in "Option 1 –

27 Concurrent Extension/Redesignation Date," noting as a "pro" in favor of the option, that it would

28 be "[l]ess confusing for employers in that they will not have to try to distinguish between TPS

45

beneficiaries with varying EAD end dates"; and, in "Option 2 – Two different designation dates for Venezuela TPS," noting as a "con" that "[i]t will be difficult to operationalize differentiating these two groups of Venezuela TPS beneficiaries in our existing systems" which "may lead to confusion").

Fourth, although Secretary Noem criticized "the explanations in the Mayorkas Notice, particularly the explanation for operational impacts, [as] thin and inadequately developed," 90 Fed. Reg. at 8807, that criticism is rooted in Secretary Noem's failure to recognize that 2021 TPS holders were necessarily 2023 TPS holders and that consolidation would thereby tend to avoid confusion and streamline the filing process.

Hence, there is no factual or legal support for the Secretary's asserted reason for the vacatur. *See Lands Council*, 395 F.3d at 1026 ("An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law.").

b.    Failure to Consider Alternatives

Moreover, as the Court held in its postponement order, the Secretary failed to consider alternatives short of vacatur when she revoked the Mayorkas extension. *See* Docket No. 93 (Order at 58). "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), but "when an agency rescinds a prior policy[,] its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). Here, Secretary Noem considered no alternatives to complete vacatur. And the context demonstrates she had no interest in doing so: "if Secretary Noem was truly concerned about confusion arising from Secretary Mayorkas's decision to allow 2021 TPS holders to register as 2023 TPS holders, she easily could have chosen to 'deconsolidate' the registration process and keep the 2021 and 2023 Designations on two different tracks – with the 2021 Designation ending in September 2025 and with the 2023 Designation still ending in

46

United States District Court
Northern District of California

1    October 2026." Docket No. 93 (Order at 59). That the Secretary did not do so "effectively

2    demonstrat[es] that confusion was not her concern so much as the desire to totally undo Secretary

3    Mayorkas's decision." Docket No. 93 (Order at 59). This is also substantiated by the timing of

4    the vacatur and the termination decisions: most notably, the termination decision was drafted even

5    before the vacatur decision was finalized, and then was formally issued within days of the

6    publication of the vacatur decision.

7                    c.    Failure to Consider Reliance Interests

8            Plaintiffs further argue that the Secretary's vacatur decision was arbitrary and capricious

9    because, as part of that decision, she invalidated (*i.e.*, canceled) TPS-related documentation that

10   had already been issued pursuant to the Mayorkas extension. According to Plaintiffs, this action

11   was arbitrary and capricious because the Secretary failed to consider reliance interests, interests

12   which the panel in this case recognized. The Court agrees. This is particularly true of those who

13   had already been issued the TPS documentation based on the extension. The analysis in Part

14   VII.C.2, *supra*, is largely applicable here.

15                   d.    Failure to Consult with Government Agencies or Review Country

16                         Conditions

17           According to Plaintiffs, the Secretary also acted arbitrarily and capriciously because she

18   made the decision to vacate the Mayorkas extension without first consulting with government

19   agencies or reviewing country conditions.[17] *Cf.* 8 U.S.C. § 1254a(b)(3)(A) (providing that, on

20   periodic review, the Secretary, "*after consultation with appropriate agencies of the Government*,

21   shall review the conditions in the foreign state . . . for which a designation is in effect under this

22   subsection and shall determine whether the conditions for such designation continue to be met")

23   (emphasis added). In response, the government argues that interagency consultation and review of

24   country conditions is required only where the Secretary is making a decision on an extension or

25

26   _____

27   [17] The administrative record for the vacatur decision contains no contemporaneous country
     conditions report – *i.e.*, a report prepared in conjunction with the vacatur decision made by
     Secretary Noem. Instead, the administrative record includes only a country conditions report from
28   the Biden era (dated August 2024), which supported the Mayorkas extension. *See* Docket No.
     103-5 (ECF Pages 162-92) (RAIO report).

                                                    47

1    termination: "The vacatur was neither." Opp'n at 16. For purposes of this decision, the Court

2    need not resolve this dispute. Even if the government's position has some merit, the Secretary's

3    failure to consult is still relevant to Plaintiffs' pretext argument which is addressed below.

4                    e.    Vacatur Decision Based on Pretext

5           Finally, the Secretary's decision to vacate was arbitrary and capricious because it was

6    pretextual – *i.e.*, it was not animated by a concern about, *e.g.*, novelty or confusion as professed,

7    nor was it otherwise the result of reasoned agency decision making. Instead, the Secretary –

8    acting with unprecedented haste and in an unprecedented manner – issued the vacatur for the

9    preordained purpose of expediting termination of Venezuela's TPS.

10          DHS began drafting the decision to vacate within days after President Trump began his

11   second administration. There is no indication that the Secretary or DHS consulted any other

12   government agencies or conducted an internal evaluation as part of this process. In fact, just two

13   days after a draft of the vacatur decision was prepared and/or circulated, *see* MacLean Decl., Ex. 1

14   (email), a draft of the termination decision was prepared and/or circulated. *See* MacLean Decl.,

15   Ex. 5 (privilege log) (NTPSA-DHS 211). Vacatur (and termination) was a *fait accompli* from the

16   outset. The draft of the termination notice was prepared even *before* the vacatur decision was

17   finalized. The same day that Secretary Noem signed off on the vacatur decision, DHS staff was

18   asked to "focus on any improvements in Venezuela," implicitly to advance and support

19   termination of Venezuela's TPS. *See* Bansal Reply Decl., Ex. 17 (email). Within days of the

20   Secretary's approval of the vacatur decision, DHS staff indicated that it was urgent to finalize the

21   termination decision. The termination decision was approved just three days after the vacatur

22   approval. Altogether, the decision making process for the vacatur through the termination took

23   place over a span of days. *Cf. Dep't of Commerce v. N.Y.*, 588 U.S. 752, 782-83 (2019) ("The

24   evidence showed that the Secretary was determined to reinstate a citizenship question from the

25   time he entered office; instructed his staff to make it happen; waited while Commerce officials

26   explored whether another agency would request census-based citizenship data; subsequently

27   contacted the Attorney General himself to ask if DOJ would make the request; and adopted the

28   Voting Rights Act rationale late in the process.").

                                                     48

United States District Court
Northern District of California

1       The pretextual nature of Secretary's asserted rationale for the vacatur is demonstrated by

2   the fact that her criticism of Secretary Mayorkas's extension and the alleged confusion it caused

3   was entirely baseless as noted above.  And there is no evidence of any reasoned decision making

4   behind Secretary Noem's vacatur.  The failure to consult with agencies in regard to the termination

5   decision which ensued immediately after the vacatur – a failure which was highly unusual and

6   unprecedented (as discussed below) – further evinces the pretextual nature of Secretary Noem's

7   purported rationale for the vacatur.

8       4.      Summary

9       As a matter of law, the Secretary lacked the implicit authority to vacate.  Even if she had

10  such authority, there is no genuine dispute that she exceeded that authority.  Furthermore, even if

11  the Secretary had the authority to vacate, there is no genuine dispute that her decision to vacate

12  was arbitrary and capricious for several reasons as set forth above.  Accordingly, the Court grants

13  Plaintiffs' motion for summary judgment on the APA claim related to the Venezuela vacatur

14  decision, and denies the government's cross-motion.

15  D.  APA Claim – Venezuela Termination

16      Plaintiffs' second APA claim focuses on the termination decision for Venezuela.

17  According to Plaintiffs, the decision to terminate TPS for Venezuela was unlawful because it was

18  predicated on the unlawful vacatur.  Plaintiffs further argue that the termination decision was

19  arbitrary and capricious because it was based on an assessment of the national interest, but

20  national interest is a factor that may be considered only at the time of the original TPS

21  designation, and not on periodic review.  Finally, Plaintiffs contend that the termination decision

22  was arbitrary and capricious because the decision was made without any meaningful consultation

23  with other government agencies, nor was there a meaningful review of country conditions.

24      1.      Predicated on Unlawful Vacatur

25      Plaintiffs' first argument has merit.  As noted above, the vacatur and termination decisions

26  essentially went hand in hand: Secretary Noem made the decision to vacate in order to advance her

27  ability to terminate.  Because termination was predicated on vacatur of the existing extension,

28  Plaintiffs are entitled to relief from the termination decision.

49

2.        <u>Failure to Consult with Government Agencies or Review Country Conditions</u>

Plaintiffs are entitled to relief from the termination decision for an additional reason. Secretary Noem failed to comply with the statutory directive to consult with appropriate agencies in deciding whether to terminate Venezuela's TPS. As noted above, the TPS statute expressly requires that the DHS Secretary "consult[] with appropriate agencies of the Government" as part of the periodic review and that consultation implicitly includes review of country conditions. It provides: "[T]he [Secretary], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . and shall determine whether the conditions for such designation . . . continue to be met." 8 U.S.C. § 1254(b)(3)(A). Moreover, the requirement to consult is not an empty obligation; rather, a consultation required by a statute means that there must be a "meaningful exchange of information." *Cal. Wilderness Coalition v. U.S. DOE*, 631 F.3d 1072, 1086 (9th Cir. 2011); *see also id.* at 1088 (characterizing a statutory requirement to consult as an "'affirmative duty'" and stating that the consultation must be "meaningful").

As an initial matter, the Court finds that the Secretary violated the TPS statute because she effectively made the decision to terminate *before* consultation with any government agency. As noted above, the TPS statute requires that a decision be made only *after* consultation – *i.e.*, the consultation is designed to inform the Secretary's decision-making. But here, the day after Secretary Noem was confirmed, DHS began to draft the decision to terminate. *See* MacLean Decl., Ex. 5 (privilege log) (NTPSA-DHS 211); *see also* Bansal Reply Decl., Ex. 7 11 (email, dated 1/27/2025) ("I created a shell for a termination notice. Can you start drafting? (I'm going to work on the memo for the vacatur notice.)"). There is no evidence that there was any consultation with, *e.g.*, the State Department prior to the initial drafting of the termination decision.

Moreover, as reflected by the evidence of record, even though DHS belatedly sought input from the State Department and assuming *arguendo* the final decision had not already been made prior to seeking that input, there was no meaningful consultation with the State Department or, for that matter, any other government agency. There is no dispute that the consultation required by the TPS statute typically involves at least the State Department. That has been the practice of DHS, as demonstrated by the GAO TPS Report discussed above. Furthermore, the State

50

United States District Court
Northern District of California

1    Department is the government agency that conducts foreign policy and thus is one of the agencies

2    most likely to have information about conditions in a foreign country.  Here, although DHS did

3    reach out to the State Department to get its input (belatedly), the Secretary of State simply

4    provided a one-and-a-half page letter; importantly, the analysis therein failed to include *any*

5    information on country conditions in Venezuela.  Instead, it focused solely on the national

6    interests of the United States.

7          To the extent the government points to a State Department country conditions report from

8    September 2024, that report was prepared by the Biden Administration, in conjunction with

9    Secretary Mayorkas's TPS decision to *extend* TPS.  *See* Docket No. 104-4 (ECF Pages 53-74)

10   (letter from Secretary of State Blinken).  Here, the new administration failed to provide a country

11   conditions report from the State Department that was prepared contemporaneously in conjunction

12   with Secretary Noem's termination decision.  Nor did the administration obtain any

13   contemporaneous country conditions report from RAIO.  Instead, it appears that the Secretary

14   could have relied at most on a RAIO country conditions report from the Biden era.  *See* Docket

15   No. 104-9 (ECF Pages 45-75) (RAIO report, dated August 2024, from the Biden era).  Given the

16   RAIO report was part of the Biden administration's decision to *extend* TPS for Venezuela, it

17   seems ironic, if not disingenuous, for Secretary Noem to now rely on that report to *terminate* TPS.

18   In fact, she cited nothing specific in the report from the Biden administration to justify her

19   decision to vacate and terminate Venezuela's TPS.

20         The above demonstrates not only a failure to engage in a meaningful consultation with

21   government agencies but also a failure to conduct a meaningful country conditions review, a

22   rudimentary element of the consultation contemplated by the statute.  This not only violates the

23   TPS statute, but also constitutes arbitrary and capricious action by the Secretary.  *See Lands*

24   *Council*, 395 F.3d at 1026 ("An agency's action is arbitrary and capricious if the agency fails to

25   consider an important aspect of a problem, if the agency offers an explanation for the decision that

26   is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed

27   to a difference in view or be the product of agency expertise, or if the agency's decision is contrary

28   to the governing law.").

1    Furthermore, Secretary Noem's decision-making was arbitrary and capricious because it

2   reversed DHS's established practices for TPS decision-making, as described in the 2020 GAO

3   TPS Report,[18] without providing any explanation for that reversal.  *See generally* MacLean Decl.,

4   Ex. 16 (GAO TPS Rpt.).  As discussed above, the GAO TPS Report reviews the four documents

5   that DHS typically collects for TPS decision-making:

6    (1) a country conditions report compiled by USCIS (an agency within DHS);

7    (2) a memo with a recommendation from the USCIS Director to the DHS Secretary;

8    (3) a country conditions report compiled by the State Department; and

9    (4) a letter with a recommendation from the Secretary of State to the Secretary of DHS.

10    DHS did not obtain a contemporaneous or updated country conditions report from the State

11   Department, nor did it obtain a contemporaneous country conditions report from USCIS

12   (including RAIO, a division within USCIS).  A contemporaneous and updated report from the

13   State Department would have been included input from the relevant regional bureau for PRM and

14   the relevant overseas post – which implicitly would have had concrete, reliable on-the-ground

15   information about country conditions.  The failure to do so represented a reversal in practice and

16   procedure long followed by previous administrations in enforcing the TPS statute.

17    Although "[a]gencies are free to change their existing policies," they must "provide a

18   reasoned explanation for the change."  *Encino Motorcars*, 579 U.S. at 221; *see also FCC v. Fox*

19   *TV Stations, Inc.*, 556 U.S. 502, 515 (2009) (stating that "the requirement that an agency provide

20   reasoned explanation for its action would ordinarily demand that it display awareness that it *is*

21   changing position[;] [a]n agency may not, for example, depart from a prior policy *sub silentio* or

22   simply disregard rules that are still on the books," and "the agency must show that there are good

23   reasons for the new policy") (emphasis in original); *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1089

24   (N.D. Cal. 2018) (in TPS case involving terminations of TPS for multiple countries, stating that

25   "[t]he APA constrains an agency's ability to change its practices or policies without

26

27   ─────────────────────

   [18] As indicated above, there is no dispute about what this process entails.  The government has not
28   objected to the GAO TPS Report, nor has it argued that the report's description of the TPS
     decision-making process is incorrect.

United States District Court
Northern District of California

1   acknowledging the change or providing an explanation), *vacated by Ramos*, 975 F.3d at 872,

2   *vacated for rehearing en banc*, 59 F.4th at 1010; *cf. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. St.*

3   *Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (stating that an agency must "examine the

4   relevant data and articulate a satisfactory explanation for its action").  Here, Secretary Noem has

5   not provided any explanation for her reversal of established practices on TPS decision-making.

6        Given the Court's rulings above, it need not reach Plaintiffs' additional argument that the

7   termination decision was unlawful because it was predicated on an assessment of national interest,

8   which is a factor to be considered only at the time of initial designation, and not as part of a

9   periodic review.  Plaintiffs' argument is based on a textual reading of the TPS statute which

10  presents a closer call.

11       3.   Summary

12       As a matter of law, the Secretary's decision to terminate the 2023 Designation was

13  unlawful because it was based on the unlawful decision to vacate.  Even if the Secretary had the

14  authority to vacate the Mayorkas extension, did not exceed her statutory authority in vacating, and

15  engaged in reasoned decisionmaking with respect to the vacatur of the Mayorkas extension, there

16  is no genuine dispute that her subsequent decision to terminate was unlawful and/or arbitrary and

17  capricious because the Secretary failed to engage in a meaningful consultation with government

18  agencies or explain her reversal of well-established agency practice.

19       The Court thus grants Plaintiff's motion for summary judgment on the APA claim based

20  on the Venezuela termination decision, and denies the government's cross-motion.

21  E.   APA Claim – Haiti Partial Vacatur

22       Plaintiffs' third APA claim concerns the partial vacatur of Haiti's TPS designation –

23  pursuant to which Secretary Noem shortened the extension/redesignation given by Secretary

24  Mayorkas from 18 to 12 months.  Plaintiffs' challenge to the partial vacatur for Haiti overlaps in

25  part with their challenge to the vacatur for Venezuela.

26       1.   Lack of Authority to Vacate and Exceeding Authority to Vacate

27       The Court agrees with Plaintiffs that the partial vacatur was unlawful because Secretary

28  Noem lacked the implicit authority to partially revoke the Mayorkas extension/redesignation.  *See*

United States District Court
Northern District of California

53

1    Part VII.C.1, *supra*. Furthermore, even if the Secretary had such authority, she exceeded the

2    scope of that authority by invalidating TPS-related documentation that had *already* issued based

3    on the February 3, 2026, date given by the Mayorkas extension/redesignation. *See* Part VII.C.2,

4    *supra*. The analysis of these issues on the Venezuela vacatur decision is equally applicable here.[19]

5         2.    <u>Arbitrary and Capricious</u>

6         Even if the Secretary had the implicit authority to partially vacate, and did not exceed her

7    authority to vacate, the vacatur decision is nonetheless problematic, because it was arbitrary and

8    capricious.

9         The reasons given for the partial vacatur were stated in the Federal Register as follows:

10        First, there is no discussion in the July 1, 2024, Federal Register
          notice of why the 18-month period was selected in lieu of a 6- or 12-
11        month period. Nor does the administrative record underlying the
          June 3, 2024, decision and July 1, 2024, notice bear any discussion
12        of why the 18-month period was chosen. Allowing aliens from a
          given country, including aliens who entered the United States
13        illegally or overstayed their authorized period of admission, to
          remain in the United States temporarily with employment
14        authorization is an extraordinary act. Congress recognized the
          gravity of such action under the TPS statute by setting the default
15        extension period at 6 months, underscoring the uniqueness of this
          authority, and limiting its own authority to enact legislation allowing
16        TPS recipients to adjust to lawful permanent resident status.
          Accordingly, determinations of how long a new designation should
17        remain in effect and whether to depart from the default six-month
          period for an extension of an existing designation should take into
18        account important considerations relating to the purpose of the
          statute and specific country and country conditions at issue and
19        should not rest alone on administrative convenience. Here, there
          was no explanation whatsoever of why the 18-month period was
20        selected.

21        Second, and similarly, the July 1, 2024, notice is bereft of any
          justification of why permitting the ever-increasing population of
22        Haitian TPS recipients, particularly those who entered the country
          unlawfully, to remain temporarily in the United States is not
23        contrary to the U.S. national interest. The notice simply states that

24    _____

25    [19] Plaintiffs also argue that the Secretary exceeded her authority because "the Secretary's timing
      for the partial vacatur contravenes the statutory mandate that the Secretary 'shall' decide whether
26    to extend or terminate a TPS designation '[a]t least 60 days *before*' the end of the previous period
      of designation." Mot. at 21 (emphasis added). It is not altogether clear what Plaintiffs' contention
27    is here. If Plaintiffs' point is that Secretary Mayorkas properly made his decision to
      extend/redesignate *before* the August 3, 2024, expiration date for Haiti's TPS, but Secretary Noem
28    did not (*i.e.*, because her vacatur decision was made months later on February 18, 2025), the Court
      agrees that Secretary Noem failed to comply with the timing provided for in the TPS statute.

54

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

"it is not contrary to the national interest of the United States."  The administrative record underlying Secretary Mayorkas' June 4, 2024, decision likewise lacks any discussion of the critical national interest criterion.  Such conclusory determinations do not accord with the gravity of TPS decisions under the INA.  "National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (e.g., potential nexus to criminal gang membership), national security, migration factors (e.g., pull factors), immigration policy (e.g., enforcement prerogatives), and economic considerations (e.g., adverse effects on U.S. workers, impact on U.S. communities).  Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment, informed by her consultations with appropriate U.S. Government agencies.

9

10

11

12

13

14

15

16

17

Third, although the July 1, 2024, notice cites some country conditions reports that are relatively proximate to the June 4, 2024, decision, several others date back to early 2023, 2022, or even earlier.  And certain sources upon which DHS relied indicated that significant developments were taking place in 2024 that might result in an improvement in conditions.  For example, as stated in the July 1, 2024, Federal Register notice, the United Nations had recently authorized a Multinational Security Support (MSS) mission to deploy in Haiti in 2024 and support the Haitian National Police in capacity building, combatting gang violence, and provide security for critical infrastructure.  The Department of State likewise underscored that significant development.  Thus, both DHS and the Department of State contemplated the real possibility of an improvement in conditions with the deployment of the United Nations MSS mission, yet that important development was not expressly factored into the determination of the length of the extension and designation period.

18

19

20

21

22

23

24

25

26

Eighteen months is the maximum period of designation or extension authorized under the TPS statute.  Neither the 2021 new designation, the 2023 extension and new designation, nor the 2024 extension and new designation contained any discussion of national interest considerations or why the 18-month (vs. 6 or 12-month) periods were granted.  Given the protracted duration of the "extraordinary and temporary conditions"-based designation for Haiti, the absence of any meaningful appraisal of national interest factors or justification for the 18-month extension, and the fact that eligible Haitians were able to register for TPS under the July 1, 2024, notice for over seven months, the Secretary has determined that a 12-month period is warranted.  Abbreviating the period from 18 to 12 months will allow for a fresh review of country conditions in Haiti and of whether such conditions remain both "extraordinary" and "temporary," whether Haitian may return in safety, and whether it is contrary to the U.S. national interest to continue to permit the Haitian nationals to remain temporarily in the United States.

27

90 Fed. Reg. at 10513-14.

28

None of these reasons reflect reasoned agency decision making.  For example, the

55

United States District Court
Northern District of California

1  Secretary claimed that the Mayorkas extension/redesignation should have given specific reasons

2  why the period was set at 18 months, particularly when the default was only 6 months.  But 6

3  months is the default only if the Secretary does *not* affirmatively make a decision on whether to

4  extend or terminate.  *See* 8 U.S.C. § 1254a(b)(3)(C) ("If the [Secretary] does not determine under

5  subparagraph (A) that a foreign state (or part of such foreign state) no longer meets the conditions

6  for designation under paragraph (1), the period of designation of the foreign state is extended for

7  an additional period of 6 months (or, in the discretion of the Attorney General, a period of 12 or 18

8  months).").  That was not the situation here: Secretary Mayorkas did make an affirmative decision

9  – *i.e.*, to extend.  Furthermore, Secretary Noem failed to acknowledge that, in prior TPS decision

10  making spanning the course of the 35 years, there typically has been no explanation as to why a

11  certain period of time was chosen.  *See* MacLean Decl. ¶ 30 (testifying that TPS decisions over the

12  course of 35 years were reviewed, and, "in virtually all instances where a DHS Secretary

13  announced the length of a TPS designation or extension, they did so without elaborating their

14  reasons for choosing that duration and not another duration length[;] [t]here are only exceedingly

15  rare instances where Secretaries have provided any explanation for the duration of a designation or

16  extension").  The government has provided no evidence to the contrary.  Thus, there is nothing in

17  the record that suggests the absence of a specific justification for the length of an extension, once

18  the decision to extend has been made, is unusual or impermissible.

19       Secretary Noem's criticism that the Mayorkas extension/redesignation failed to explain

20  why it was not contrary to national interest to extend TPS suffers from the same basic flaw.  That

21  is, in prior TPS decision making, DHS Secretaries typically have not given explanations as to why

22  allowing TPS holders to remain in the United States is not contrary to the national interest.  *See*

23  MacLean Decl. ¶ 30 ("Secretaries have never explained their conclusion that 'permitting [TPS

24  beneficiaries] to remain temporarily in the United States' is not 'contrary to the national

25  interest.'").[20]  The government presents no evidence that the Mayorkas decision was contrary to

26  established practice.

27   

                     _____

28  [20] Plaintiffs also fairly note that this would require a Secretary to prove a negative.

1    In addition to the above, the partial vacatur decision arbitrary and capricious because (like

2    the vacatur decision for Venezuela) it was preordained without any meaning analysis and review.

3    It was, *inter alia,* made without consultation with government agencies or country conditions

4    review.  As with the administrative record for the Venezuela vacatur, there was no

5    contemporaneous country conditions report in the administrative record for the Haiti partial

6    vacatur.  Rather, there was only a country conditions report from the Biden era that *supported* the

7    Mayorkas extension/redesignation.  *See* Docket No. 110-5 (RAIO report, dated January 2024)

8    (ECF Pages 29-43).  As in the case of Venezuela, it is ironic, if not disingenuous, for Secretary

9    Noem to rely on a report which supported the Mayorkas extension/redesignation to *vacate* that

10   extension/redesignation.  She has cited nothing specific in those reports to support her decision to

11   vacate, with a single exception: reference to that fact that the United Nations had authorized a

12   Multinational Security Support (MSS) mission to deploy in Haiti in 2024.  But Secretary Noem

13   cited no evidence on the status of the deployment and if so whether by 2025 it has had any real

14   impact on the crime and lawlessness which had plagued Hait in recent years.  There is no evidence

15   that she obtained or even requested a current update on the MSS mission.  Simply put, in deciding

16   to partially vacate the TPS extension, Secretary Noem had no regard for the facts and actual

17   conditions.

18   Instead, like her decision to vacate Venezuela's TPS,  the Secretary's decision to partially

19   vacate was simply driven by her predetermined desire to terminate Haiti's TPS on a hastened

20   timeline.  DHS began to draft the vacatur decision within days of the Venezuela termination.  The

21   decision to vacate was made approximately two weeks later.  A press release, dated February 20,

22   2025, announcing the partial vacatur included statements that the vacatur was "part of President

23   Trump's promise to *rescind* policies that were magnets for illegal immigration and inconsistent

24   with the law" – effectively noting that termination would be forthcoming.  MacLean Decl., Ex. 15

25   (press release) (emphasis added; also asserting that, "[f]or decades the TPS system has been

26   exploited and abused" and pointing out that, "[l]ast month, Secretary Norm similarly rescinded the

27   previous administration's Venezuela TPS extension").

28   To be sure, the timeline for Haiti is, on its face, not as stark as that for Venezuela – *i.e.*, it

57

United States District Court
Northern District of California

1    does not appear as compressed; this might suggest that there was less of an urgency to terminate

2    than in the case of Venezuela.  However, a closer look establishes that the path laid out for Haiti

3    was not materially different from that carried out for Venezuela.  Secretary Noem was able to

4    effectuate a full vacatur of the Mayorkas extension for Venezuela only because the period for the

5    extension had not yet begun.  (The period for the extension would have run from April 2025 to

6    October 2026.  Secretary Noem vacated the extension in February 2025.)  The full vacatur is what

7    enabled the Secretary to then immediately terminate.  In contrast, Secretary Noem was not able to

8    do a full vacatur of the Mayorkas extension/redesignation for Haiti because the period for that

9    extension/redesignation had already begun (starting in August 2024) by the time she made the

10   decision to vacate in February 2025.  Nor did Secretary Noem have the option of shortening the

11   extension/redesignation to 6 months (instead of 12) for the partial vacatur because that deadline

12   had already passed as well.  Thus, Secretary Noem was effectively forced to do a partial vacatur

13   that shortened the extension/redesignation period to 12 months (instead of 18, as provided for by

14   Secretary Mayorkas).  Once that 12-month period was soon due to expire, Secretary Noem did not

15   waste time in proceeding with the termination of Haiti's TPS.

16          3.    Summary

17          The Court grants Plaintiffs' motion for summary judgment on the APA claim related to the

18   partial vacatur for Haiti, and denies the government's cross-motion.  The Secretary lacked the

19   authority to partially vacate and/or exceeded her authority to vacate.  Even if she had statutory

20   authority to vacate, the decision to partially vacate was arbitrary and capricious.

21   F.    Equal Protection Claims

22          Only the government has moved for summary judgment on the Equal Protection claims;

23   Plaintiffs have not.[21]  The Court denies the government's motion for summary judgment because,

24   consistent with its postponement order, it holds that *Trump v. Hawaii*, 585 U.S. 667 (2018), does

25   not provide the governing standard.  *See* Docket No. 93 (Order at 60-61) (distinguishing *Trump v.*

26   
_____

27   [21] Although the APA provides that a court shall set aside agency action that is "contrary to
     constitutional right," 5 U.S.C. § 706(2)(B), Plaintiffs' complaint does not appear to expressly
     allege a violation of the APA predicated on a constitutional violation.  Rather, Plaintiffs seem to
28   have asserted constitutional claims separate from and independent of the APA claims.

58

United States District Court
Northern District of California

1    *Hawaii* because it dealt with the admission and exclusion of foreign nationals whereas TPS

2    holders are already present in the United States; adding that the *Ramos* panel invoked similar

3    reasoning).

4           Under the applicable analytical framework set forth in *Arlington Heights v. Metropolitan*

5    *Housing Development Corp.*, 429 U.S. 252, 265 (1977), the Court finds that there is a genuine

6    dispute of material fact as to whether the decisions to vacate and terminate were based on racial,

7    ethnic, and/or national origin animus. Such animus can reasonably be inferred from the

8    discriminatory statements made by Secretary Noem and/or President Trump alone. *See* Docket

9    No. 93 (Order at 64-69) (surveying some of the discriminatory statements – *e.g.*, statements by

10   Secretary Noem that "Venezuela didn't send us their best" but rather sent "criminals" and that the

11   TPS program resulted in Venezuelan gang members being present in the United States); *see also*

12   Docket No. 93 (Order at 70-71) (noting that President Trump influenced TPS policy and/or

13   decision-making). Notably, at least some of these statements were made when the Secretary or

14   President was discussing TPS, either expressly or implicitly.

15          For example, during a January 29, 2025, interview on Fox, when Secretary Noem

16   announced the vacatur decision for Venezuela, the Secretary stated:

17               [F]or 18 months, they were going to extend this protection to people
18               that are in temporary protected status, which meant they were going
                 to be able to stay here and violate our laws for another 18 months,
19               and we stopped that. Today we signed an executive order within the
                 Department of Homeland Security in a direction that we were not
20               going to follow through on what he did to tie our hands, that we are
                 going to follow the process, evaluate all of these individuals that are
21               in our country, including the Venezuelans that are here and members
                 of [TdA]. Listen, I was in New York City yesterday and the people
22               of this country want these dirt bags out.

23   MacLean Decl., Ex. 18 (transcript). As noted in the Court's postponement order, Secretary

24   Noem's generalization of the alleged acts of a few (for which there is little or no evidence) to the

25   entire population of Venezuelan TPS holders who have lower rates of criminality and higher rates

26   of college education and workforce participation than the general population is a classic form of

27   racism. *Cf. Hirabayashi v. United States*, 320 U.S. 81, 96-99 (1943) (describing why Japanese

28   Americans as a group, despite the fact that most were American citizens, were susceptible to

                                                  59

1   disloyalty and thus constitute a security threat, relying on assumed stereotypes); *Korematsu v.*

2   *United States*, 323 U.S. 214, 233, 235 (1944) (Murphy, J., dissenting) (characterizing the majority

3   decision upholding the mass internment of Japanese Americans as falling into the "ugly abyss of

4   racism"; noting that the "forced exclusion [of Japanese Americans] was the result in good measure

5   of the erroneous assumption of racial guilt . . ."). The government has suggested that the Secretary

6   was simply calling the members of the TdA gang members "dirt bags," but there is at the very

7   least ambiguity as to whether she was calling only gang members dirt bags, or instead referring to

8   the larger Venezuelan TPS population in the United States. *See* Docket No. 93 (Order at 65 n.26).

9   In any event, even if the government were right, a reasonable jury could still infer racial animus

10  from the Secretary's statement because she was choosing to strip legal status from all Venezuelan

11  TPS holders – numbering in the hundreds of thousands – based off her assessment of a limited

12  number of individuals, and with no proof that any alleged gang member was a TPS holder.

13          As for President Trump, his comments included derogatory and baseless claims that

14  Haitian immigrants in Springfield, Ohio – TPS holders – were eating people's pets. *See* Docket

15  No. 129 (Order at 5); *see also* MacLean, Decl., Ex. 19 (article, dated October 2024; Docket No. 93

16  (Order at 67). Also, during his first administration – when there were also a number of attempts to

17  terminate TPS – there was a discussion about protecting immigrants from Haiti, El Salvador and

18  African countries, and President Trump asked: "Why are we having all these people from shithole

19  countries come here?" Docket No. 93 (Order at 66) (internal quotation marks omitted). He then

20  suggested that the "United States should instead bring more people from countries such as Norway

21  . . . ." Docket No. 93 (Order at 66) (internal quotation marks omitted).

22          To be clear, the record from which a reasonable inference of animus can be made consists

23  of more than just the discriminatory statements of Secretary Noem and President Trump, some of

24  which were proximate in time to the decisions challenged herein. As discussed in the Court's

25  postponement order, a number of other *Arlington Heights* factors suggest animus including "the

26  anomalous procedures followed (the highly compressed time in which the decisions to vacate and

27  then terminate were made and the precedential and unique nature of the decisions made), and the

28  lack of bona fides for the decisions to vacate and then terminate." Docket No. 93 (Order at 75).

United States District Court
Northern District of California

1    The government's motion for summary judgment on the Equal Protection Claims is

2    denied.

3                          **VIII.     MOTIONS TO DISMISS**

4    A.    Legal Standard

5    Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

6    statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A

7    complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil

8    Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss

9    after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic*

10   *Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . .

11   . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d

12   1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and

13   construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St.*

14   *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). "A claim has facial

15   plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

16   inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The

17   plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

18   possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

19   B.    Termination of Haiti's TPS

20   The government has filed two motions to dismiss. The original motion to dismiss and

21   briefing related thereto were all completed before the Secretary terminated Haiti's TPS. After

22   Haiti's TPS was terminated, the parties stipulated that Plaintiffs could file an

23   amended/supplemental complaint to include the termination. Plaintiffs did so, after which the

24   government filed a new motion to dismiss. The new motion to dismiss is largely the same as the

25   original motion to dismiss, except that it also addresses the Haiti termination.

26   As an initial matter, Plaintiffs argue that their filing of a supplemental complaint did not

27   moot out the original motion to dismiss. Practically speaking, this procedural issue is not material.

28   Plaintiffs do not argue that the government should be barred from moving to dismiss with respect

United States District Court
Northern District of California

United States District Court
Northern District of California

1  to the Haiti termination. Thus, the Court can consider the government's arguments in favor of

2  dismissal, whether in the original motion to dismiss or in the new one.

3        As for those arguments, those related to the Venezuela vacatur, Venezuela termination, and

4  Haiti partial vacatur lack merit for the reasons discussed in the Court's summary judgment

5  analysis.

6        Turning to the Haiti termination, the government's arguments in favor of dismissal also

7  lack merit. Indeed, because the Court has found the Haiti partial vacatur unlawful, the Haiti

8  termination – which was possible only because of the vacatur – is necessarily unlawful too.

9  Plaintiffs' APA and Equal Protection claims related to the Haiti termination are also plausible as

10  there are allegations in the operative complaint suggesting pretext. For example, Plaintiffs have

11  alleged that, on June 7, 2025, DHS announced in a press release that Haiti's TPS would be

12  terminated, *both* because country conditions had improved and because allowing Haitians to

13  remain temporarily in the United States was against national interest. *See* FASC ¶ 106. However,

14  on July 1, 2025, when the decision to terminate was published in the Federal Register, no mention

15  was made of improved conditions; the decision rested on a national interest assessment alone. *See*

16  FASC ¶ 107. Country conditions were referenced only indirectly in the context of the Secretary's

17  national interest findings – and here there was no mention of any improved conditions; rather, the

18  clear suggestion that there was significant instability in the country. *See, e.g.*, 90 Fed. Reg. at

19  28763 (stating that "[g]ang violence in Haiti persists as armed groups operate with impunity,

20  enabled by a weak or effectively absent central government"; "[w]idespread gang violence in Haiti

21  is sustained by the country's lack of functional government authority"); *id.* at 28762 (stating that

22  "'Haiti lacks a central authority with sufficient availability and dissemination of law enforcement

23  information necessary to ensure its nationals do not undermine the national security of the United

24  States'"). As Plaintiffs argue, "Defendants' simultaneous promulgation of two directly

25  contradictory explanations for the Haiti termination suffices to demonstrate, at least for purposes

26  of a motion to dismiss, that the reasons given were pretextual." Docket No. 264 (Opp'n at 3).

27  Pretext may further be inferred from the facts discussed above in regard to the partial vacatur.

28        The motions to dismiss are, therefore, denied.

# IX.    SCOPE OF RELIEF

Because the Court has granted Plaintiffs' summary judgment motion on the APA claims related to the Venezuela vacatur, the Venezuela termination, and the Haiti partial vacatur, the Court must also consider the to which relief Plaintiffs are entitled.  Section 706 of the APA specifies that a court "shall . . . hold unlawful and set aside agency action . . . found to be," *e.g.*, arbitrary or capricious, not in accordance with the law, in excess of statutory authority, and without observance of procedure required by law.  5 U.S.C. § 706(2).  Based on this statutory language, the Court sets aside, or vacates, each of the above decisions made by Secretary Noem.

The Court first rejects the government's contention that relief as a legal matter should categorically be limited in scope to only Plaintiffs – *i.e.*, the individual plaintiffs and the members of the National TPS Alliance ("NTPSA").  As noted above, in *Trump v. CASA*, where the Supreme Court addressed the viability of nationwide or universal injunctions, it expressly stated its holding therein did not "resolve[] the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Trump v. CASA*, 156 S. Ct. at --- n.10.  The government has also cited no authority to suggest that § 706 of the APA incorporates equitable principles, which were the basis of the Supreme Court's holding in *Trump v. CASA*.  In fact, the Fifth Circuit has stated that

> vacatur under § 706 is, as we have repeatedly described it, the "default" remedy for unlawful agency action.  Thus, contrary to what the Government and the amici represent, we do not read our precedent to require consideration of the various equities at stake before determining whether a party is entitled to vacatur.

*Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024), *rev'd and remanded on other grounds sub nom. Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427 (2025); *see also Cabrera v. U.S. DOL*, No. 25-cv-1909 (DLF), 2025 U.S. Dist. LEXIS 141992, at *23-24 (D.D.C. July 25, 2025) (noting that, "[i]n non-APA cases, 'background equitable principles may control' because 'Congress has rarely authorized courts to act directly on federal statutes or to prohibit their enforcement against nonparties,'" but "the APA permits courts to act directly on agency actions"); *Ksanka Kupaqa XA v. U.S. Fish & Wildlife Serv.*, 534 F. Supp. 3d 1261, 1273 (D. Mont. 2021) (rejecting defendant's argument that plaintiff had to show irreparable harm: "[t]hat

63

United States District Court
Northern District of California

argument misses the mark" because "the APA directs that the 'reviewing court shall . . . set aside agency action, findings, and conclusions found to be' arbitrary, capricious, or contrary to law").

Furthermore, the Court finds persuasive Justice Kavanaugh's concurrence in *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, 603 U.S. 799 (2024). There, Justice Kavanaugh rejected the government's contention that "the APA's authorization to 'set aside' agency action [under § 706] does not allow vacatur, but instead permits a court only to enjoin an agency from enforcing a rule against the plaintiff." *Id.* at 827 (Kavanaugh, J., concurring). Justice Kavanaugh characterized that argument as "far-reaching," "novel," and "wrong. It 'disregards a lot of history and a lot of law.'" *Id.* He then explained that the APA does in fact authorize vacatur of unlawful agency action, including agency rules, based on "the text and history of the APA, the longstanding and settled precedent adhering to that text and history, and the radical consequences for administrative law and individual liberty that would ensue if vacatur were suddenly no longer available." *Id.* at 829. In short, it is hard to imagine, textually and logically, how a singular rule or order issued by an agency which has uniform national application can be "held unlawful and set aside" under § 706 only as to some and not others equally subject to and affected by such unlawful rule or order.

At the hearing in the instant case, the government argued for the first time that § 703 defines the authority of the court to issue relief, and not § 706. That argument was not raised in the government's papers and therefore has been waived. In any event, on the merits, the argument is without merit for the reasons stated in Justice Kavanaugh's concurrence in *Corner Post*.

> Section 703 determines the "form of proceeding" for suits under the APA and identifies the federal actors against whom an "action for judicial review may be brought." But "no court has ever held that Section 703 implicitly delimits the kinds of remedies available in an APA suit. For good reason: As explained above, the ordinary meaning of "set aside" in §706(2) has long been understood to refer to the remedy of vacatur. The conclusion that §706 governs remedies is also supported by §706(1), which authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed" – unmistakably a remedy. By contrast, the text of §703 "speaks to venue and forms of proceedings, not to remedies, and regardless, its listing of the available forms of proceedings is nonexhaustive."

*Id.* at 838-39.[22]

The government contends that the Ninth Circuit's recent decision in *IDL*, 2025 U.S. App. LEXIS 17884, precludes this Court from setting aside the Secretary's orders in their entirety and requires the Court to limit relief to Plaintiffs herein. The Court disagrees. The plaintiffs in *IDL* filed suit challenging the implementation of the Trump Administration's "Remain in Mexico" policy (also known as the Migrant Protection Protocols or MPP). Under the policy, persons from Mexico seeking asylum in the United States had to remain in Mexico pending adjudication of their asylum proceedings – even though this made it difficult for the individuals to access counsel to represent them in their asylum proceedings. The plaintiffs moved for a stay of the implementation of the policy pending the conclusion of the litigation. The district court granted a nationwide stay pursuant to 5 U.S.C. § 705. The government appealed that decision.

On appeal, the government argued, *inter alia*, that the stay should be limited to only the organizational plaintiff's clients. The Ninth Circuit agreed with the government, stating that, "*at this stage in the litigation*, . . . limiting the district court's order to [IDF]'s current and future clients is the more equitable approach 'to preserve status [and] rights pending conclusion of the review proceedings.'" *Id.* at *41 (emphasis added; quoting § 705). The Ninth Circuit acknowledged that, in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), the Supreme Court expressly stated that "[n]othing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Id.* at 945 n.10 (citing § 706). However, the Ninth Circuit stated that *Trump v. CASA* still provided some guidance in the

---

[22] A number of lower courts have agreed with Justice Kavanaugh, whether explicitly or implicitly. *See, e.g.*, *N.Y. Legal Assistance Grp. v. Cardona*, No. 20 Civ. 1414 (LGS), 2025 U.S. Dist. LEXIS 51632, at *10 (S.D.N.Y. Mar. 20, 2025) (citing, *inter alia*, Justice Kavanaugh's concurrence in rejecting defendant's interpretation of §§ 706 and 703); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. CV 25-306 (RDM), 2025 WL 1825431, at *50 (D.D.C. July 2, 2025) (stating that "[t]he D.C. Circuit has 'made clear that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated – not that their application to the individual petitioners is proscribed"'"). Nevertheless, the Court acknowledges that not all Justices on the Supreme Court are in agreement with Justice Kavanaugh. Justice Gorsuch, for example, seems to agree with the government's position. *See United States v. Texas*, 599 U.S. 670, 696-98 (2023) (Gorsuch, J., concurring) (asserting that "[t]here are many reasons to think § 706(2) uses 'set aside' to mean 'disregard' rather than 'vacate'"; also asserting that § 703 "is where the APA most clearly discusses remedies" and it does not provide for vacatur).

context of that case "because the factors used to determine whether to issue a § 705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction." *IDL*, 2025 U.S. App. LEXIS 17884, at *42.

*IDL* does not require that relief in this case – a final judgment under § 706, not an interim postponement order under § 705 – be limited to the individual plaintiffs and members of the plaintiff National TPS Alliance. *IDL*'s holding was clearly informed by the procedural posture of that case, where the plaintiffs were seeking *preliminary* relief to preserve the status quo under § 705. *IDL*'s ruling applies to preliminary relief where such relief is predicated on equitable considerations similar to that which apply to preliminary injunctions under *Winter v. NRDC*, 555 U.S. 7 2008; *see also Colorado v. United States EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (stating that the preliminary injunction "factors also determine when a court should grant a stay of agency action under section 705 of the APA"); *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020) (stating that the standard for a stay under § 705 is "the same" as the standard for a preliminary injunction); *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 529 (N.D. Cal. 2020) (stating that factors considered in determining whether to postpone pursuant to § 705 "'substantially overlap with the . . . factors for a preliminary injunction'"). That similarity makes *CASA* apposite to stays under § 705, but inapposite to the instant case where final relief under § 706 is not anchored to the equitable *Winter* factors. Section 706 directs that the court "must" "[h]old unlawful and set aside agency actions" if they are unlawful for the reasons set forth in § 706(2). *Trump v. CASA*, informed by historic equitable remedies, does not apply to § 706 of the APA which contains a clear statutory directive.

Even if, as a legal matter, *Trump v. CASA*'s restriction on the scope of relief were to guide the scope of relief under § 706, the Ninth Circuit – in affirming this Court's postponement order – indicated that relief should be nationwide in scope *in this case* because (1) full relief for the NTPSA and its tens of thousands of members who reside in all fifty states and the District of Columbia could not be obtained otherwise and (2) limiting relief as proposed by the government was not a workable solution under the TPS statute. *See NTPSA*, 2025 U.S. App. LEXIS 22269, at *56. The court stated as follows:

Plaintiffs have demonstrated that a postponement of the Vacatur Notice, effective nationwide, is the only remedy that provides complete relief to the parties before the court and complies with the TPS statute.  First, Plaintiff NTPSA, a membership organization, brings this challenge on behalf of its more than 84,000 members who are Venezuelan TPS holders in all fifty states and the District of Columbia.  As the district court reasoned, "[f]ull relief for the NTPSA and its members cannot be obtained absent application to all fifty states and the District of Columbia."

Second, limiting the relief to individual plaintiffs and NTPSA members is not a workable solution under the TPS statute.  Plaintiffs challenge a single act: Secretary Noem's vacatur of the prior extension of Venezuelan TPS.  They do not challenge the eligibility determination for any particular TPS holder.  Limiting Secretary Noem's decision to affect only certain individuals would effectively mean rewriting it in a way that does not comply with the TPS statute.  Although the TPS statute contemplates only a single binary determination for each country's TPS designation, we would be replacing Secretary Mayorkas's positive determination, and Secretary Noem's negative determination, with a judicially created patchwork.

These statutory constraints distinguish this appeal from those arising in otherwise similar contexts. In *Immigrant Defenders*, the plaintiff organization challenged the enrollment of asylum seekers in the "Remain in Mexico" program.  There, we limited the scope of the order postponing the implementation of the "Remain in Mexico" program to the organization's individual clients, as doing so awarded the plaintiffs complete relief.  The statute at issue in *Immigrant Defenders* stated that the Secretary of Homeland Security "may return the [noncitizen]" to Mexico pending removal proceedings.  Thus, the statute did not prohibit the Secretary from adopting a piecemeal approach by returning some, but not all, noncitizens to Mexico.  Indeed, the statute specifically contemplated separate actions for each individual asylum seeker, so the piecemeal approach was consistent with the statute's design and purpose.  Similarly, the challenge in *East Bay v. Barr* was to a rule limiting the eligibility of certain noncitizens for asylum.  We held that the "nationwide scope" of the injunction was "not supported by the record" at that stage in the litigation because the district court failed to discuss why nationwide relief was necessary to remedy Plaintiffs' harm.  Again, since the rule at issue dealt with asylum eligibility, it was possible to apply the rule to asylum applicants in some areas but not others, because each person's asylum eligibility is an individual determination.

"Where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown."  Here, relief cannot be structured on an individual basis.  Postponing the rule for just some individuals would require rewriting the statute itself, and a narrower construction is not possible.  TPS does not allow for partial determinations; no Secretary has the authority to designate a country for TPS when it comes to California residents, but not for Pennsylvania residents.  And we do not claim the authority to do so

United States District Court
Northern District of California

1    judicially.

2    *Id.* at *56-59. The Ninth Circuit's analysis is dispositive as to the scope of properly relief herein.

3    The Court further notes that limiting relief to the individual plaintiffs and the members of

4    NTPSA only would be highly problematic for additional reasons. For example, limiting relief to

5    the members of the organization would require that identification of the members be provided to

6    DHS which would raise serious concerns about privacy and associational rights. *Cf. NAACP v.*

7    *Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958) (noting that "compelled disclosure of affiliation

8    with groups engaged in advocacy may constitute as effective a restraint on freedom of association

9    as the forms of governmental action"). Moreover, there may also be insurmountable practical

10    problems given that NTPSA has members numbering in the tens of thousands, if not in the

11    hundreds of thousands, throughout the country. At the time of the Court's postponement order,

12    NTPSA's members included over 84,000 Venezuelan TPS holders alone. *See* Docket No. 93

13    (Order at 2). Contacting all members in a short time span within which their rights must be

14    protected may be impossible as a practical matter.

15    ## X.    CONCLUSION

16    For the foregoing reasons, the Court grants Plaintiffs' motion for summary judgment on

17    the APA claims related to the Venezuela vacatur, the Venezuela termination, and the Haiti partial

18    vacatur. It finds those decision of Secretary Noem are unlawful and sets aside each of those

19    agency actions. The Court denies the government's motion for summary judgment on the same

20    APA claims. It further denies the government's motion for summary judgment on the Equal

21    Protection claims and its motion to dismiss on the APA claims related to the Haiti termination.

22    In addition, given the likelihood of an appeal to the Ninth Circuit and possibly the

23    Supreme Court, and the significant rights of the Venezuelan and Haitian TPS holders who have

24    lost or will lose status in the absence of relief and the consequential need for expeditious final

25    adjudication, the Court directs entry of a final judgment under Rule 54(b) on the APA claims for

26    which the Court has granted summary judgment in favor of Plaintiffs. There is no just reason for

27    delay. *See* Fed. R. Civ. P. 54(b) ("When an action presents more than one claim for relief . . . , the

28    court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties

United States District Court
Northern District of California

68

only if the court expressly determines that there is no just reason for delay."). **The Clerk of the Court is directed to enter a final judgment in favor of Plaintiffs on the APA claims related to (1) the Venezuela vacatur, (2) the Venezuela termination, and (3) the Haiti vacatur.[23]**

As for the remaining claims – *i.e.*, (4) the APA claim related to the Haiti termination, (5) the Equal Protection claim related to the Venezuela TPS decisions, and (6) the Equal Protection claim related to the Haiti TPS decisions – the Court temporarily stays continued litigation. Given the prior proceedings in this case, it seems likely that the government will appeal this order. A temporary stay will help conserve judicial and party resources and further will allow the appellate courts to adjudicate most of the statutory claims before the constitutional ones.[24] *Cf. Califano v. Yamasaki*, 442 U.S. 682, 692 (1979) (stating that "[a] court presented with both statutory and constitutional grounds to support the relief requested usually should pass on the statutory claim before considering the constitutional question").

This order disposes of Docket Nos. 122, 165, 199, 172, and 262.

**IT IS SO ORDERED**.

Dated: September 5, 2025

_____
EDWARD M. CHEN
United States District Judge

[23] The Court acknowledges the Supreme Court's order staying enforcement of the postponement order. However, the Supreme Court's order only concerns the preliminary relief ordered by this Court in postponing agency action. The Supreme Court's order did not bar this Court from adjudicating the case on the merits and entering a final judgment issuing relief under § 706 of the APA.

[24] The APA claim based on the Haiti termination is not a constitutional claim, but, as discussed above, the Haiti termination will be unlawful if the Haiti vacatur is deemed unlawful.

United States District Court
Northern District of California

69

**EXHIBIT 2**

District Court Judgment (Sept. 5, 2025)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL TPS ALLIANCE, et al., | Case No. 25-cv-01766-EMC |
| Plaintiffs, | |
| v. | **JUDGMENT** |
| KRISTI NOEM, et al., | |
| Defendants. | |

On September 5, 2025, the Court granted Plaintiffs' APA claims related to (1) the Venezuela vacatur, (2) the Venezuela termination, and (3) the Haiti vacatur.  Pursuant to Federal Rule of Civil Procedure 58, the Court hereby ENTERS judgment in favor of Plaintiffs and against Defendants.

**IT IS SO ORDERED.**

Dated: September 5, 2025

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

**EXHIBIT 3**

Plaintiffs' Reply in Support of Motion to Enforce (Sept. 11, 2025)

1   Ahilan T. Arulanantham (SBN 237841)
    arulanantham@law.ucla.edu
2   CENTER FOR IMMIGRATION LAW AND
    POLICY, UCLA SCHOOL OF LAW
3   385 Charles E. Young Dr. East
    Los Angeles, CA 90095
4   Telephone: (310) 825-1029

5   Emilou MacLean (SBN 319071)
    emaclean@aclunc.org
6   Michelle (Minju) Y. Cho (SBN 321939)
    mcho@aclunc.org
7   Amanda Young (SBN 359753)
    ayoung@aclunc.org
8   ACLU FOUNDATION
    OF NORTHERN CALIFORNIA
9   39 Drumm Street
    San Francisco, CA 94111-4805
10  Telephone: (415) 621-2493
    Facsimile: (415) 863-7832

11

12  Attorneys for Plaintiffs
    *[Additional Counsel Listed on Next Page]*

13

14              UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16               SAN FRANCISCO DIVISION

17

| | |
|---|---|
| 18  NATIONAL TPS ALLIANCE, MARIELA GONZÁLEZ, FREDDY JOSE ARAPE RIVAS, M.H., CECILIA DANIELA GONZÁLEZ HERRERA, ALBA CECILIA PURICA HERNÁNDEZ, E.R., HENDRINA VIVAS CASTILLO, A.C.A., SHERIKA BLANC, VILES DORSAINVIL, and G.S., | Case No. 3:25-cv-01766-EMC **PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR COMPLIANCE WITH COURT ORDER** |
| 21           Plaintiffs, | |
| 22       vs. | |
| 23  KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA, | |
| 26           Defendants. | |

27

28  Additional Counsel for Plaintiffs

---

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (*Pro Hac Vice*)
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (*Pro Hac Vice*)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, 1H
San Diego, CA 92120
Telephone: (949) 603-7411

**INTRODUCTION**

Defendants contend they can disregard the Court's September 5 judgment, and end run the Court's order denying their emergency stay motion, by belatedly pretending that Federal Rule of Civil Procedure 62(a) stayed the effect of the judgment even before they filed their emergency stay motion. This reflects a troubling pattern of post-hoc excuses for unabashed noncompliance. If Defendants had any serious ground for believing Rule 62(a) automatically stayed the judgment, then they never would have filed an emergency stay motion one day after the judgment (on a Saturday no less, and with an urgent deadline for its resolution), let alone a reply in support of their emergency stay motion yesterday. Indeed, it would be sanctionable misconduct to ask this Court to rule on an emergency motion to stay within three court days if the judgment already was automatically stayed for 30 days under Rule 62(a).

Not surprisingly, that is not the only fatal defect in Defendants' Rule 62(a) argument. First, courts have held that even where a judgment is stayed under Rule 62(a) for purposes of collecting monetary judgment—the vast majority of cases in which Rule 62(a) has been applied—the judgment does not lose its effectiveness for other purposes. Second, the Rule does not apply to this case because Rule 62's exceptions were drafted to be consistent with 28 U.S.C. § 1292(a)(1)—the statute governing appellate jurisdiction—which courts have read to apply not just to injunctions but also to other orders sufficiently similar to them. Finally, even if Rule 62(a) could have otherwise applied, the Rule permits this Court to exercise its discretion to make its orders effective immediately. If this Court does not reject Defendants' arguments outright, this Court should exercise its discretion to protect hundreds of thousands of Venezuelan and Haitian TPS holders from unlawful detention and deportation, and for the other reasons it declined to grant the emergency motion to stay.

**ARGUMENT**

**I.    The Court's Order is Not Automatically Stayed**

Despite asking for an emergency stay, Defendants now contend they are not required to comply with this Court's September 5 order because it was stayed automatically pursuant to Federal Rule of Civil Procedure 62(a), which provides for an automatic stay of "proceedings to enforce" a judgment except in, *inter alia*, "an action for an injunction." Fed. R. Civ. P. 62(a), (c). Defendants

then contend that set aside relief under APA Section 706 is not injunctive in nature because this Court concluded it was not injunctive for purposes of the immigration statute's jurisdiction-limiting provision at 8 U.S.C. 1252(f). This argument is meritless for several reasons.

The first threshold problem is that Defendants' position cannot be reconciled with their request for an emergency stay. That alone is reason to reject it, as Defendants should be estopped from arguing such blatantly inconsistent positions. *United States v. Paulson*, 68 F.4th 528, 547 (9th Cir. 2023) (explaining judicial estoppel "exists to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment" (cleaned up)); *id.* at 547 n.29 ("judicial estoppel may be applied to prevent the government from asserting inconsistent legal arguments"); *see also* 18 Moore's Federal Practice § 134.30, p. 134–62 (3d ed. 2000) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding") (cited in *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).

Second, even when Rule 62(a)'s automatic stay applies, it "does not purport to make a judgment ineffective" during the stay period. *Fish Mkt. Nominee Corp. v. Pelofsky*, 72 F.3d 4, 6 (1st Cir. 1995); *cf. Huron Holding Corporation v. Lincoln Mine Operating Co.*, 312 U.S. 183, 189 (1941) ("[I]n the federal courts the general rule has long been recognized that while appeal with proper supersedeas stays execution of the judgment, it does not—until and unless reversed—detract from its decisiveness and finality."). Accordingly, even when Rule 62(a) could operate to stay a judgment, a prevailing party may, for example, record a judgment to preserve a lien on property awarded by the judgment. *In re Vanden Bossche*, 125 B.R. 571, 573 (N.D. Cal. 1991). Similarly, even if Rule 62's automatic stay had applied here—which it does not—it would not prevent the Court ordering USCIS to update its website to reflect this Court's judgment and its effect on the status of Venezuela's TPS designation to preserve the relief awarded by the judgment; or from ensuring that Venezuelan TPS holders have adequate opportunity to re-register for the extension which is now in effect as a result of the Court's order.

While these considerations make it unnecessary for this Court to address the question whether Rule 62(a)'s automatic stay rule applies to set aside relief under APA Section 706, if it does

2

1    reach that issue, the answer is clear. Rule 62(a) "primarily serves to give one against whom a money

2    judgment is entered time to post a supersedeas bond to stay enforcement of that judgment pending

3    appeal." *Fish Mkt. Nominee Corp.*, 72 F.3d at 6. Defendants cite no authority for the novel

4    proposition that Rule 62 *also* permits federal agencies to decline to comply with final judgments in

5    Administrative Procedure Act cases. It does not.

6         "When an appeal is taken from a judgment that is not a money judgment or an exception of

7    Rule 62(a) within the strict meaning of those terms, but is comparable to one or the other of these

8    judgments, most of the few courts that have addressed the issue appear (for purposes for Rule 62) to

9    treat the judgment like the judgment to which it is comparable." *In re Cap. W. Invs.*, 180 B.R. 240,

10   243 (N.D. Cal. 1995) (collecting cases). As such, courts have read Rule 62's reference to injunctions

11   to cover other kinds of orders that are similar in relevant ways. For example, the Ninth Circuit has

12   held that an order enforcing an agency subpoena, although not labeled an injunction, should be

13   treated as one for purposes of Rule 62. *NLRB v. Westphal*, 859 F.2d 818, 819 (9th Cir. 1988); *see*

14   *also Donovan v. Fall River Foundry Co.*, 696 F.2d 524, 526 (7th Cir. 1982) (holding that an order

15   requiring compliance with an agency inspection should be treated as an injunction for purposes of

16   Rule 62).

17        An action to set aside unlawful agency action pursuant to APA Section 706 falls within Rule

18   62's exception for injunctions, because it is similar to an injunction for purposes of the rule. Fed. R.

19   Civ. Pro. 62(c). Rule 62 was explicitly drafted to be consistent with the rules governing appeal of

20   district court orders at 28 U.S.C. § 1292(a)(1). *See* Committee Notes on 2018 Amendment to Fed. R.

21   Civ. P. 62 ("The language [of subdivisions (c) and (d)] is revised to include all of the words used in

22   28 U.S.C. § 1292(a)(1) to describe the right to appeal from interlocutory actions with respect to an

23   injunction, but subdivisions (c) and (d) apply both to interlocutory injunction orders and to final

24   judgments that grant, refuse, or otherwise deal with an injunction."). Therefore, "injunction" as used

25   in Rule 62 must be interpreted consistently with "injunction" as used in 28 U.S.C. § 1292(a)(1).

26        As the Ninth Circuit recently recognized in this case, courts have read Section 1292(a)(1) to

27   cover orders that are not injunctions, so long as they have the same "practical effect" as an

28   injunction, under a three-part test. *Nat'l TPS All. v. Noem,* No. 25-2120, 2025 WL 2487771, at \*7–\*8

3

1   (9th Cir. Aug. 29, 2025) ("*NTPSA*") (citing *Carson v. Am. Brands, Inc.*, 450 U.S. 79 (1981)). All of

2   the reasons the Ninth Circuit recently provided for why this Court's order postponing agency action

3   under APA Section 705 was injunctive in nature for purposes of Section 1292(a)(1) apply to this

4   Court's ruling under Section 706 as well. *Id.* (citing *Imm. Defs. Law Ctr. v. Noem*, 145 F.4th 972,

5   983-84 (9th Cir. 2025) ("*ImmDef*")). While APA Section 705 and 706 differ in certain respects, *see*

6   Dkt. 279 at 63-68 (explaining that relief under Section 705 is anchored to equitable principles, while

7   relief under Section 706 is not), the two types of orders are not materially different for purposes of

8   the *Carson* test, as the Ninth Circuit's recent decisions in this case and *ImmDef* have interpreted it.

9   Regarding the first prong, both 705 and 706 relief halt the implementation of agency action, and

10  therefore have the practical effect of an injunction. *See Nat'l TPS All.*, 2025 WL 2487771, at *7

11  (finding Section 705 relief injunctive in native because it "pauses the []implementation of" agency

12  action) (citing *ImmDef,* 145 F.4th at 983). On the second *Carson* factor, because the Ninth Circuit

13  found that postponing the termination of TPS had serious consequences, the same is necessarily true

14  of setting the termination aside permanently. *Id.* at *8. Finally, the Ninth Circuit found that the

15  temporary nature of TPS decisions renders them effectively challengeable only by immediate appeal.

16  *Id*. Accordingly, like Section 705 relief, Section 706 relief orders are injunctive for purposes of their

17  immediate appealability under 28 U.S.C. § 1292, and therefore must also be considered injunctive

18  for purposes of Rule 62. Contrary to Defendants' assertion, Opp. at 5, the Ninth Circuit's recent

19  decision in *ImmDef* made clear that an order can be injunctive in nature for purposes of appealability

20  under Section 1292, even though it is not injunctive in nature for purposes of the jurisdiction-

21  stripping provisions of the immigration laws under Section 1252(f)(1). *Compare ImmDef*, 145 F.4th

22  at 983-85 *with id*. at 989-90.

23          Finally, if the Court is not inclined to reject Defendants' argument on threshold grounds or

24  definitively construe Rule 62 for purposes of Section 706 set aside relief, it can prevent manifest

25  injustice to Plaintiffs and other TPS holders by ordering that its judgment be effective immediately.

26  Rule 62(a) "expressly recognizes the court's authority to dissolve the automatic stay." Committee

27  Notes on 2018 Amendment to Fed. R. Civ. P. 62. Should this Court have any doubt about whether

28  Rule 62(a)'s automatic stay may apply, it should exercise its authority to dissolve the stay for the

4

1   reasons given in its order denying Defendants' stay request. Dkt. 296 at 6 ("A stay of the judgment

2   would irreparably harm the individual plaintiffs and the thousands of members of NTPSA who

3   would immediately face the prospect of a return to countries that are so dangerous that even the State

4   Department advises against travel (not to mention loss of the ability to work, drive, and so forth).").

5                                           **CONCLUSION**

6        For the foregoing reasons, as well as those set out in Plaintiffs' motion, this Court should

7   grant Plaintiffs' motion and order Defendants to comply with this Court's September 5 order.

8

9    Date:  September 11, 2025                       Respectfully submitted,

10                                                   NATIONAL DAY LABORER
                                                     ORGANIZING NETWORK
11

12                                                    /s/ *Jessica Karp Bansal*
                                                     Jessica Karp Bansal
13                                                   Lauren Michel Wilfong (*Pro Hac Vice*)
                                                     NATIONAL DAY LABORER
14                                                   ORGANIZING NETWORK

15                                                   Emilou MacLean
                                                     Michelle (Minju) Y. Cho
16                                                   Amanda Young
                                                     ACLU FOUNDATION
17                                                   OF NORTHERN CALIFORNIA

18                                                   Ahilan T. Arulanantham
                                                     CENTER FOR IMMIGRATION LAW AND
19                                                   POLICY, UCLA SCHOOL OF LAW

20                                                   Eva L. Bitran
                                                     ACLU FOUNDATION
21                                                   OF SOUTHERN CALIFORNIA

22
                                                     Erik Crew (*Pro Hac Vice*)
23                                                   HAITIAN BRIDGE ALLIANCE

24                                                   *Attorneys for Plaintiffs*

25

26

27

28

                                            5

1

### CERTIFICATE OF SERVICE

2       I hereby certify that on September 11, 2025, I caused the foregoing to be electronically filed

3  with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing

4  (NEF) to all counsel of record.

5

6                                          NATIONAL DAY LABORER ORGANIZING
                                           NETWORK

7

8                                           /s/ *Jessica Karp Bansal*
                                           Jessica Karp Bansal

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28