Cite as: 606 U. S. \_\_\_\_ (2025)        1

# SUPREME COURT OF THE UNITED STATES

No. 25A326

KRISTI NOEM, SECRETARY, DEPARTMENT OF HOMELAND SECURITY, ET AL. *v.* NATIONAL TPS ALLIANCE, ET AL.

ON APPLICATION FOR A STAY

[October 3, 2025]

In March of this year, the United States District Court for the Northern District of California entered a preliminary order postponing the effective date of the Secretary of Homeland Security's decision to remove "temporary protected status" (TPS) from Venezuelan nationals living in the United States. See 8 U. S. C. §1254a; 5 U. S. C. §705. In May, this Court stayed that order while the Government appealed. The United States Court of Appeals for the Ninth Circuit ultimately affirmed the District Court's preliminary order. Last month, the District Court entered final judgment in respondents' favor, holding unlawful and setting aside the Secretary's actions effectuating her decision—namely, her vacatur of a pending extension of TPS for Venezuelan nationals, and her termination of that status itself. See 5 U. S. C. §706(2). (The District Court also concluded that the Secretary unlawfully vacated a TPS extension for Haitian nationals. The Government now seeks to stay the portions of the District Court's judgment pertaining to Venezuela, but not Haiti. See Application 7, n. 6.)

The application for stay presented to JUSTICE KAGAN and by her referred to the Court is granted. Although the posture of the case has changed, the parties' legal arguments and relative harms generally have not. The same result that we reached in May is appropriate here.

2                  NOEM *v.* NATIONAL TPS ALLIANCE

JACKSON, J., dissenting

The September 5, 2025 order entered by the United States District Court for the Northern District of California, case No. 25–cv–1766, is stayed as to the Venezuela vacatur and Venezuela termination, pending the disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and disposition of a petition for a writ of certiorari, if such writ is timely sought. Should the petition for a writ of certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

JUSTICE SOTOMAYOR and JUSTICE KAGAN would deny the application.

JUSTICE JACKSON, dissenting from the grant of application for stay.

On January 19, 2021, the United States Government told Venezuelans living in the United States that Venezuela was experiencing the "worst humanitarian crisis in the Western Hemisphere in recent memory."[1] A couple months later, it said their country was in the midst of a "'severe political and economic crisis'" marked by "[e]conomic contraction," "deepening poverty," "a collapse in basic services," and "human rights abuses and repression."[2] The Government said substantially the same thing in

---

[1] Deferred Enforced Departure for Certain Venezuelans, Memorandum of Jan. 19, 2021, 86 Fed. Reg. 6845 (2021).

[2] See Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure, 86 Fed. Reg. 13576 (2021).

Cite as: 606 U. S. ____ (2025)            3

JACKSON, J., dissenting

September 2022,[3] and again in October 2023,[4] and again in January 2025.[5]

These fact-based conclusions had legal import: They entitled eligible Venezuelans to temporary protected status (TPS) under federal law. As a result, certain Venezuelans were shielded from removal, permitted to work, and qualified as lawfully present in the United States. See 8 U. S. C. §§1254a(a)(1), (f)(4). By law, this protection was supposed to last until at least October 2026.[6]

When President Trump took office in late January 2025, however, the Government quickly reversed course. The TPS statute plainly states that a TPS designation shall remain effective until the expiration of its "most recent previous extension." §1254a(b)(3)(B). But Secretary of Homeland Security Kristi Noem announced a much nearer termination date for some 300,000 Venezuelan TPS recipients: April 2025.[7]

By now, our lower court colleagues have determined five times over that this abrupt truncation of the TPS period was unlawful or likely so.[8] They have done so in reasoned and thoughtful written opinions—opinions that, in the normal course, we would get to parse, assess, and embrace or reject, while fully explaining our reasoning.

———————

[3] See Extension of the Designation of Venezuela for Temporary Protected Status, 87 Fed. Reg. 55026–55027 (2022).

[4] See Extension and Redesignation of Venezuela for Temporary Protected Status, 88 Fed. Reg. 68132 (2023).

[5] See Extension of the 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 5963–5966 (2025).

[6] *Id.*, at 5966 (extending Venezuela's TPS designation for an 18-month period ending October 2, 2026).

[7] See Vacatur of 2025 Temporary Protected Status Decision for Venezuela, 90 Fed. Reg. 8807; Termination of the Oct. 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9043–9044.

[8] See 773 F. Supp. 3d 807 (ND Cal. 2025); 2025 WL 1019671 (ND Cal., Apr. 4, 2025); ___ F. 4th ___, 2025 WL 2487771 (CA9, Aug. 29, 2025); ___ F. Supp. 3d ___, 2025 WL 2578045 (ND Cal., Sept. 5, 2025); ___ F. 4th ___, 2025 WL 2661556 (CA9, Sept. 17, 2025).

4                    NOEM *v.* NATIONAL TPS ALLIANCE

JACKSON, J., dissenting

The lower courts have also made a second considered judgment on a different question: What should happen to 300,000 human beings while our colleagues on the Ninth Circuit, and then perhaps we, do the job of judging?  Should those individuals get to remain in the United States, working legally, as the Government promised them a few short months ago?  Or should they be left vulnerable to job loss, family separation, and deportation to a country the Government determined in January was "experiencing 'a complex, serious and multidimensional humanitarian crisis'" to which they could not "retur[n] in safety"?  See 90 Fed. Reg. 5963, 5966.

Our lower court colleagues have already chosen the obvious—*i.e.*, least disruptive and most humane—answer to that question.[9]  So, this stay application presents us with an antecedent decision: whether the Government's interest in terminating TPS *right now* is so urgent that *this* Court, rather than the able judges currently exercising jurisdiction over the matter, should be the one to decide those individuals' interim fate.  See *Noem* v. *Doe*, 605 U. S. ___, ___–___ (2025) (JACKSON, J., dissenting from grant of application for stay) (slip op., at 7–8); see also *Magnum Import Co.* v. *Coty*, 262 U. S. 159, 164 (1923) (explaining that "this Court requires an extraordinary showing" before it will override the stay decision of a lower court, rendered "with a much fuller knowledge [of the case] than we can have").  Only if the Government demonstrates such a time-sensitive need should we even consider vetoing the lower courts' unanimous judgment about the most equitable interim status.

The Government has made no such showing.  Yet, for the second time in this same case, the Court grants it the

—————
[9] See 2025 WL 1019671 (ND Cal., Apr. 4, 2025) (denying stay pending appeal of postponement of agency action under 5 U. S. C. §705); ___ F. 4th ___, 2025 WL 2487771 (affirming postponement); 2025 WL 2617231 (ND Cal., Sept. 10, 2025) (denying stay pending appeal from final judgment); ___ F. 4th ___, 2025 WL 2661556 (same).

Cite as: 606 U. S. \_\_\_\_ (2025)          5

JACKSON, J., dissenting

extraordinary relief it seeks. We once again eschew re-
straint—ignoring the need for exigency or any other pru-
dent threshold limitation on the exercise of our discretion—
and wordlessly override the considered judgments of our
colleagues. We once again use our equitable power (but not
our opinion-writing capacity) to allow this Administration
to disrupt as many lives as possible, as quickly as possible.

I view today's decision as yet another grave misuse of our
emergency docket. This Court should have stayed its hand.
Having opted instead to join the fray, the Court plainly mis-
judges the irreparable harm and balance-of-the-equities
factors by privileging the bald assertion of unconstrained
executive power over countless families' pleas for the sta-
bility our Government has promised them. Because, re-
spectfully, I cannot abide our repeated, gratuitous, and
harmful interference with cases pending in the lower courts
while lives hang in the balance, I dissent.