No. 25-5724

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
————————

NATIONAL TPS ALLIANCE, MARIELA GONZÁLEZ, FREDDY JOSE ARAPE RIVAS, M.H., CECILIA DANIELA GONZÁLEZ HERRERA, ALBA CECILIA PURICA HERNÁNDEZ, E.R. HENDRINA VIVAS CASTILLO, A.C.A., SHERIKA BLANC, VILES DORSAINVIL, and G.S.,
*Plaintiffs-Appellees*,

vs.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and UNITED STATES OF AMERICA,
*Defendants-Appellants.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, NO. 3:25-CV-01766-EMC
HONORABLE EDWARD M. CHEN

————————

**BRIEF FOR APPELLEES**

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBNY 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493

Ahilan T. Arulanantham (SBN 237841)
*Counsel of Record*
arulanantham@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

*Attorneys for Plaintiffs-Appellees*

Additional Counsel for Plaintiffs-Appellees

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
Diana Sanchez (SBN 338871)
dianasanchez@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT .................................................................................................... 2

I. FACTUAL BACKGROUND ...................................................................... 3

    A. Congress's Statutory Scheme for TPS ............................................ 3

    B. TPS for Venezuela ............................................................................ 4

    C. The Venezuela Vacatur and Termination ...................................... 6

    D. TPS for Haiti .................................................................................... 7

    E. The Haiti Partial Vacatur and Termination ................................... 8

II. PROCEDURAL BACKGROUND .............................................................. 9

    A. Plaintiffs Sue and Win Preliminary Relief,
       Which the Supreme Court Stays .................................................... 9

    B. The District Court Issues Partial Summary Judgment
       Which the Supreme Court Partially Stays ................................... 10

STANDARD OF REVIEW .............................................................................. 13

ARGUMENT ................................................................................................... 14

I. THIS COURT IS BOUND BY *NTPSA I*.................................................. 14

II. THE DISTRICT COURT HAD SUBJECT MATTER
JURISDICTION OVER PLAINTIFFS' APA CLAIMS ............................ 17

    A. The District Court Correctly Concluded That
       8 U.S.C. § 1254a(b)(5)(A) Does Not Bar Any of
       Plaintiffs' APA claims .................................................................... 17

        1. Section 1254a(b)(5)(A) bars only claims
           challenging the Secretary's country conditions assessments.................. 18

        2. Plaintiffs' vacatur authority claims do not
           challenge any "determination"................................................ 20

        3. Plaintiffs' challenge to the reasons for the Venezuela
           vacatur does not challenge any determination under subsection(b). ........ 22

        4. Plaintiffs' claim against the Venezuela termination
           is cognizable because it challenges agency action in
           violation of statutorily-mandated procedures ........................... 23

        5. Plaintiffs' challenges to the Haiti vacatur are cognizable....................... 25

    B. Section 1252(f)(1) Does Not Bar APA Relief. ............................... 26

III. THE DISTRICT COURT CORRECTLY FOUND DEFENDANTS
VIOLATED THE APA ............................................................................. 28

A.     The Secretary Lacked Authority to Vacate the TPS Extensions for Venezuela and Haiti .................................................................. 28

B.     The Secretary's Venezuela Vacatur Decision Was Arbitrary and Capricious .................................................................... 32

     1.     The District Court did not err in considering extra-record evidence ................................................... 32

     2.     The District Court committed no error in finding the Venezuela vacatur arbitrary and capricious ........................................ 36

C.     The District Court Correctly Held the Venezuela Termination Decision Failed to Comply With the TPS Statute. ................................. 39

D.     The Haiti Vacatur Decision Was Arbitrary and Capricious. ................................ 42

IV.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN SPECIFYING THE APPROPRIATE SCOPE OF RELIEF ...................................... 42

CONCLUSION ........................................................................................ 45

CERTIFICATE OF COMPLIANCE ........................................................ 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Haramain Islamic Found., Inc. v. U.S. Dep't Treasury*,
  686 F.3d 965 (9th Cir. 2012) ................................................. 13

*Allen v. Milligan*,
  599 U.S. 1 (2023) ................................................................... 1

*Am. Methyl Corp. v. EPA*,
  749 F.2d 826 (D.C. Cir. 1984) ............................................. 29

*Amgen, Inc. v. Smith*,
  357 F.3d 103 (D.C. Cir. 2004) ............................................. 24

*Asarco, Inc. v. EPA*,
  616 F.2d 1153 (9th Cir. 1980) ............................................. 35

*Biden v. Texas*,
  597 U.S. 785 (2022) .............................................................. 36

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
  631 F.3d 1072 (9th Cir. 2011) ......................................... 40, 41

*California v. Grace Brethren Church*,
  457 U.S. 393 (1982) .............................................................. 27

*China Unicom (Ams.) Ops. Ltd. v. FCC*,
  124 F.4th 1128 (9th Cir. 2024) .................................. 28, 29, 30

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) .............................................................. 34

*Civil Aeronautics Bd. v. Delta Air Lines, Inc.*,
  367 U.S. 316 (1961) .............................................................. 28

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
  603 U.S. 799 (2024) .............................................................. 43

*DCH Reg'l Med. Ctr. v. Azar*,
  925 F.3d 503 (D.C. Cir. 2019) ............................................. 24

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019) ......................................................... 34, 38

*Doe v. San Diego Unified School District*,
  19 F.4th 1173 (9th Cir. 2021) .......................................................14, 16

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ...........................................14, 16, 43, 45

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016).........................................................................35, 41

*FCC v. Fox TV Stations, Inc.*,
  556 U.S. 502 (2009).........................................................................35, 41

*Garcia v. USCIS*,
  146 F.4th 743 (9th Cir. 2025) ................................................................22

*Garland v. Ming Dai*,
  593 U.S. 357 (2021).........................................................................35, 36

*Gebhardt v. Nielsen*,
  879 F.3d 980 (9th Cir. 2018) .................................................................21

*Gonzalez v. Arizona*,
  677 F.3d 383 (9th Cir. 2012) (en banc) ................................................14

*Gorbach v. Reno*,
  219 F.3d 1087 (9th Cir. 2000) (en banc) ................................28, 29, 30

*Grand Canyon Tr. v. U.S. Bureau of Reclamation*,
  691 F.3d 1008 (9th Cir. 2012), *as amended* (Sept. 17, 2012)................13

*Haig v. Agee*,
  453 U.S. 280 (1981).................................................................................29

*Immigrant Assistance Project of the L.A. AFL-CIO v. INS*,
  306 F.3d 842 (9th Cir. 2002) .................................................................20

*Immigration Defs. Law Ctr. v. Noem*,
  145 F.4th 972 (9th Cir. 2025) ..........................................................26, 27

*Ivy Sports Med. v. Burwell*,
  767 F.3d 81 (D.C. Cir. 2014)..................................................................28

*Lair v. Bullock*,
  798 F.3d 736 (9th Cir. 2015) ...........................................................14, 16

*Lands Council v. Powell*,
  395 F.3d 1019 (9th Cir. 2005) ...............................................................34

iv

*McNary v. Haitian Refugee Ctr.*,
  498 U.S. 479 (1991)..............................................................20, 21, 22

*Nakka v. USCIS*,
  111 F.4th 995 (9th Cir. 2024) ......................................................21

*Nat'l TPS All. v. Noem* (*NTPSA I*),
  150 F.4th 1000 (9th Cir. 2025) ........................................... *passim*

*Nicholas v. United States*,
  633 F.2d 829 (9th Cir. 1980) ........................................................25

*Noem v. Nat'l TPS All.*,
  145 S. Ct. 2728 (2025)............................................................9, 16

*Noem v. Nat'l TPS All.*,
  606 U.S. —, — S. Ct. —, 2025 WL 2812732 (Oct. 3, 2025)..........................13, 16

*Nat'l TPS All. v. Noem* (*NTPSA II*),
  — F.4th —, 2025 WL 2661556 (9th Cir. Sept. 17, 2025) (*NTPSA II*)......................... *passim*

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
  477 F.3d 668 (9th Cir. 2007) ....................................................38, 41

*Patel v. Garland*,
  596 U.S. 328 (2022)...............................................................21, 22

*Perry v. Schwarzenegger*,
  591 F.3d 1147 (9th Cir. 2010) ......................................................45

*Ramos v. Neilsen*,
  709 F. Supp. 3d 871 (N.D. Cal. 2023) ..............................................7

*Ramos v. Wolf*,
  975 F.3d 872 (9th Cir. 2020),
  *vacated upon reh'g en banc*, 59 F.4th 1010 (9th Cir. 2023)......................22

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*,
  499 F.3d 1108 (9th Cir. 2007) ......................................................14

*Reeb v. Thomas*,
  636 F.3d 1224 (9th Cir. 2011) ......................................................24

*Reno v. Catholic Soc. Servs., Inc.*,
  509 U.S. 47 (1993)...................................................................20

*Richards v. United States*,
  369 U.S. 1 (1962)....................................................................18

v

*Robertson v. Bradbury*,
132 U.S. 491 (1889) ........................................................................31

*Rodriguez v. Hayes*,
591 F.3d 1105 (9th Cir. 2009) .......................................................27

*Rodriquez Diaz v. Garland*,
53 F.4th 1189 (9th Cir. 2022) .......................................................27

*Russello v. United States*,
464 U.S. 16 (1983) .........................................................................31

*Saget v. Trump*,
375 F. Supp. 3d 280 (E.D.N.Y. 2019) .....................................7, 39

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014) .........................................................35

*Skagit County Public Hospital District No. 2 v. Shalala*,
80 F.3d 379 (9th Cir. 1996) ...........................................................24

*Smartt v. Kijakazi*,
53 F.4th 489 (9th Cir. 2022) ....................................................33, 40

*Trump v. Boyle*,
606 U.S. —, 145 S. Ct. 2653 (2025) .............................................16

*Trump v. Wilcox*,
145 S. Ct. 1415 (2025) ...................................................................16

*Turtle Island Restoration Network v. U.S. Dep't Commerce*,
878 F.3d 725 (9th Cir. 2017) .........................................................13

*In re U.S. Dep't of Educ.*,
25 F.4th 692 (9th Cir. 2022) ..........................................................34

*United States v. Johnson*,
256 F.3d 895 (9th Cir. 2001) (en banc) ........................................14

*United States v. Texas*,
143 S. Ct. 51 (2022) .........................................................................1

*United States v. Tohono O'odham Nation*,
563 U.S. 307 (2011) .......................................................................25

*United States v. Wilson*,
503 U.S. 329 (1992) .......................................................................31

*Vietnam Veterans of Am. v. Sec'y of the Navy,*
    843 F.2d 528 (D.C. Cir. 1988) ....................................................................41

*In re Zermeno-Gomez,*
    868 F.3d 1048 (9th Cir. 2017) ...........................................................14, 15

**Statutes & Rules**

5 U.S.C. § 705 ...........................................................................................9, 26, 27

5 U.S.C. § 706 ..................................................................................13, 23, 26, 42

8 U.S.C. § 1252(b)(9) ......................................................................................21

8 U.S.C. § 1252(f)(1) ...................................................................................26, 27

8 U.S.C. § 1252(g) ............................................................................................21

8 U.S.C. § 1254a(b) ................................................................................ *passim*

8 U.S.C. § 1254a(c) ........................................................................................3, 22

8 U.S.C. § 1254a(d) .....................................................................................13, 19

22 U.S.C. § 217a ................................................................................................29

28 U.S.C. § 1292(a) ...........................................................................................27

Fed. R. Civ. P. 62(c) ..........................................................................................27

L.R. 7-3(a) .........................................................................................................33

**Other Authorities**

73 Fed. Reg. 57,128 (Oct. 1, 2008) ....................................................................5

78 Fed. Reg. 32,418 (May 30, 2013) ..................................................................5

86 Fed. Reg. 6,845 (Jan. 19, 2021) .....................................................................4

88 Fed. Reg. 5,022 (Jan. 26, 2023) .....................................................................7

88 Fed. Reg. 68,130 (Oct. 3, 2023) .....................................................................4

90 Fed. Reg. 8,805 (Feb. 3, 2025) ...............................................................31, 37

90 Fed. Reg. 10,511 (Feb. 24, 2025) .................................................................31

90 Fed. Reg. 28,760 (July 1, 2025) .....................................................................9

Veronica Egui Brito & Syra Ortiz Blanes, *Trump Administration Detains Hundreds of Venezuelans with TPS Despite Court Order*, Miami Herald (Sep. 27, 2025), https://perma.cc/S82S-74GN.........................................................13

# INTRODUCTION

This appeal arises in what used to be an unusual posture: the Supreme Court stayed the district court's order granting Plaintiffs' motion for partial summary judgment pending resolution of this appeal. Although the stay robs this Court's decision of any immediate practical effect, this appeal remains extraordinarily important. In recent years the Supreme Court has affirmed rulings after staying them, *see Allen v. Milligan*, 599 U.S. 1, 16--19 (2023), and reversed rulings it declined to stay. *E.g.*, *United States v. Texas*, 143 S. Ct. 51 (2022) (denying stay of district court order halting Secretary's enforcement priorities guidance), *reversed by* 599 U.S. 670 (2023) (reversing that same order). An opinion from this Court will provide crucial guidance both to the Supreme Court in this case and to other courts considering similar issues. What this Court says will also matter to the more than 1 million people from Venezuela and Haiti—including young people who fled political and economic upheaval, parents with small children, and other valued members of communities throughout this country now facing detention and deportation. They have turned to our federal courts to vindicate their rights in the face of unprecedented lawlessness by the government.

The underlying dispute is largely familiar to this Court from its opinion affirming the district court's preliminary relief order in this case—which the Supreme Court had also stayed before this Court ruled. *See Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1023 (9th Cir. 2025) ("*NTPSA I*"). Former DHS Secretary Mayorkas extended Temporary Protected Status protection that by law should have lasted until at least October 2026 for Venezuela and February 2026 for Haiti. However, new DHS Secretary Noem took the unprecedented step of *vacating* those TPS extensions, even though the statute never mentions the possibility of vacatur. The Venezuela decision was the first vacatur of a TPS extension in the 35-year history of the TPS statute. The Haiti decision was the second. The Venezuela decision was also the single largest act of de-

1

documentation in U.S. immigration history, as it laid the groundwork to strip 600,000 people of the right to live and work in this country, including 350,000 who lost their status immediately when the Supreme Court's first stay order issued. The Haiti decision followed just behind, placing the status of 500,000 more people in imminent jeopardy. Unsurprisingly, the Secretary followed each decision with a termination; she has now terminated TPS for all eight countries as to which she has made a decision.

Plaintiffs here challenge three agency actions: the Venezuela vacatur, the Venezuela termination, and the Haiti vacatur. This Court's *NTPSA I* opinion already adopts Plaintiffs' first argument—that the Secretary has no vacatur authority because the statute never mentions that power and its structure forecloses it. *NTPSA I* therefore controls the outcome of this appeal: the Secretary had no authority to vacate either country's TPS extension; both must therefore remain in place.

Although this Court could affirm by simply applying *NTPSA I*, Plaintiffs respectfully urge the Court to address their other arguments, as doing so would give the Supreme Court and others throughout the nation the benefit of this Court's analysis of several important issues no appellate court has addressed to date. Specifically, this Court should hold that Congress did not bar judicial review of core APA claims in the TPS context, such that federal courts remain available to ensure the agency conforms its decision-making to basic procedural requirements imposed by statute. And it should uphold the district court's decision enforcing those requirements here, as it rests on detailed factual findings that must be sustained, particularly on clear error review.

## STATEMENT

### I.    FACTUAL BACKGROUND

#### A.  Congress's Statutory Scheme for TPS

"In enacting the TPS statute [in 1990], Congress designed a system of temporary status that was predictable, dependable, and insulated from electoral politics," replacing the prior ad hoc system for humanitarian protection. *NTPSA I*, 150 F.4th at 1008. The statute authorizes the Secretary of Homeland Security to provide humanitarian relief to certain citizens of countries in crisis, and prescribes "explicit guidelines, specific procedural steps, and time limitations" governing such relief. *Id.* at 1010. To qualify for and maintain TPS, applicants must not have been "convicted of any felony or 2 or more misdemeanors," or be a danger to U.S. security. *Id.* 8 U.S.C. § 1254a(c)(1)(A)(iii), (c)(2)(B)(i), (c)(3)(A).

The statute vests the Secretary with substantial discretion over which countries qualify for initial designations. 8 U.S.C. § 1254a(b)(1). In contrast, the statute strictly limits the Secretary's discretion after a designation through rules governing the timing of periodic review, the process for conducting that review, and mandatory criteria for deciding whether to extend or terminate TPS designations. *See generally* 8 U.S.C. § 1254a(b); *see also* 5-ER-458–521 (GAO Report); 1-ER-7–12 (district court opinion). "[A]t least 60 days before [the] end" of any "period of designation," the Secretary "shall" conduct a "periodic review" to determine whether designation remains warranted. 8 U.S.C. § 1254a(b)(3). Specifically, "after consultation with appropriate agencies," the Secretary "shall review the conditions in the foreign state" and "determine whether the conditions for such designation . . . continue to be met." *Id.* at § 1254a(b)(3)(A).

If the Secretary makes an "affirmative determination" that "conditions for [] designation . . . continue to be met," *id.*, or fails to make any decision by the statutory deadline, then the designation "is extended" for 6 months or "in [her] discretion . . . a period of 12 or 18 months."

*Id.* at § 1254a(b)(3)(C). An extension is effective "immediate[ly]." SER-152. *See also NTPSA I*, 150 F.4th at 1023. If the Secretary determines the statutory conditions are no longer met, she "shall terminate the designation." *Id.* at § 1254a(b)(3)(B).

The statute never mentions authority to vacate or rescind an extension. No TPS extension had ever been vacated before this year. 1-ER-4.

### B. TPS for Venezuela

On the last day of his first term, President Trump designated Venezuela for Deferred Enforced Departure—a form of nationality-based, discretionary relief from deportation—because Venezuela was experiencing "the worst humanitarian crisis in the Western Hemisphere in recent memory." 86 Fed. Reg. 6,845 (Jan. 19, 2021). President Trump's action permitted approximately 300,000 Venezuelans to live and work here for 18 months. *See NTPSA I,* 150 F.4th at 1011.

Shortly afterwards, on March 9, 2021, then-DHS Secretary Mayorkas designated Venezuela for TPS. 4-ER-234–41, 5-ER-450–57. He both extended that designation and re-designated TPS for Venezuela on October 3, 2023, thereby allowing more recently-arrived Venezuelans to apply. The 2023 cohort of TPS holders (the more recent arrivals) received protection through April 2, 2025. 88 Fed. Reg. 68,130 (Oct. 3, 2023); *NTPSA I*, 150 F.4th at 1011. Secretary Mayorkas extended the 2021 designation of TPS for Venezuela also, ultimately providing protections through September 10, 2025 to those who initially registered in 2021. 3-ER-224–32; 88 Fed. Reg. at 68,130.

Because Secretary Mayorkas designated Venezuela for TPS at two different times, DHS operated two registration tracks. *Id.* However, as beneficiaries of the 2021 designation were also here in 2023, "a TPS beneficiary under the 2021 Designation was necessarily a TPS beneficiary under the 2023 Designation." *NTPSA I*, 150 F.4th at 1024 n. 12.

Secretary Mayorkas announced a further extension of Venezuela's 2023 designation 75 days before the 2023 designation was set to expire, consistent with the statutory requirement that such decisions be made "[a]t least 60 days before" the expiration date, 8 U.S.C. § 1254a(b)(3)(A), and the regular agency practice of announcing decisions ahead of the 60-day deadline, 5-ER-495, 3-ER-155–66.[1] Secretary Mayorkas cited Venezuela's ongoing "complex, serious and multidimensional humanitarian crisis," which has "disrupted every aspect of life," and concluded that the "extraordinary and temporary conditions supporting Venezuela's TPS designation remain." 3-ER-157 (citation omitted).

In the extension order, Secretary Mayorkas also streamlined the registration process for TPS holders by consolidating them into a single track, "allow[ing] existing beneficiaries of either the 2021 or 2023 TPS designation to seek an 18-month extension of status through October 2, 2026." *NTPSA I*, 150 F.4th at 1011. He did so based on an evaluation of "the operational feasibility and resulting impact on stakeholders of having two separate filing processes," which had resulted in "confusion among stakeholders" such as TPS holders, employers and government actors. 3-ER-157.

The extension took effect immediately. 8 U.S.C. § 1254a(b)(3)(C). *See also NTPSA I*, 150 F.4th at 1023. TPS holders began re-registering for protection on January 17 and receiving notices confirming extension of their work authorization immediately thereafter. *Id. See also* SER-152, 260. The Federal Register notice also "automatically extend[ed] [certain work permits] . . . without any further action." 3-ER-161–65. Approximately 607,000 Venezuelans qualified under the January 17 extension. 3-ER-160.

---

[1] *See, e.g.*, 73 Fed. Reg. 57,128 (Oct. 1, 2008) (extension published 159 days before expiration); 78 Fed. Reg. 32,418 (May 30, 2013) (102 days).

### C.  The Venezuela Vacatur and Termination

DHS began to prepare to vacate Secretary Mayorkas' Venezuela extension decision almost immediately after President Trump took office, even before Secretary Noem was confirmed as DHS Secretary. 1-ER-13.

On January 28, three days after she took office, Secretary Noem vacated Secretary Mayorkas's January 17 extension. 1-ER-14. Her decision was published on February 3. 3-ER-140–42. The vacatur order directed USCIS to undo the extension's immediate effects, by "invalidat[ing]" TPS-related documents "issued with October 2, 2026 expiration dates" as well as employment authorization documents that had been extended. 3-ER-142.

The vacatur notice did not mention national interests, national security, foreign policy, or conditions in Venezuela; rather, it justified the vacatur based solely on concerns about the TPS registration process. 3-ER-140–42. Secretary Noem described the "consolidated" registration process established by the January 17 extension as "novel," "confus[ing]," and possibly not "consistent with the TPS statute." 3-ER-142.

The vacatur of Secretary Mayorkas's extension of TPS ostensibly created a need for a new TPS decision for Venezuela, thus paving the way for a termination. "[E]ven before the decision to vacate was finalized, DHS was preparing to terminate Venezuela's TPS." 1-ER-13. Agency personnel, who typically conduct an objective country conditions analysis in service of the statutorily mandated periodic reviews, were tasked instead to "focus on any improvements in Venezuela," to advance a preordained decision to terminate Venezuela's TPS. 1-ER-14. On February 1, three days after signing the vacatur, Secretary Noem terminated the 2023 designation, finding that "even assuming" conditions in Venezuela warranted it, extension was "contrary to the national interest." 5-ER-273–75.

For the termination decision, "there was no meaningful consultation with internal or external agencies, in particular, regarding country conditions." SER-8. The day before Secretary Noem's termination decision, and well after she had "effectively made the decision to terminate," 1-ER-51, "Secretary of State Marco Rubio sent a one-and-a-half page letter to Secretary Noem, recommending termination on the basis of U.S. national interest alone." 1-ER-14. "Secretary Rubio's letter did not address country conditions, nor did the State Department provide any country conditions report to USCIS." 1-ER-15.

The 2023 Venezuela termination decision was published February 5, and scheduled to enter into effect April 7, 2025. 5-ER-273–77. The 2021 Venezuela Designation retained its September 10, 2025 expiration date.

### D. TPS for Haiti

Haiti was first designated for TPS on January 21, 2010 based on "extraordinary and temporary conditions" following a 7.0 magnitude earthquake that affected one-third of the population. 6-ER-668–71. After a 2011 redesignation and several extensions, DHS terminated Haiti's designation during the first Trump Administration. 6-ER-661–67. Two federal district courts held the termination likely violated the APA and found substantial evidence that it was unconstitutional because motivated by animus toward Haitian immigrants. The courts issued preliminary injunctions, and the termination never entered into effect. *Ramos v. Neilsen*, 709 F. Supp. 3d 871, 877–79 (N.D. Cal. 2023); *Saget v. Trump*, 375 F. Supp. 3d 280, 372, 374 (E.D.N.Y. 2019).

On August 3, 2021, in the wake of the assassination of Haiti's president, DHS newly designated Haiti for TPS. 6-ER-653–60. On January 26, 2023, and again on July 1, 2024, DHS extended and redesignated TPS for Haiti. 88 Fed. Reg. 5,022 (Jan. 26, 2023); 6-ER-532–44. The

July 2024 extension and redesignation was due to "remain in effect for 18 months, ending on February 3, 2026." 6-ER-533.

### E.  The Haiti Partial Vacatur and Termination

DHS began efforts to undo the extension of TPS for Haiti immediately after publishing the Venezuela termination notice. 1-ER-18. On February 18, Secretary Noem authorized an unprecedented decision to "partially vacate" TPS for Haiti, limiting the period of extension granted by the prior DHS Secretary from 18 months to 12 months. 1-ER-19. As with Venezuela, the partial vacatur was predetermined, with vacatur the only outcome DHS leadership deemed permissible from the start. No country conditions review or State Department consultation took place. SER-125–131.

The partial vacatur was published in the Federal Register on February 24. 6-ER-523–27. In the press release announcing the partial vacatur, DHS "implicitly pointed to an anticipated termination of Haiti's TPS, stating, *e.g.* that the partial vacatur was part of President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law." 1-ER-19.

In the notice, the agency offered three reasons for the partial vacatur: (1) the July 1, 2024 extension notice failed to explain "why the 18-month period was selected in lieu of a 6- or 12-month period" and why it "depart[ed] from" a supposed "default six-month period for an extension of an existing designation"; (2) the notice did not explain its conclusion that extending and redesignating Haiti for TPS was not contrary to the U.S. national interest; and (3) the notice relied on "several" sources of country conditions information which were from 2023 or before. 6-ER-525–26. Based on these reasons, the partial vacatur notice purported to retroactively shorten the expiration dates of all documents issued under the prior extension from February 3, 2026 to August 3, 2025.

On July 1, 2025, Secretary Noem terminated the TPS designation for Haiti. *See* 90 Fed. Reg. 28,760 (July 1, 2025). Under that decision, Haiti's TPS designation was scheduled to end on September 2, 2025.

## II.    PROCEDURAL BACKGROUND

### A.  Plaintiffs Sue and Win Preliminary Relief, Which the Supreme Court Stays

Plaintiffs filed suit challenging Secretary Noem's vacatur of the January 17 extension of TPS for Venezuela and subsequent termination order. 1-ER-23. Plaintiffs later amended and supplemented their complaint to challenge the Haiti partial vacatur and termination decisions as well. SER-175–247, 28–103.

Plaintiffs moved for, and won, preliminary relief under 5 U.S.C. § 705, postponing the effective date of the Venezuela vacatur and termination decisions, which were the only decisions then at issue. The district court held it had jurisdiction and that Plaintiffs were likely to succeed on two APA claims related to the Venezuela vacatur: (i) that the Secretary lacked vacatur authority, and (ii) that, even if she had authority, her action was arbitrary and capricious. SER-143–158. The district court also found likely constitutional violations due to racial animus in both the vacatur and termination decisions. SER-158-174.

Defendants appealed the Section 705 postponement order to the Ninth Circuit and sought a stay. *NTPSA I*, Dkt. 21.1 (Sept. 16, 2025) SER-137–141. After this Court denied the stay, the Supreme Court  granted the stay application "pending the disposition of the appeal . . . and disposition of a petition for a writ of certiorari, if such a writ is timely sought." *Noem v. Nat'l TPS All.*, 145 S. Ct. 2728, 2729 (2025) (Mem). The order provided no reasoning, although it specified it was "without prejudice to any challenge to Secretary Noem's February 3, 2025 vacatur notice insofar as it purports to invalidate" TPS-related documentation issued pursuant to the extension.

*Id.* Relying on the Supreme Court's implicit suggestion that the Secretary's actions may have been unlawful as to individuals who already received documents under the January 17 extension, Plaintiffs successfully moved to preserve TPS status and work authorization for those individuals. 1-ER-24; SER-115–116; 1-ER-43–44. Defendants did not appeal that order.

After briefing and argument, this Court subsequently affirmed the district court's postponement order based on Plaintiffs' first APA claim. *NTPSA I*, 150 F.4th 1000. As to jurisdiction, it held "[t]extually, Plaintiffs' first APA claim—challenging the Secretary's authority to vacate a prior TPS extension—falls outside the scope of this jurisdiction-stripping provision." *Id.* at 1017. On the merits it held the vacatur order violated the APA because "Congress has displaced any inherent revocation authority by explicitly providing the procedure by which a TPS designation is terminated." *Id.* at 1020–21 (citing 8 U.S.C. § 1254a(b)(3)(B)). Defendants have not sought review of that decision.

### B. The District Court Issues Partial Summary Judgment Which the Supreme Court Partially Stays

One week after the Ninth Circuit affirmed the district court's postponement order, and following discovery and a hearing on a fully-developed record, the district court granted partial summary judgment and set aside three distinct orders: the vacatur of the TPS extension for Venezuela, the termination of the 2023 Venezuela TPS designation, and the partial vacatur of the TPS extension for Haiti. 1-ER-2–70.

The district court first held 8 U.S.C. § 1254a(b)(5)(A) does not bar any of Plaintiffs' claims, based on the statute's text and precedent construing similar provisions. 1-ER-25–31. On the merits, the district court ruled for Plaintiffs on five distinct claims. The first two pertain to the Venezuela vacatur; the third pertains to the Venezuela termination; and the last two pertain to the Haiti vacatur.

First, the court held the Secretary lacked authority to vacate Venezuela's TPS extension because the statute never mentions vacatur and its structure forecloses it, as this Court had already held in *NTPSA I*. 1-ER-40–43 (as to Venezuela).

Second, it held the vacatur of Venezuela's TPS extension was arbitrary and capricious for several reasons. The court found Secretary Noem's stated concerns about the extension's registration process rested on legal and factual errors: the process "was not novel, did not engender confusion, and was not 'thin' in explanation." 1-ER-46. "[A]s a factual matter," consolidating re-registration was standard agency practice. *Id.* (describing "similar streamlining" for Sudan and Haiti). The agency was also well-aware that "streamlining [registration] . . . would tend to eliminate, not create, confusion." *Id.* Officials searched for evidence that consolidation caused confusion, but found the opposite.[2] And the Certified Administrative Record (CAR) for the vacatur contains nothing about the extension's registration process at all. SER-132–136. The court found the stated reasons for vacatur were a sham; the true reason was to pave the way for termination. 1-ER-49. As further support for that conclusion, the court found the agency drafted the TPS vacatur notice over just four days, even though TPS decisions usually take months, 1- ER-13–14, and "even before the decision to vacate was finalized, DHS was preparing to terminate Venezuela's TPS." 1-ER-13, 1-ER-51. Independently, the court found Secretary Noem "failed to consider alternatives short of vacatur," and "failed to consider reliance interests." 1-ER-45–50.

Third, the court held the Venezuela termination unlawful because the Secretary did not consult with the State Department or review country conditions *before* deciding to terminate. 1-

_____

[2]*See, e.g.*, 1-ER-46–47; SER-27 (USCIS Director-Nominee Joseph Edlow requested evidence that the registration process "presented operational challenges" so he could describe those challenges in the vacatur federal register notice); *id.* at 25 (USCIS operational personnel reported that the lack of consolidation prior to the extension had resulted in "confusion."); SER-105–108 (USCIS 2023 analysis concluding the same)

ER-50–54. This, it concluded, violated the statute's requirement that the termination decision be made only "after" consultation and review. *Id.* (citing 8 U.S.C. § 1254a(b)(3)(A)). *See also NTPSA I*, Dkt. 23.1 at 10 (Sept. 17, 2025) (finding that "effectively none of DHS's normal procedures was followed" in the termination).

Fourth, the court held the Secretary lacked authority for her "partial vacatur" of Haiti's TPS extension for the same reasons she lacked authority to vacate Venezuela's extension. 1-ER54–55 (Haiti).

Fifth, and finally, the court separately held the partial vacatur of Haiti's TPS extension was arbitrary and capricious, and did not "reflect reasoned agency decisionmaking." 1-ER-55–59. The court found that the Secretary's justifications were not factually based: there is no six-month "default period" for an extension, and therefore the statute could not have imposed a requirement that Secretary Mayorkas explain a deviation from that alleged default rule; and Secretaries do not typically explain why it is not contrary to the national interest to extend TPS, making this justification for the partial vacatur inconsistent with established practice. 1- ER-56–57. The court also found the partial vacatur decision arbitrary and capricious because it was "preordained without any meaning analysis and review," without "regard for the facts and actual conditions," and "driven by [the Secretary's] predetermined desire to terminate Haiti's TPS on a hastened timeline." 1-ER-58.[3]

Defendants did not initially comply with the district court's order setting aside the agency's unlawful orders. They did so only after the district court granted Plaintiffs' motion to enforce.

---

[3]The court also noted that its ruling on vacatur authority as to Venezuela also applied to the Haiti vacatur. 1-ER-54–55.

SER-1–4.[4] Defendants then sought a partial stay of the district court's order. This Court rejected that request in a published order. *NTPSA v. Noem*, — F.4th — , 2025 WL 2661556 (9th Cir. Sept. 17, 2025) ("*NTPSA II*"). Defendants then sought the same relief from the Supreme Court, which it granted without explanation. *Noem v. Nat'l TPS Alliance*, 606 U.S. —, — S. Ct. —, 2025 WL 2812732, *1 (Oct. 3, 2025). The Supreme Court's stay order did not apply to the district court's ruling as to Haiti, or to its decision preserving TPS status for Venezuelans who had already received documents under the January 17 extension. *Noem v. Nat'l TPS All.*, Case No. 25A326 (S. Ct. filed Sept. 19, 2025), Defendants' Application for Stay at 7-8 n.6, 21 n. 12.

## STANDARD OF REVIEW

The district court was required to "'hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 'in excess of statutory jurisdiction,' or 'without observance of procedure required by law.'" *Turtle Island Restoration Network v. U.S. Dep't Commerce*, 878 F.3d 725, 732 (9th Cir. 2017) (quoting 5 U.S.C. § 706(2)(A), (C)-(D)). This Court "review[s] *de novo* the district court's grant of summary judgment" in cases brought under the Administrative Procedure Act (APA). *Grand Canyon Tr. v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1016 (9th Cir. 2012), *as amended* (Sept. 17, 2012). Underlying factual findings are reviewed for clear error. *See Al Haramain Islamic Found., Inc. v. U.S. Dep't Treasury*, 686 F.3d 965, 976 (9th Cir. 2012).

---

[4]*See, e.g.*, SER-5–6 (Defendants asserting no obligation to update the TPS website); Veronica Egui Brito & Syra Ortiz Blanes, *Trump Administration Detains Hundreds of Venezuelans with TPS Despite Court Order*, Miami Herald (Sep. 27, 2025), https://perma.cc/S82S-74GN (Defendants continue to detain TPS holders contrary to the text of 8 U.S.C. § 1254a(d)(4), which provides TPS holders "shall not be detained").

## ARGUMENT

## I.     THIS COURT IS BOUND BY *NTPSA I.*

This Court is bound by the legal rulings it already published in its opinion affirming the preliminary relief order in *NTPSA I*, 150 F.4th 1000. *See* AOB 13, 18 n.4. That decision establishes "law of the circuit" that binds this Court because "published decision[s] [are] binding authority which must be followed unless and until overruled by a body competent to do so." *In re Zermeno-Gomez*, 868 F.3d 1048, 1052 (9th Cir. 2017) (cleaned up); *see also United States v. Johnson,* 256 F.3d 895, 914 (9th Cir. 2001) (en banc) ("[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit.").

Defendants argue *NTPSA I* is not binding because it arose in preliminary posture, AOB at 18 n.4 (citing *Doe v. San Diego Unified School District*, 19 F.4th 1173, 1177 n.4 (9th Cir. 2021)), but that does not render its legal rulings non-precedential, even if they would not otherwise constitute law of the case. "[E]xceptions to the law of the case doctrine are not exceptions to [the] general 'law of the circuit' rule, i.e. the rule that a published decision of this court constitutes binding authority." *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc); *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*, 499 F.3d 1108, 1114 (9th Cir. 2007). In contrast, *Doe* arose in a stay posture and  described its own ruling as preliminary; whereas *NTPSA I* is a decision published after full briefing and oral argument that contains no such caveat. Moreover, a stay decision "predicting the likelihood of success of the appeal," is different from a preliminary relief ruling assessing "the likelihood of success of the actual litigation." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660 (9th Cir. 2021). The latter creates binding precedent even where the former does not. *See also id.* at 660, 661 n.3 (discussing *Lair v. Bullock*, 798 F.3d 736, 747 (9th Cir. 2015)). Indeed, Defendants themselves acknowledged that *NTPSA I*

would be binding when they requested that the district court stay further rulings pending this Court's decision in *NTPSA I*, emphasizing that the decision would resolve "identical" issues and "bind" the district court. *See* SER-9–11 (Defendants' Supplemental Brief in Support of a Temporary Stay).

Defendants also suggest that *NTPSA I* should not be treated like all other binding precedent because, they say, they were deprived of the opportunity to petition for rehearing or seek certiorari when the district court issued its summary judgment ruling, such that the decision should be vacated. AOB 13, 18 n.4. This argument is meritless. If Defendants believed they were entitled to vacatur of *NTPSA I*, they could have sought that relief at any point in the two months since this Court issued the decision. They did not. And it is far from clear that they would have been entitled to vacatur had they sought it. *Cf. NTPSA II*, 2025 WL 2661556, at *3 ("reject[ing] the Government's argument that *NTPSA I* is likely to be vacated as moot") (internal quotations omitted).

Defendants claim they could not seek vacatur because this Court entered an administrative order staying Defendants' deadline to seek post-judgment relief due to the shutdown, *see* AOB 18 n.4, but that order does not *prevent* Defendants from pursuing rehearing, certiorari, or vacatur of the Court's *NTPSA I* opinion; it merely stays their briefing deadlines.[5]

In any event, none of these considerations would permit this Court to disregard the *NTPSA I* decision, as it is a published opinion of this Court. *Zermeno-Gomez*, 868 F.3d at 1052. Defendants

---

[5] Defendants 'argument is also suspect on its facts. They had a week to seek review before the district court ruled, and longer still prior to the shutdown. They have repeatedly sought relief from other orders in this case in less time than that. *See, e.g.*, 6-ER-696 (filing stay motion in district court one day after postponement order); *NTPSA I*, Dkt. 3 (April 4, 2025) (motion for stay at Ninth Circuit filed the same day district court order denied stay); 6-ER-719 (motion to stay filed in district court one day after order on appeal); Dkt. 7 (Sept. 12, 2025) (motion for stay of summary judgment order two days after district court denied motion).

cite no authority for their proposed new exception to the law-of-the-circuit rule; and Plaintiffs are aware of none.

As to *NTPSA II*, this Court need not decide the extent to which any of its rulings constitute law of the circuit. Plaintiffs recognize that its status is less certain because it was decided on the motions docket without oral argument, and a motions panel's decision "predicting the likelihood of success of the appeal," is different from a merits panel's inquiry into "the likelihood of success of the actual litigation" in a preliminary injunction appeal. *E. Bay*, 993 F.3d at 661 n.3 (discussing *Lair*, 798 F.3d at 747). *Accord Doe*, 19 F.4th at 1177 n.4. But there can be no serious dispute that, at the very least, *NTPSA II* is highly persuasive authority, and Defendants have provided no reason to depart from its reasoning—including its close examination of the underlying record on Plaintiffs' APA claims.

Defendants also appear to suggest this Court should give some precedential effect to the Supreme Court's stay orders in this case. AOB 14, 16. It should not. Unlike this Court's published opinions, the Supreme Court's unreasoned stay orders have no precedential effect. Indeed, they could not create precedent because they cite no law and contain no legal reasoning. The Supreme Court's stay orders in this case thus differ from Supreme Court shadow docket orders which have provided at least a few pages of substantive reasoning. *Compare Noem v. Nat'l TPS All.*, 2025 WL 2812732, at *1 and *Noem v. Nat'l TPS All.*, 145 S. Ct. 2728, with *Trump v. Wilcox*, 145 S. Ct. 1415 (2025) and *Trump v. Boyle*, 606 U.S. — , 145 S. Ct. 2653 (2025). Accordingly, as this Court already concluded, the Supreme Court's May 19 stay order is not binding in this appeal, *NTPSA II*, 2025 WL 2661556, at *2, and there is nothing materially different about the Supreme Court's September 19 stay order for purposes of assessing its precedential effect. *Cf. E. Bay*, 993 F.3d at

661 n.3 (holding that motions panel's holding on impact of Supreme Court authority is a purely legal issue that binds future merits panel).

The Supreme Court's stay orders make only one thing truly clear: that this Court must fully address all the issues in this appeal given the likelihood that the case will return to the Supreme Court.

## II. THE DISTRICT COURT HAD SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' APA CLAIMS

Defendants' jurisdictional arguments contravene this Court's two prior decisions in this case. First, this Court has already held that Plaintiffs' vacatur authority claims remain cognizable. *NTPSA I*, 150 F.4th at 1016–18. Second, this Court has already acknowledged and rejected Defendants' arguments against the reviewability of Plaintiffs' other APA claims. *NTPSA II*, 2025 WL 2661556, at *5.

Nonetheless, both because this case will likely return to the Supreme Court and because Defendants' jurisdictional positions continue to shift, *see, e.g., infra* n.6 Plaintiffs respectfully suggest that the Supreme Court, other courts considering TPS cases, and the parties would benefit from an opinion by this Court addressing jurisdiction as to all of Plaintiffs' claims.

### A. The District Court Correctly Concluded That 8 U.S.C. § 1254a(b)(5)(A) Does Not Bar Any of Plaintiffs' APA claims

The district court correctly concluded that Section 1254a(b)(5)(A) does not bar Plaintiffs' claims. That provision states:

> There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection [i.e., subsection (b)].

Contrary to Defendants' misreading of the statute, it does not bar review of "the Secretary's *decisions*." AOB 15 (emphasis added). Instead, Section 1254a(b)(5)(A) uses the term

"determination." None of Plaintiffs' claims challenge any determination as that term is used in this statute.

### 1. Section 1254a(b)(5)(A) bars only claims challenging the Secretary's country conditions assessments.

As the rest of Section 1254a(b) makes clear, "determination" in Section 1254a(b)(5)(B) refers to the Secretary's assessment of whether a country satisfies the conditions requirements for a TPS designation, extension, or termination. It is "fundamental that a section of a statute should not be read in isolation from the context of the whole Act." *Richards v. United States*, 369 U.S. 1, 11 (1962). Yet in brief after brief Defendants fail to analyze Subsection 1254a(b)'s other uses of "determination" or "determine," choosing instead to rest on dictionary definitions without any consideration of how the term is used in context.

The statute's use of "determine" and "determination" shows Defendants' interpretation is meritless. As the district court explained:

> [t]he government's position gives short shrift to how the word 'determination' or 'determine' is used in the TPS statute. When 'determination' or 'determine' is used in connection with periodic review, the term describes the *substantive assessment of country conditions in reaching a decision on whether to extend or terminate TPS.*

1-ER-29.

Subsection 1254a(b) contains eight uses of the words "determine" or "determination," and *every one* refers unambiguously to the Secretary's assessment of whether *country conditions* meet the requirements for designation, extension, or termination. For example, Section 1254a(b)(3)(A) requires the Secretary to "*determine* whether the conditions for [] designation . . . continue to be met" and publish "*such determination* (including the basis for *the determination*, and, in the case of *an affirmative determination*, the period of extension of designation . . . .)" (emphases added). Section 1254a(b)(3)(B) also refers to country conditions "determinations," providing:

> If the Attorney General *determines* under subparagraph (A) that a foreign state (or part of such foreign state) no longer continues to meet the conditions for designation under paragraph (1), the Attorney General shall terminate the designation by publishing notice in the Federal Register of the *determination* under this subparagraph (including the basis for the *determination*).

(emphases added). Subsection 1254a(b)(3)(C) uses the word "determine" the same way, mandating extension if the Secretary "does not *determine*" a country no longer satisfies the conditions for designation. (emphasis added). *See also* 8 U.S.C. § 1254a(d)(3) (referring to "the *determination*" that country conditions require termination) (emphasis added). Thus, Section 1254a(b)(5)(A) bars challenges to any of the Secretary's "determinations" regarding whether a particular country satisfies applicable conditions requirements. In contrast, nowhere does the statute use "determination" to refer to the ultimate decision to designate, extend, or terminate TPS as to any particular country, let alone to issue a "vacatur"—a term that appears nowhere in the statute.

Defendants nonetheless contend that the decisions to vacate and terminate are *themselves* determinations, AOB 21–22. But the statute consistently refers to any "determination" regarding country conditions as *distinct* from the designation, termination, or extension that follows from that determination, thus making clear that the determination regarding country conditions is a distinct act. While designation, extension, and termination decisions must rest on country conditions determinations, they are not *themselves* "determinations" as Congress used the term here. *E.g.*, 8 U.S.C. § 1254a(b)(3)(A) (the Secretary shall "*determine* whether the conditions for such *designation* . . . continue to be met") (emphases added); *id.* § 1254a(b)(3)(B) (if the Secretary "*determines* . . . that a foreign state . . . no longer continues to meet the conditions for *designation* . . . [she] shall *terminate* the designation") (emphases added).

Nor, contrary to Defendants' dictionary definitions, are any of the many other decisions, actions, and judgments the Secretary can take with respect to TPS described as "determinations"

in the statute. If Congress thought they were determinations, it would have called them that. Thus, while "determination" theoretically could, in other contexts, refer broadly to virtually any decision or judgment, in Section 1254a(b) it refers to country conditions determinations.

Careful attention to the statute's use of "determination" is particularly appropriate because the Supreme Court has twice construed that same term to preserve review of APA claims in immigration cases decided shortly after Congress enacted the TPS statute. *See McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 492 (1991); *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 47, 56–58 (1993) (same, as applied to statutory interpretation claim). This Court has repeatedly relied on those cases as well. *See, e.g.*, *Immigrant Assistance Project of the L.A. AFL-CIO v. INS*, 306 F.3d 842, 862–63 (9th Cir. 2002) (same, as to claim about proof requirements).

### 2. Plaintiffs' vacatur authority claims do not challenge any determination

Plaintiffs' first claim challenges the agency's legal conclusion that the statute contains implicit vacatur authority. 1-ER-40–42. This Court has already held "[t]he extent of statutory authority granted to the Secretary is a first order question that is not a 'determination ... with respect to the designation, or termination or extension' of a country for TPS." *NTPSA I*, 150 F.4th at 1017. That holding controls the outcome as to this claim.

Defendants contend otherwise, but yet again fail to grapple with the implications of their extreme position. If review of predicate legal judgments were foreclosed, then "under the government's position, there could be no judicial review even if the government were to blatantly violate the statute, *e.g.*, by granting an extension that exceeds 18 months or failing to provide the minimum 60 days' notice of a termination decision." 1-ER-31.[6]

---

[6]Perhaps for that reason, the Solicitor General did not contest jurisdiction on this claim at the Supreme Court when the government sought to stay the decision below. *See* Appl. 18 n.11. Defendants also flip-flopped on this issue at oral argument in *NTPSA I*, acknowledging an

Defendants argue that even statutory authority claims must be barred because the statute covers "any" determination "with respect to" the covered TPS determinations, citing *Patel v. Garland*, 596 U.S. 328, 338 (2022). AOB 19–20. But the statute in *Patel* did *not* use "determination," which may be why this Court already rejected Defendants' reliance on it. *NPTSA I*, 150 F.4th at 1017 (distinguishing *Patel*). *Patel* also had no occasion to consider whether the statute it interpreted barred review of legal claims; *Patel* barred review only of factual claims. It also relied on other context clues not present here. *Patel*, 596 U.S. at 339 (citing amendment history of 8 U.S.C. § 1252(a)(2)(D)). In keeping with those distinctions, this Court has read *Patel* not to foreclose challenges to collateral questions such as those involving agency policies and procedures. *Nakka v. USCIS*, 111 F.4th 995, 1003, 1009 (9th Cir. 2024) (citing *McNary, supra*).[7]

In any event, as the textual analysis above reveals, Plaintiffs' interpretation does give "any" meaning: there are many "determinations" so labeled in subsection (b); "any" makes clear that Section 1254a(b)(5)(A) covers all of them. It works to take a large swath of claims challenging country conditions assessments off the table—claims this Court sees routinely in hundreds of asylum cases each year.

As *McNary*, *Patel*, and *Nakka* show, when Congress wants to bar most or all judicial review, it uses far clearer language than it used here. *See Nakka*, 111 F.4th at 1005 (describing "the *McNary* blueprint"). The TPS statute does not bar review of "all questions of law or fact" or "any cause or claim." *Compare* 8 U.S.C. §§ 1252(b)(9), 1252(g); *cf. Gebhardt v. Nielsen*, 879 F.3d

---

exception for "extraordinary cases" which they now seem to have forgotten. *See* Oral Argument, Tr. 3:19-5:15, 25-2120, *NTPSA v. Noem*, https://www.youtube.com/watch?v=SSIf7bEQz3c They have yet to explain how to reconcile this exception with their sweeping dictionary definition-based reading of the statute.

[7]Defendants' argument that "respecting" renders the statute broad enough to cover this claim fails for similar reasons, and also because the statute in *McNary* itself used "with respect to."

980, 984–85 (9th Cir. 2018) (immigration statute specifying decisions were in Secretary's "sole and unreviewable discretion" barred review of all but constitutional claims); *Garcia v. USCIS*, 146 F.4th 743, 757 (9th Cir. 2025) (Bress, J., concurring) (distinguishing *McNary* from *Patel* because, *inter alia*, the former statute used "determination" while the latter used "judgment").

### 3. Plaintiffs' challenge to the reasons for the Venezuela vacatur does not challenge any determination under subsection(b).

Plaintiffs' second claim challenges the Secretary's *reasons* for issuing the vacatur—which rested on alleged concerns about TPS *registration* processes. 1-ER-45–50. The Secretary justified her decision to vacate an extension of TPS for 600,000 Venezuelans on the ground that the prior TPS extension had employed a "confusing" registration process. 1-ER-27 (explaining that the vacatur order was "based purely on procedural concerns" that the prior decision's "novel" approach to registration "caus[ed] confusion").

Review of those conclusions is not barred by Section 1254a(b)(5)(A) because it bars review only over determinations under "*this* subsection," i.e., subsection 1254a(b) (emphasis added), whereas TPS registration authority is discussed in subsection (c) rather than (b). *See* 8 U.S.C. § 1254a(c)(1)(A)(iv), (B).

Defendants completely ignore the reference to "this subsection" in Section 1254a(b)(5)(A). Even if Plaintiffs' challenge to the vacatur's reasoning could be deemed a challenge to the Secretary's determinations, they would be cognizable because those determinations are not *under subsection (b)*.

Defendants' other arguments against the reviewability of the vacatur's reasoning are meritless. They cite the 2-1 Ninth Circuit panel majority decision in *Ramos*, which was later vacated by the en banc court. *Ramos v. Wolf*, 975 F.3d 872, 895 (9th Cir. 2020), *vacated upon reh'g en banc*, 59 F.4th 1010 (9th Cir. 2023). The vacated *Ramos* panel decision was rejected by

a majority of this Court and is not good law. And in any event the *Ramos* panel had no occasion to address a registration claim.

Defendants also suggest that the vacatur must have implicitly rested on a country conditions analysis, because it "necessarily made a determination" that country conditions are no longer satisfied. AOB 29. But the district court was not required to accept Defendants' post-hoc rationalization, rather than simply focusing on the reasons stated in the vacatur itself—which never mentioned country conditions. *See supra* Sections I(C), II(B).

### 4. Plaintiffs' claim against the Venezuela termination is cognizable because it challenges agency action in violation of statutorily-mandated procedures.

Plaintiffs' third claim challenges the Secretary's non-compliance with procedural requirements Congress established for TPS decision-making. 1-ER-51–54; 5 U.S.C. § 706(2)(A).[8] As the district court found, the Secretary failed to consult with the State Department and actually review country conditions *before* making the termination decision. Challenges to a failure to comply with the statute's procedural obligations are not challenges to country conditions determinations. So this claim, too, is reviewable.

Defendants contend otherwise, relying on cases about other statutes for the general proposition that "no-review provision[s]" generally bar review of challenges to arbitrary and capricious agency action. AOB 25–27. Unsurprisingly, however, no case stands for the general proposition that all jurisdiction-stripping provisions are the same, as Defendants' one-size-fits-all approach requires. The cases they cite for that proposition analyze the claims at issue by reference to the statutes relevant to those cases, none of which use the word "determination." Nor do they

---

[8]This claim was not before this Court in *NTPSA I* but was at issue in *NTPSA II*. The Court exercised jurisdiction over it to the extent it denied Defendants' stay application in *NTPSA II*.

support stripping review of claims that the agency has failed to follow procedure required by law, which is what Plaintiffs allege here.

Defendants cite *Amgen, Inc. v. Smith*, 357 F.3d 103, 112–13 (D.C. Cir. 2004), but it held the opposite, reading the statute to preserve review of agency authority claims. Moreover, the jurisdiction stripping provision at issue in *Amgen* explicitly precluded review over not only payment "adjustments" but also "[t]he development of the [payment] classification system" itself; which is why the court held it lacked authority to review the manner in which the agency made a payment adjustment decision. *Id*. at 111.

Similarly, *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 506 (D.C. Cir. 2019), barred review of a claim about the methodology for estimating costs, but only because it "unavoidably" encompassed a "challenge to the estimates themselves" under the statutory scheme, which the statute explicitly barred. The court also recognized that it might have had authority to review the manner by which the agency calculated payments if the regulatory scheme had provided a general rule for calculating payments that was applied to individual hospitals. *Id.* Here, in contrast, questions about whether the agency complied with the statute's procedural requirements are conceptually distinct from whether country conditions support a particular decision to designate, extend, or terminate. And the TPS statute does provide a general rule for making country conditions determinations that is applied to individual country decisions.

The other cases Defendants cite are even farther afield. *Skagit County Public Hospital District No. 2 v. Shalala*, 80 F.3d 379, 386 (9th Cir. 1996), acknowledged that challenges to agency "procedures" would generally be reviewable, even though the challenge to the classification decision there had been mooted by a change in the process. *Reeb v. Thomas*, 636 F.3d 1224, 1226 (9th Cir. 2011), found an individual prisoner's APA challenge to his expulsion from a drug

treatment program barred by a statute that said "the provisions of [the APA] do not apply to the making of any determination, decision, or order under" treatment program decisions. *Id.* (cleaned up). In other words, the provision actually changed the applicable substantive law, rather than merely limiting jurisdiction, and barred review of any "decision, or order," which this Court read as barring review of "any substantive decision" concerning placement. *Id.* at 1227. And the tax assessment review scheme in *Nicholas v. United States*, 633 F.2d 829 (9th Cir. 1980), *permitted* judicial review in district court; it barred only appeals, and therefore implicated none of the jurisdiction-stripping doctrine at issue in this case. *Id.* at 831. *See also United States v. Tohono O'odham Nation*, 563 U.S. 307, 316 (2011) (relief available in either of two courts, just not both).[9]

In short, Defendants cite no case even suggesting that a statute barring review of "determinations" can be read to bar claims challenging agency action that violates statutory requirements or the basic rationality constraints imposed by the APA.

### 5. Plaintiffs' challenges to the Haiti vacatur are cognizable

Plaintiffs' challenges to the Haiti vacatur were not previously before this Court, but they are cognizable for the same reasons as Plaintiffs' other claims. For jurisdictional purposes, Plaintiffs' vacatur authority claim for Haiti is the same as for Venezuela. 1-ER-54. Their claim that the Secretary's reasons for vacating the Haiti extension are unlawful are also cognizable for the reasons stated previously—namely, none of the defects identified by the district court involve a challenge to the Secretary's country conditions assessments. 1-ER-55–58. Instead, they focus on

---

[9] Plaintiffs agree with Defendants that jurisdiction over this claim and the vacatur authority claim rise and fall together, because there is no basis to distinguish between different kinds of statutory authority claims in this context. AOB 23 (citing *City of Arlington v. FCC*, 569 U.S. 290 (2013)). Because Plaintiffs' vacatur authority claim is cognizable, the procedural requirements claim is too.

her misreading of the statute's rules governing the length of extensions, her unexplained departure from past practice, and the predetermined, pretextual nature of her decision. *Id.*

*   *   *

Although the above considerations suffice to establish jurisdiction over all of Plaintiffs' APA claims, any further doubt is resolved by the presumption that agency actions are reviewable. Defendants must show that Congress intended to bar Plaintiffs' claims by "clear and convincing evidence." *NTPSA I*, 150 F.4th at 1016. They plainly have not made that showing. The Court should therefore hold that each of Plaintiffs' APA claims is cognizable.

### B. Section 1252(f)(1) Does Not Bar APA Relief.

Defendants make a distinct jurisdictional argument against the relief the district court ordered, arguing that it "impermissibly restrained the Secretary's operation of the TPS statute." AOB 33 (citing 8 U.S.C. § 1252(f)(1) and *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022)).

However, "[this] circuit has already squarely resolved this issue." *NTPSA II*, 2025 WL 2661556, at *3 (citing *Immigration Defs. Law Ctr. v. Noem*, 145 F.4th 972, 989 (9th Cir. 2025) ("*ImmDef*")); *see also NTPSA I*, 150 F.4th at 1018–19 (citing *ImmDef*, 145 F.4th at 990–91); 1-ER 31–35 (district court rejecting this argument). *ImmDef* held relief under the APA is not covered by Section 1252(f)(1), and Defendants conceded in district court that the district court was bound by that decision. 1-ER-34. This Court cannot abrogate *ImmDef* or *NTPSA I. See supra* Section I.

While *ImmDef* concerned preliminary relief pursuant to 5 U.S.C. § 705 rather than "set aside" relief under 5 U.S.C. § 706, this Court ruled in *NTPSA II* that *ImmDef* applied to the decision below, which was issued under Section 706. As that ruling recognizes, the features of preliminary relief under Section 705 that render it not injunctive—in particular that it operates directly upon an agency's rule and is not directed at persons—apply equally to Section 706 set-asides. *See also* 1-ER-34 ("[A] vacatur under §706 is, if anything, less akin than postponement under §705 to the

26

equitable remedy of a preliminary injunction"); *ImmDef*, 145 F.4th at 989–90 (recognizing Congress made no mention of limiting APA claims in Section 1252(f)(1) and instead only explicitly limited injunctive relief).

Defendants make a distinct argument that set aside relief under the APA should be understood to "restrain" for purposes of Section 1252(f)(1) even if it does not "enjoin," AOB 35–36, but this Court rejected that precise argument in *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2009). *Rodriguez* also rejected Defendants' Tax Injunction Act argument. *Id.* at 1109 (distinguishing *California v. Grace Brethren Church*, 457 U.S. 393 (1982), on which Defendants rely).[10]

Defendants raise two further arguments that warrant brief rebuttal. They assert the district court's order must be barred by Section 1252(f)(1) because the district court deemed it akin to an injunction for purposes of Federal Rule of Civil Procedure 62(c). Defendants complain that it "would make little sense" to treat an order as injunctive for some purposes and not others. AOB 15. But this Court's precedent does just that. As *NTPSA I* already explained, preliminary relief under Section 705 of the APA is already considered injunctive for purposes of 28 U.S.C. § 1292(a)(1), but nonetheless does not "enjoin or restrain" under 8 U.S.C. § 1252(f)(1). *NTPSA I*, 150 F.4th at 1014. *See also ImmDef*, 145 F.4th at 983–85 and 989–90 (same). The district court simply ruled that Rule 62(c) must be interpreted consistently with Section 1292(a). SER-2.

Defendants make a related point that the district court's order must be an injunction because, after they refused to update their website to reflect the district court's ruling, the court issued a separate order requiring them to do so. AOB 35. But this undermines their argument—

---

[10]Contrary to Defendants' contention, AOB 38, *Jennings v. Rodriguez* did *not* reverse or remand *Rodriguez v. Hayes*. *Jennings* remanded a later ruling in the *Rodriguez* litigation that addressed other issues. See *Rodriquez Diaz v. Garland*, 53 F.4th 1189, 1199-1200 (9th Cir. 2022).

the summary judgment ruling did not *itself* enjoin or restrain any particular government official to update the website (or do anything else); it just set aside the agency's TPS decisions. If the summary judgment ruling had itself required some federal official to update the website, the court would have held that person in contempt. Instead, it issued a *separate* order requiring Defendants to update the website after they failed to do so. *See* SER-1–4, Compliance Order (Sept. 11, 2025). Defendants did not appeal that order; it is not before this Court.

## III. THE DISTRICT COURT CORRECTLY FOUND DEFENDANTS VIOLATED THE APA

### A. The Secretary Lacked Authority to Vacate the TPS Extensions for Venezuela and Haiti

This Court is bound by its prior holding that "the TPS statute does not authorize the vacatur of a prior grant of TPS." *NTPSA I*, 150 F.4th at 1024; *supra* Section I. Defendants nonetheless reassert their claim to non-statutory "inherent authority" to vacate a TPS extension, as though they did not lose *NTPSA I*. AOB 39. Remarkably, they entirely ignore its analysis of this Court's precedent.

Fortunately, this Court does not live in Defendants' time machine. As *NTPSA I* explained, whether vacatur authority exists is a question of statutory interpretation. Some statutes impliedly grant vacatur authority; others do not. The TPS statute forecloses it because it sets fixed terms for extensions and provides a statutory process for altering designations. *See NTPSA I*, 150 F.4th at 1019–21 (discussing, *inter alia*, *China Unicom (Ams.) Ops. Ltd. v. FCC*, 124 F.4th 1128, 1143 (9th Cir. 2024); *Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000) (en banc), and *Ivy Sports Med. v. Burwell*, 767 F.3d 81 (D.C. Cir. 2014)); *see also Civil Aeronautics Bd. v. Delta Air Lines, Inc.,* 367 U.S. 316, 322–25 (1961) ("[S]pecific instructions set out in the statute should not be modified by resort to such generalities as 'administrative flexibility' and 'implied powers.'").

Defendants concede implied vacatur authority is "foreclosed," where Congress has "requir[ed] other procedures." AOB 40. But they never grapple with the fact that their assertion of implied authority permits the Secretary to disregard procedures that Congress required for TPS decision-making. *See, e.g.*, *NTPSA I*, 150 F.4th at 1021 (explaining that statute prohibits "midstream" TPS termination, but implied vacatur effectively allows it); *cf. Am. Methyl Corp. v. EPA*, 749 F.2d 826, 836–37 (D.C. Cir. 1984) (holding EPA lacked authority to revoke waiver where statute required automatic waiver if EPA failed to make a decision by deadline); 8 U.S.C. § 1254a(b)(3)(C) (extension issues automatically if Secretary fails to make a decision by deadline).

Although *NTPSA I* already resolves the question whether the statute permits implied vacatur authority, one new argument Defendants advance warrants a response. They assert the TPS statute's use of a fixed term for extensions cannot be dispositive because the Supreme Court has found agency vacatur authority "in the context of fixed-term passports." AOB at 47 (citing *Haig v. Agee*, 453 U.S. 280, 297 n.38 (1981)). *Haig* predates *Gorbach* and *China Unicom*, so cannot justify altering this Court's reading of those cases in *NTPSA I*. In any event, the Passport Act at issue in *Haig* explicitly *authorized* the Secretary to shorten the period of a passport's validity. *See* 22 U.S.C. § 217a (1981) (prior to 1982 amendment) ("[T]he Secretary of State may limit a passport to a shorter period."). Here, in contrast, Congress has explicitly *prohibited* the Secretary from ending a TPS designation prior to "the expiration of the most recent previous extension." 8 U.S.C. § 1254a(b)(3)(B).[11]

---

[11]*Haig* is also distinguishable because Congress "expressly recogniz[ed] . . . Executive authority" to deny passports on national security grounds, *Haig*, 453 U.S. at 294, and the plaintiff "concede[d] that if the Secretary may deny a passport application for a certain reason, he may revoke a passport on the same ground." *Id.* at 291.

Defendants also rehash their argument for an exception to the rule established in *Gorbach*, *China Unicom*, and other cases, claiming the TPS statute does not speak to "whether or how a Secretary can vacate an extension that has not yet taken effect." AOB 45. They assert *NTPSA I*'s rejection of this argument "is erroneous." *Id*.

Even if it were not foreclosed by *NTPSA I*, Defendants' position would be meritless as to the Venezuela vacatur for three reasons. *First*, *NTPSA I* rejected their position that the extension was not in effect as "factually incorrect," because "TPS holders began applying to extend their status" as soon as the extension was announced on January 17, 2025. *NTPSA I*, 150 F.4th at 1023. The Supreme Court's stay order recognized as much, insofar as it suggested an exemption to its stay for "already-issued documents under the extension." *Id*. *NTPSA I* also recognized that "TPS holders began to rely upon the extension of their protected status" by applying for TPS documentation, which DHS had already started to issue. *Id*. Defendants provide no reason to reject those considered conclusions.

*Second*, Defendants' proposed exception permitting vacatur before the time period for a new extension has begun to run is at war with the statute's rules governing effective dates. Congress provided for delayed effective dates for designations and terminations. *See* 8 U.S.C. § 1254a(b)(2) (titled, "Effective period of designation for foreign states"). A designation "take[s] effect upon the date of publication" or a later date specified by the Secretary, and "shall remain in effect" until terminated. *Id*. Similarly, a termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id*. § 1254a(b)(3)(B).

In contrast, the statute does *not* provide for delayed effective dates for extensions. Rather— in accordance with the statutory requirement that a designation "shall remain in effect" until

terminated, *id.* § 1254a(b)(2)(B)—the statute says that, if a periodic review concludes without a termination decision, then the designation "*is* extended*,*" *Id.* § 1254a(b)(3)(C) (emphasis added). "Congress' use of [the present] tense" to describe an extension's effect on a designation "is significant . . . ." *United States v. Wilson*, 503 U.S. 329, 333 (1992). It shows an extension operates on a designation right away. *See Robertson v. Bradbury*, 132 U.S. 491, 493 (1889) (where act used present tense to repeal prior act, "[w]e do not see how there can be any doubt that this repealing section went into immediate effect"). That the statute says nothing about an extension's effective date confirms its immediacy. When Congress wanted to delay an action's effective date, it made that explicit, as with both designations and terminations. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely.") (citation omitted).

*Third*, Defendants' assertion that the Venezuela extension was not in effect contravenes the agency's own statements about it. The vacatur announcement acknowledged the extension "has been in effect," changed the "status quo," and induced reliance interests. *See* 90 Fed. Reg. 8,805, 8,807 (Feb. 3, 2025).

Defendants' passing suggestion that vacatur was justified because Secretary Mayorkas somehow acted improperly by issuing a "hasty" extension is utterly meritless. AOB 44. The TPS statute *required* a decision about Venezuela's designation "*[a]t least* 60 days before" its expiration, 8 U.S.C. § 1254a(b)(3)(A) (emphasis added), i.e., no later than February 1, 2025. *See* 90 Fed. Reg. at 8,807. Further, it is typical agency practice to provide more than 60 days' notice before making TPS decisions that affect the lives of thousands of people. TPS decisions were published with more than 60 days' notice 49 times between 1990 and 2019, during both

Democratic and Republican administrations. GAO Report 33. Some decisions were published over 100 days before expiration. *See, supra,* n.1. The timing of Secretary Mayorkas's decision, 75 days before the designation was set to expire, was normal.

*Finally*, even if Defendants' proposed exception for extensions that they assert have not taken effect were warranted, it could not save their Haiti vacatur. That order purported to vacate an extension that had taken effect *months* earlier, even on Defendants' flawed understanding of when an extension takes effect. *See* 90 Fed. Reg. 10,511 (Feb. 24, 2025) (vacating Haiti's TPS extension *seven months* after it was issued, and purporting to retroactively alter the expiration dates of all documents issued under it). Defendants say nothing about why the Haiti vacatur is consistent with the TPS statute given *NTPSA I*'s holding.[12]

### B. The Secretary's Venezuela Vacatur Decision Was Arbitrary and Capricious

The district court also found the vacatur arbitrary and capricious for several reasons which this Court already analyzed in *NTPSA II*. Defendants' objections to this aspect of the district court's ruling are meritless.

#### 1. The District Court did not err in considering extra-record evidence

Defendants seek reversal on the ground that the district court erred in considering extra-record evidence, challenging the district court's consideration of a publicly-available 2020 report

---

[12] Defendants do not dispute the district court's conclusion that if the vacatur was unlawful, then the termination was also unlawful, because the Secretary had no authority to issue the termination absent the vacatur. 1-ER-50. Defendants also do not argue that the Haiti vacatur could be lawful even if the Venezuela vacatur is not. Therefore, this Court can affirm the entire district court order—i.e., its set aside of the Venezuela vacatur, the Venezuela termination, and the Haiti vacatur—based on this argument alone. Nonetheless, as explained above Plaintiffs believe the Supreme Court, other courts, and the parties would benefit from this Court's resolution of the other issues in this case.

by the U.S. Government Accountability Office concerning the history of TPS decision-making ("GAO Report"). AOB at 53–55.[13] Defendants' argument fails at the outset because *they* relied on the GAO Report in this litigation even before Plaintiffs moved to supplement the administrative record; Defendants cited to it in both of their stay applications before the Supreme Court. Defendants' Application for Stay at 6 n.3, *Noem v. Nat'l TPS All.,* Case No. 24A1059 (S. Ct. May 1, 2025); *Noem v. Nat'l TPS All.*, Case No. 25A326 (S. Ct. filed Sept. 19, 2025), Defendants' Application for Stay at 7 n.4. Defendants also failed to object to consideration of the GAO Report before the district court and never suggested it was inaccurate (perhaps because they themselves had relied on it). 1-ER-9 n.3, 1-ER-53 n.18 (Defendants "cite[] no instance, prior to the current Administration taking office, where the general procedure of reviewing TPS deviated in any substantial way from that described by the GAO."). *See also* N.D. Cal. L.R. 7-3(a) ("Any evidentiary and procedural objections to [a] motion must be contained" in the opposition). Defendants' own reliance on this document and their failure to challenge the district court's consideration of it below forecloses their objection now; they have waived it. 1-ER-39-40. *See Smartt v. Kijakazi*, 53 F.4th 489, 500 (9th Cir. 2022) (finding arguments waived because party did "not rais[e] them before the district court").

Defendants claim to have preserved the issue because they generally objected to all extra-record discovery in a letter. AOB 53. But objecting to discovery is not the same as objecting to admission of evidence. In any event, Defendants' objection cannot survive their own prior use of the same evidence. Nor can it excuse their subsequent reliance on extra-record evidence in their summary judgment briefing. 1-ER-46 (considering "evidence that the *government* submitted in

---

[13]The district court also admitted as extra-record evidence limited discovery related to the decisions and Defendants' public statements, but Defendants do not specifically challenge any use of that evidence here.

conjunction with the summary judgment proceedings" which demonstrates that the Biden Administration consolidated the process for the 2021 and 2023 TPS holders precisely to *avoid* confusion" (emphasis in original)).

Waiver aside, the district court's consideration of extra-record evidence was not an abuse of discretion. The district court permitted extra-record discovery only after Defendants produced the certified administrative record, and upon finding that extra-record evidence was permissible under *Dep't of Commerce v. New York*, 588 U.S. 752, 782 (2019). 1-ER-38–39. *See also* SER-118–124. . As Defendants concede, AOB 51, considering evidence outside the administrative record is appropriate where plaintiffs "make a showing of agency bad faith." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005); *see Dep't of Commerce*, 588 U.S. at 784–85; *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *In re U.S. Dep't of Educ.*, 25 F.4th 692, 700, 702–03 (9th Cir. 2022). Requisite bad faith is established where the "explanation for agency action . . . is incongruent with what the record reveals about the agency's priorities and decision-making process"—that is, if the rationale for the agency's action "seems to have been contrived." *Dep't of Commerce*, 588 U.S. at 784–85.

Defendants claim the district court never explained what constituted bad faith, AOB 53, but this is false. The district court expressly described, as evidence of bad faith, the "repeated discriminatory statements by Secretary Noem and President Trump, the short timeframe in which decisions were made, the lack of legal and/or evidentiary support for the decisions, and the unprecedented nature of the decisions." 1-ER-39.[14]

---

[14]Defendants note the district court did not decide the discrimination claim, but it denied Defendants' summary judgment motion after finding "genuine dispute of material fact as to whether the decisions to vacate and terminate were based on racial … animus." 1-ER-60.

Extra-record evidence is also admissible to determine whether the agency failed to adequately "consider[] all relevant factors" or "explain[] its decision." *Lands Council*, 395 F.3d at 1030. Here, the district court rightly found that limited extra-record evidence was proper for the court to analyze whether the Secretary failed to "consider[] all relevant matters" before deciding to vacate and terminate the TPS designations. *See Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980); *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014) (extra-record discovery permissible to "evaluate the integrity of the agency's analysis" and assess "whether the agency complied with the APA's requirement that the agency's decision be neither arbitrary nor capricious").

Defendants also object that the GAO Report was published in 2020, five years before the challenged TPS decisions. AOB 53–54. But the Court considered the report relevant to assess the factors DHS Secretaries have typically considered in making a TPS decision, for which its date is appropriate. Defendants' argument that the GAO Report is not law is equally meritless. AOB 54–55. The district court did not treat it as law, but only as relevant to show what factors are typically part of TPS decision-making processes, in order to determine whether those factors were utilized here (which they were not). 1-ER-4, 8–11, 51–53 (relying on GAO Report to evaluate "DHS's established practices for TPS decision-making").

Defendants suggest the district court's consideration of the practices described in the report constituted "additional judge-made procedural requirements," AOB 54 (citing *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021)), but this confuses court-imposed practices with those established by the agency itself. *Ming Dai* did not alter the hornbook administrative law that an agency must acknowledge and explain departures from longstanding agency practices. *E.g.*, *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221

(2016). Were there doubt, the Supreme Court reiterated that the APA's constraints continue to govern immigration policymaking even after *Ming Dai*. *See Biden v. Texas*, 597 U.S. 785, 806–807 (2022) (stating, in case about asylum processing at the border, that "the [APA] … require[s] that an executive agency's exercise of discretion be reasonable and reasonably explained").

### 2. The District Court committed no error in finding the Venezuela vacatur arbitrary and capricious

Defendants purport to seek reversal of the district court's detailed rulings establishing that the reasons for the Secretary's vacatur of TPS for Venezuela were unlawful, but they never address this Court's thorough treatment of those issues in *NTPSA II*, 2025 WL 2661556, at *4–6, as well as its prior discussion of one central aspect of them in *NTPSA I*, 150 F.4th at 1024 n.12. Nor do Defendants engage with the evidence the district court cited, let alone establish clear error on the detailed findings the court based on that evidence. *Compare* 1-ER-45–50 *with* AOB 56–62.

Defendants first attempt to defend Secretary's Noem's confused reasoning, in which she stated Secretary Mayorkas acted unlawfully in "effectively extend[ing]" the TPS designation for those in the 2021 cohort when he consolidated the distinct Venezuelan TPS registration periods. AOB 56–57. Like Secretary Noem herself, Defendants appear to have "failed to recognize that a TPS beneficiary under the 2021 designation was necessarily a TPS beneficiary under the 2023 designation," despite this Court clearly explaining that in *NTPSA I*. 150 F.4th at 1024 n.12. As this Court ruled, "the district court correctly held that the basis for the vacatur was predicated on the Secretary's factual and legal misapprehension as to the operation of the TPS statute." *Id*. Secretary Mayorkas's extension did not "effectively extend" TPS for anyone in the 2021 cohort (or anyone else); the TPS statute itself necessarily did that once Secretary Mayorkas issued the redesignation in 2023, because everyone in the 2021 cohort was by definition also part of the 2023 cohort. Secretary Noem's error on that crucial point provides a sufficient basis to affirm on this claim.

Defendants also parrot the Secretary's reasons from the Federal Register, asserting they were "objective and reasonable," AOB 57, but never engage with the district court's detailed findings to the contrary. *See, e.g.*, ER 1-46–47 (describing record evidence establishing that consolidation did in fact decrease confusion). Defendants cannot establish clear error by ignoring the evidence on which the district court relied.

That is particularly so when this Court has already credited the district court's factual findings. As *NTPSA II* explained, "a primary rationale for Secretary Noem's vacatur—that 'vacatur [was] warranted to untangle the confusion' of consolidating the 2021 and 2023 TPS designations—was squarely contradicted by evidence that the consolidations were 'not novel, did not engender confusion, and [were] not 'thin' in explanation.'" 2025 WL 2661556, at *4 (citing the district court's findings). As the district court found, the evidence showed consolidation *reduced* confusion—and DHS knew it. 1-ER-46–47.

Defendants also fail to rationalize the Secretary's refusal to consider the most obvious solution to the non-existent problem she purported to identify: even if consolidation were confusing, the solution was to deconsolidate, not to vacate entirely. *Compare* 1-ER-46–48 *with* AOB 58. The district court rightly concluded that the Secretary's failure to consider that option was arbitrary. 1-ER-46 ("When an agency rescinds a prior policy, its reasoned analysis must consider the alternatives that are within the ambit of the existing [policy].") (cleaned up) (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020)).

Defendants' only explanation as to why the Secretary failed to consider this obvious alternative comes from her statement that the vacatur gave her "an opportunity for informed determinations regarding the TPS designations and clear guidance." AOB 58 (citing 90 Fed. Reg. at 8,807). But the record refuted that claim, as "even before the decision to vacate was finalized,

DHS was preparing to terminate Venezuela's TPS." 1-ER-13. In fact, as the district court found, Secretary Noem's statement just expressed "the desire to totally undo Secretary Mayorkas's decision," 1-ER-47. As the court concluded, that is not a valid basis for exercising implied vacatur authority, even where such authority exists. 1-ER-43 n.16 (citing *Am. Trucking Ass'ns v. Frisco Transp. Co*., 358 U.S. 133, 145−46 (1958)).

As to the district court's separate finding that the Secretary's reasons for the vacatur were pretextual, Defendants simultaneously suggest both that pretextual reasons are permissible and that her reasons were genuine. AOB 58–59. Both claims are wrong. As to the former, the district court found the Secretary's decisions so obviously disingenuous as to violate the rule established by the Supreme Court in *Dep't of Commerce*, 588 U.S. at 782–83. 1-ER-49. The extensive evidence on which the court relied shows that finding was not clear error. And as to the latter, contrary to Defendants' claims the Secretary never asserted foreign policy or national interest reasons as justification for the vacatur; nor did she cite any country conditions in support of the vacatur. *Compare* AOB 60 *with* 1-ER-45 (quoting the actual reasons Secretary Noem provided).[15] Defendants cannot win reversal on clear error by fabricating reasons the Secretary never provided. *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin*., 477 F.3d 668, 688 (9th Cir. 2007) ("we must look to [the agency's] reasoning in making its decision … and not to other reasons for its decision that [the agency] might marshal before us").

---

[15]Defendants support their contention by citing material from the Certified Administrative Record for the Venezuela vacatur decision, but the Secretary's decision must be judged by the reasons she gave for it. Her decision references none of the material Defendants cite. *Compare* AOB 60 (citing 3-ER-155–66; 3-ER-213-32; 4-ER-234–71; 3-ER-149–50; 3-ER-152–54; and 3-ER-167–209) (referencing, inter alia, a State Department press statement, the President's Border Emergency Proclamation, and agency documents regarding country conditions) *with* 5-ER-523–27 (actual reasons given in the vacatur, which mention none of those).

Nor was the district court required to accept Defendants' fanciful spin that their correspondence showing a pre-ordained decision "merely depicts communications between agency personnel gathering information regarding country conditions." AOB 61. The district court credited evidence showing the termination was prepared even *before* the vacatur, 1-ER-49, and that staff were told to "focus on … improvements" rather than objectively evaluate country conditions, *id.*, thus unmasking as a lie Defendants' claim that the vacatur's purpose was to allow for more careful consideration of the termination decision. That both decisions happened "over a span of days," further supports the district court's finding. *Id.*[16]

Finally, Defendants fault the district court for supposedly ruling that the Secretary failed to comply with statutory consultation and review requirements before vacating, but the district court held no such thing. *Id*. Rather, the district court held the lack of any consultation or review was further evidence of pretext. This was not clear error.

### C. The District Court Correctly Held the Venezuela Termination Decision Failed to Comply With the TPS Statute.

Defendants make no serious attempt to dispute the district court's most extensive basis for finding the Venezuela termination unlawful, which was that "the Secretary violated the TPS statute because she effectively made the decision to terminate *before* consultation with any government agency." 1-ER-51 (emphasis in original). That violates the statute, which requires that

> [T]he [Secretary], *after* consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . .  and shall determine whether the conditions for such designation under this subsection continue to be met.

---

[16]Defendants cite *Saget*, 375 F. Supp. 3d at 305 to suggest that it was normal to "refashion" the conclusions of career agency officials, but *Saget* cited that evidence to show the opposite—i.e., that officials of the first Trump administration illegally terminated TPS for Haiti because they "refashioned evidence- and fact-based memoranda to arrive at predetermined outcomes." *Id*. at 349.

8 U.S.C. § 1254a(b)(3)(A) (emphasis added). The district court also found the (post-decision) consultation that did occur "failed to include *any* information on country conditions," in violation of another "rudimentary element" of the Secretary's statutory obligations.

Defendants entirely ignore the *temporal* aspect of these findings. They point to record evidence that they say shows consultation occurred, but the district court found it happened *after* the decision was made. AOB 65. The court also found the decision occurred without any country conditions review. *Id*. Defendants' failure to address the deficiencies the district court actually found is fatal to their argument. That is particularly so because, again, this Court already credited these precise findings: "Secretary Noem finalized the vacatur decision and began pressuring staff to terminate Venezuela's TPS status *before* receiving any input from the Department of State, the Secretary of State, or USCIS. *NTPSA II*, 2025 WL 2661556, at *4–5.

Aside from the facts, Defendants argue the agency's failure to comply with the statute's basic procedural requirements was essentially harmless error, because the Secretary had already decided (without consultation) that terminating TPS for Venezuela was contrary to the national interest, and therefore she would have terminated TPS even if she had actually reviewed country conditions before reaching her decision, as the statute requires. AOB 63–64. This argument fails for three reasons.

*First*, Defendants never made this argument below; it is waived. *See Smartt*, 53 F.4th at 500.

*Second*, the Secretary's failures were not harmless. In the APA context, an error is harmless only if it "clearly had no bearing on the procedure used or the substance of the decision reached." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1090 (9th Cir. 2011). Failure to comply with a statutory consultation requirement is "not some technical error, but result[s] in a

decision-making process . . . contrary to that mandated by Congress." *Id.* at 1095. Moreover, "a court can hardly conclude that [an] agency's refusal to consult" with stakeholders "had no bearing on the substance of the decision reached." *Id.* at 1094. Defendants' failure to comply with statutory consultation and review arguments was thus not harmless. *Third*, the district court separately found that the Secretary's failure to consult with State Department experts and review country conditions rendered her termination decision arbitrary and capricious, because it represented a (massive) unexplained departure from with past practice. 1-ER-52. That constitutes a separate APA violation, apart from the Secretary's failure to follow statutory requirements.

In support of that finding, the court pointed to the GAO Report describing the way the agency had conducted TPS decision-making over many years. 1-ER-53. *See supra* Section I. As the Court noted, "the government has not objected to the GAO TPS Report, nor has it argued that the report's description of the TPS decision-making process is incorrect." *Id*. n.18.

Defendants argue not only that the court should not have considered the GAO Report, *see supra* Section III(B)(1), but also that internal procedures cannot bind an agency's discretion unless they were established with an intent to do so. AOB 67. But the Supreme Court mentioned no such requirement when finding agency action arbitrary for having failed to explain its departure from past practices in *Fox*, 556 U.S. at 515, and in *Encino Motorcars*, 579 U.S. at 221. Nor has this Court in its cases enforcing that requirement. *See, e.g., Nw. Envtl. Def. Ctr.*, 477 F.3d at 687–88 (finding APA violation where agency failed to explain departure from prior rule for funding its own fish conservation infrastructure).[17] Ultimately, Defendants cannot seriously contest that the

---

[17] Defendants also cite *Vietnam Veterans of Am. v. Sec'y of the Navy*, 843 F.2d 528, 539 (D.C. Cir. 1988) to support this argument, AOB 67, but that case long pre-dates *Fox* and its progeny. In any event, it held only that the agency policy memoranda at issue there did not create their own right of action, not that agencies could radically depart from past practice without explanation.

paper-thin country conditions review conducted over less than ten days and with no consultation prior to the decision being made constituted a radical break from prior processes. The district court did not err in concluding that this change required some meaningful acknowledgment and explanation.

### D.  The Haiti Vacatur Decision Was Arbitrary and Capricious.

Defendants devote less than two pages to defending the Secretary's decision to vacate TPS for Haiti, even though the district court described the legal error in that decision in detail, 1-ER-56–59, and despite the fact that Defendants' primary defense of the Venezuela vacatur does not apply to the Haiti decision because, as they acknowledge, the Haiti vacatur unquestionably was in effect even under their own flawed conception of when an extension takes effect. *See supra* Section III(A). The period of time granted by the TPS extension the Secretary purported to vacate had been running for *six months* when she decided to cancel it, AOB 69, even though the statute guaranteed TPS for more than a year longer. Thus, to justify the Haiti vacatur Defendants have to win that the statute implicitly authorizes the vacatur of TPS extensions *at any time*. That view cannot be reconciled with the statute's text and structure, as *NTPSA I* held.

The district court also found the Haiti vacatur unlawful because the decision rested on legal confusion about the default length of TPS extensions, failed to explain its radical break with past practice, reflected "no regard for the facts and actual conditions," and was instead "driven by [the Secretary's] predetermined desire to terminate Haiti's TPS on a hastened timeline." 1-ER-57–58. There is no error of law or clear error of fact in the district court's order on these issues.

### IV.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN SPECIFYING THE APPROPRIATE SCOPE OF RELIEF

Defendants contend the district court erred in issuing what they call "universal relief," but what they really attack is the default rule that a "set aside" under 5 U.S.C. § 706 runs against the

agency action itself, rather than only against the parties to the case. *Compare* AOB 70–75 *with E. Bay Sanctuary Covenant*, 993 F.3d at 681 ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.") (citation omitted); *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 830−31 (2024) (Kavanaugh, J., concurring) ("When a federal court concludes that an agency adjudicative order [or any other agency action] is unlawful, the court must vacate that order"). Even if this Court were otherwise inclined to deviate from the default rule, there is no reason to do so here given this Court's prior rulings and the district court's factual findings.

This Court need not engage with doctrinal questions concerning how the limitations on universal relief generally apply to APA cases because the district court found, as a matter of fact, that "full relief for the NTPSA and its tens of thousands of members who reside in all fifty states and the District of Columbia could not be obtained" without universal relief. 1-ER-67. It also held that any more limited form of relief was "not a workable solution under the TPS statute" because of how the TPS statutory scheme operates. *Id*. This Court affirmed that finding in *NTPSA I*, explaining that "Plaintiffs have demonstrated that a postponement of the Vacatur Notice, effective nationwide, is the only remedy that provides completely relief to the parties before the court and complies with the TPS statute." 150 F.4th at 1028.

Defendants resist these findings, which can only be reversed for clear error, claiming that Plaintiffs "only provided a short list" of people affected. AOB 74. This is false. *Everyone* who held employment authorization through TPS lost it when Defendants' unlawful termination went into effect, subject only to the small exception for people whose documents had previously been

issued.[18] Plaintiffs' declarations specifically describe "countless" people who have suffered catastrophic economic consequences, been separated from their families, detained, and deported due to the unlawful decisions challenged here, and Defendants never presented a shred of evidence suggesting these harms were not widespread. *See* SER-265, 12–24, 109–114, 248–258, 261–268.

Defendants also ignore that their proposal—which apparently would limit relief to whomever among the tens of thousands of NTPSA members can show "concrete injury," however Defendants would define it—"would effectively mean rewriting [Secretary Noem's vacatur] in a way that does not comply with the TPS statute." 1-ER-68. As the district court noted, the statute contemplates "a single binary determination for each country's TPS designation." *Id*. Defendants proposal would therefore itself violate the statute, and require a "judicially created patchwork." *Id*.

The district court also found that requiring NTPSA members to identify themselves would raise serious First Amendment problems. 1-ER-69 (citing *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958)). Defendants respond that TPS holders already have to register with DHS, AOB 74, but requiring someone to disclose that they hold TPS is obviously different from requiring them to disclose their membership in an advocacy organization that has repeatedly sued the federal government. The First Amendment problems with requiring people to disclose such associational activity as the price of securing relief from unlawful government action are obvious:

> [T]he government must justify its actions not only when it imposes direct limitations on associational rights, but also when governmental action would have the practical effect of discouraging the exercise of constitutionally protected political rights. . . . Such actions have a chilling effect on, and therefore infringe, the exercise of fundamental rights. Accordingly, they must survive exacting scrutiny.

---

[18]Defendants have not challenged that aspect of the district court's order. AOB 18 n.5 (citing 1-ER-43–44).

*Perry v. Schwarzenegger*, 591 F.3d 1147, 1159–60 (9th Cir. 2010) (cleaned up). Given that Defendants made no further attempt to defend their proposal against these obvious First Amendment objections, the district court acted well within its discretion to reject it.

Defendants also advance various arguments for changing the "ordinary rule" that APA relief runs against the agency action itself, "not that their application to the individual petitioners is proscribed." *E. Bay Sanctuary Covenant*, 993 F.3d at 681. The district court's factual findings, this Court's ruling affirming them in *NTPSA I*, and the prior precedent from *East Bay* and other cases foreclose those arguments.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Dated: November 5, 2025

Respectfully submitted,

By: */s/ Ahilan T. Arulanantham*
Ahilan T. Arulanantham (SBN 237841)
*Counsel of Record*
arulanantham@law.ucla.edu
CENTER FOR IMMIGRATION LAW AND
POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBNY 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
 Diana Sanchez (SBN 338871)
dianasanchez@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, 1H

San Diego, CA 92120
Telephone: (949) 603-7411

*Attorneys for Plaintiffs-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with Circuit Rules 27-1(1)(d) and 32-3 because it contains less than 14,000 words, including words manually counted in any visual images, and excluding the parts of the document exempted by Rules 27(a)(2)(B) and 32(f) of the Federal Rules of Appellate Procedure. The brief also complies with the typeface and typestyle requirements of Rules 32(a)(5)–(6) of the Federal Rules of Appellate Procedure because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: Novermber 5, 2025                    Respectfully submitted,

                                            By: */s/ Ahilan Arulanantham*
                                            Ahilan Arulanantham