No. 25-2120

# United States Court of Appeals for the Ninth Circuit

NATIONAL TPS ALLIANCE, MARIELA GONZALEZ, FREDDY ARAPE RIVAS, M.H., CECILIA GONZALEZ HERRERA, ALBA PURICA HERNANDEZ, E.R., HENDRINA VIVAS CASTILLO, VILES DORSAINVIL, A.C.A., SHERIKA BLANC,

*Plaintiffs-Appellees,*

— v. —

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
IN CASE NO. 3:25-CV-1766-EMC, HONORABLE EDWARD M. CHEN

## BRIEF FOR *AMICI CURIAE* IMMIGRATION LAW SCHOLARS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

ANDREW I. SCHOENHOLTZ
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 662-9000
schoenha@law.georgetown.edu

JAYA RAMJI-NOGALES
TEMPLE UNIVERSITY,
BEASLEY SCHOOL OF LAW
1719 North Broad Street
Philadelphia, Pennsylvania 19122
(215) 204-7861
jayarn@temple.edu

ANNE LAI
UC IRVINE SCHOOL OF LAW
401 East Peltason Drive
Irvine, California 92697
(949) 824-9894
alai@law.uci.edu

*Attorneys for Amici Curiae*

 COUNSEL PRESS (800) 4-APPEAL • (715307)

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ...............................................................................I

TABLE OF AUTHORITIES........................................................................ II

INTEREST OF *AMICI CURIAE*................................................................ 1

SUMMARY OF ARGUMENT.................................................................... 1

ARGUMENT............................................................................................3

I. PREDECESSOR FORMS OF HUMANITARIAN PROTECTION THROUGH
    EXECUTIVE DISCRETION............................................................3

II. THE 1980 REFUGEE ACT: ESTABLISHING A PROCESS TO PROTECT A
    NARROW CLASS OF INDIVIDUALS FLEEING HARM.............5

III. FROM EXTENDED VOLUNTARY DEPARTURE TO TEMPORARY
    PROTECTED STATUS....................................................................6

IV. CONGRESS CRAFTED TEMPORARY PROTECTED STATUS TO
    PROVIDE NON-DISCRETIONARY GUIDANCE TO THE EXECUTIVE
    IN ITS AWARDS OF NATIONALITY-BASED HUMANITARIAN
    PROTECTION ..............................................................................10

V. THE HISTORY OF TEMPORARY PROTECTED STATUS CONTRADICTS
    THE GOVERNMENT'S ARGUMENTS.......................................14

APPENDIX ...............................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Statutes**

8 U.S.C. § 1158(b)(1)(A) ................................................................ 5

8 U.S.C. § 1254a(b)(1) ............................................................... 9, 10

8 U.S.C. § 1254a(b)(1)(B) ............................................................... 2

8 U.S.C. § 1254a(b)(3) .................................................................... 9

8 U.S.C. § 1254a(b)(3)(A) ............................................................. 10

8 U.S.C. § 1254a(b)(3)(B) ............................................................. 10

8 U.S.C. § 1254a(b)(3)(C) ......................................................... 10, 11

8 U.S.C. § 1254a(b)(5)(A) ......................................................... 12, 13

**Legislative Materials**

133 Cong. Rec. (House) 21331 (statement of Rep. Hamilton Fish, Jr.) ............................. 7

135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. Joseph E. Brennan) . 8

135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) ........ 8

135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. Bill Richardson) ...... 8

136 Cong. Rec. (House) 8686 (statement of Rep. William H. Gray) ................................. 5

136 Cong. Rec. (House) 8686 (statement of Rep. Mary Rose Oakar) ................... 6, 12, 15

136 Cong. Rec. (House) 8687 (statement of Rep. Marcy Kaptur) ................................ 6, 12

136 Cong. Rec. (House) 19559 (statement of Rep. Hamilton Fish, Jr.) ............................ 7

136 Cong. Rec. (House) 19560 (statement of Rep. Romano Mazzoli) .............................. 7

136 Cong. Rec. (House) 27131 (statement of Rep. Mary Rose Oakar). ...............................

H.R. Rep. No. 100-627, 100th Cong., 2d Sess. (1988) ......................................... 3, 5, 6, 12

S. Rep. No. 96-125, 96th Cong., 1st Sess. (1979) ............................................................. 5

**Other Authorities**

Stanley A. DeSmith, Lord Woolf, and Jeffrey Jowell, JUDICIAL REVIEW OF ADMINISTRATIVE ACTION, 5th Ed. at 296 (Sweet & Maxwell 1995) .......................... 14

Bill Frelick & Barbara Kohnen, *Filling the Gap: Temporary Protected Status*, 8(4). J. Ref. Studs. 339, 362-63 (1995).

Rebecca Hamlin & Philip E. Wolgin, *Symbolic Politics and Policy Feedback: The United Nations Protocol Relating to the Status of Refugees and American Refugee Policy in the Cold War*, 46 Int'l Migration Rev. 586, 601-02, 612, 615 (2012) ............................. 4

Andrew I. Schoenholtz, *The Promise and Challenge of Humanitarian Protection in the United States: Making Temporary Protected Status Work as a Safe Haven*, 15(1) Nw. J. L. & Soc'l Pol. 1, 5 (2019)

Ruth Ellen Wasem and Karma Ester, *Temporary Protected Status: Current Immigration Policy and Issues*, Cong. Rsch. Serv. (2008) ................................................................. 9

Jill H. Wilson, *Temporary Protected Status and Deferred Enforced Departure*, Cong. Rsch. Serv. (Sept. 23, 2024) ........................................................................................ 11

Extension and Redesignation of Haiti for Temporary Protected Status, 89 Fed. Reg. 54484 (July 1, 2024).

Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10511 (Feb. 24, 2025).

## INTEREST OF *AMICI CURIAE*

*Amici Curiae* are law professors who research, teach, and publish scholarship about U.S. immigration law.[1]  *Amici* have collectively studied the implementation and history of the Immigration and Nationality Act ("INA") for decades.  *Amici* include experts on Temporary Protected Status ("TPS"), asylum, and other forms of humanitarian relief, as well as on executive power and administrative law in the immigration context.  Accordingly, they have a special interest in the proper administration and interpretation of the nation's immigration laws, particularly the INA.

## SUMMARY OF ARGUMENT

Starting with the Eisenhower administration and long before statutory authorization for Temporary Protected Status, the Attorney General offered temporary protection to noncitizens who were unable to return to their home country because of conditions that made return unsafe.  For many years, however, blanket group-based forms of humanitarian relief such as Extended Voluntary Departure ("EVD") were determined solely by the Executive, without reference to any

---

[1] A complete list of *amici* is set forth in the appendix to this brief.  University affiliations are provided for identification purposes only.  No counsel for any party authored this brief in whole or in part, and no person or entity other than *amici* or their counsel of record made a monetary contribution to its preparation or submission.  This brief is filed with the consent of all parties.

1

statutory criteria or constraints, and with little if any explanation for why nationals of certain countries received protection while others did not.

In 1990, Congress sought to regulate the process of providing humanitarian relief to ensure that the Executive exercised its authority to grant temporary protection on the basis of enumerated and consistent criteria, rather than unfettered discretion or political considerations. To that end, Congress amended the INA to provide TPS as a form of humanitarian immigration relief for people who are already present in the United States but are unable to return safely to their home country due to war, natural disaster, or other unsettled conditions. 8 U.S.C. §1254a(b)(1)(B). It is essential, Congress concluded, to protect individuals whose return to their home country would be dangerous, even if they do not meet the narrow eligibility requirements for other forms of humanitarian protection, such as asylum.

The legislative history of the TPS statute and its predecessor safe haven bills reflect clear congressional intent to adopt statutory criteria to constrain executive discretion, replacing the Executive's prior practice of providing nationality-based humanitarian protection on an *ad hoc* and opaque basis. For individuals in the United States who would face unstable or dangerous conditions if they returned to their home countries, Congress' goal was to provide clear rules, promote transparency, and limit arbitrariness in awarding nationality-based humanitarian protection. To the extent the Government argues here that the TPS statute was

2

intended to provide unreviewable discretion to the Secretary of Homeland Security ("DHS Secretary") in this area, that argument is inconsistent with the history of the TPS statute, which arose as a response to pre-existing discretionary practices.

## **ARGUMENT**

## I. **PREDECESSOR FORMS OF HUMANITARIAN PROTECTION THROUGH EXECUTIVE DISCRETION**

In the thirty years before Congress enacted the TPS statute in 1990, presidential administrations repeatedly granted group-based humanitarian protection to foreign nationals in the United States on an *ad hoc* basis. As a House Report observed in 1988: "Recognizing that in some circumstances an individual who cannot show persecution may nevertheless be subjected to great danger if forced to return home, every Administration starting with President Eisenhower has permitted one or more groups of otherwise deportable aliens to remain temporarily in the United States out of concern that forced repatriation of these individuals could endanger their lives or safety." H.R. Rep. No. 100-627, at 6 .

In 1960, the Eisenhower administration first used the form of *ad hoc* humanitarian protection known as Extended Voluntary Departure or "EVD," to protect Cuban nationals already in the United States. Thereafter, the Attorney General used EVD to protect nationals of at least fifteen other countries between

1960 and 1989 from return to dangerous conditions.[2] EVD grants shielded recipients from deportation and made them eligible for employment authorization, but without conferring permanent immigration status. The periods of EVD protection ranged from less than eight months (Iran) to fifteen years (Lebanon). Frelick & Kohnen at 362–63. In this same period, however, the Attorney General's *ad hoc* and opaque determinations about which nationalities would be granted EVD protections came under widespread criticism.

In 1990, President George H.W. Bush first used his executive authority to grant another form of *ad hoc* humanitarian protection known as deferred enforced departure, or "DED". This temporary program finds its basis in the executive's discretionary power over foreign relations, and is not regulated by statute. The president normally grants DED to offer protection against civil unrest, natural disasters, or war, providing blanket relief from removal as well as employment authorization.[3]

---

[2] Designated nationalities included those from: Afghanistan, Cambodia, Chile, Cuba, Czechoslovakia, the Dominican Republic, , Ethiopia, Hungary, Iran, Laos, Lebanon, Nicaragua, Poland, Romania, Uganda, and Vietnam . Bill Frelick & Barbara Kohnen, *Filling the Gap: Temporary Protected Status*, 8 J. REFUGEE STUD. 339, 362–63 (1995). .

[3] Andrew I. Schoenholtz, *The Promise and Challenge of Humanitarian Protection in the United States: Making Temporary Protected Status Work as a Safe Haven*, 15 NW. J. L. & SOC. POL'Y 1, 6 (2019); JILL H. WILSON, CONG. RSCH. SERV. RS20844, TEMPORARY PROTECTED STATUS AND DEFERRED ENFORCED DEPARTURE 4 (2024).

## II.  THE 1980 REFUGEE ACT: ESTABLISHING A PROCESS TO PROTECT A NARROW CLASS OF INDIVIDUALS FLEEING HARM

The 1980 Refugee Act was Congress's first reform of the *ad hoc* and unwieldy system that offered various forms of protection to some foreign nationals in the United States who were fleeing persecution.  Rebecca Hamlin & Philip E. Wolgin, *Symbolic Politics and Policy Feedback: The United Nations Protocol Relating to the Status of Refugees and American Refugee Policy in the Cold War*, 46 INT'L MIGRATION REV. 586, 601-02, 612, 615 (2012).  Senator Edward Kennedy, the legislative sponsor of the Refugee Act, explained that it had two goals.  First, it adopted into federal law our national commitment to human rights and humanitarianism.  S. Rep. No. 96-125, at 23232 (1979).  Second, the Refugee Act created a statutory asylum system that would ameliorate some of the chaos of the prior approach to humanitarian protection.  *Id.* at 23233.  Specifically, Senator Kennedy pointed to (1) greater congressional involvement in the admissions decision; (2) more equitable treatment for refugees; (3) advance notice to organizations supporting refugees; and (4) taxpayer savings due to planning efficiencies arising from increased predictability and transparency.  *Id.*

The Refugee Act codified protections on a case-by-case basis, but only for those who show that they fear persecution on account of race, religion, nationality, political opinion, or membership in a particular social group.  8 U.S.C. §1158(b)(1)(A).  Those who cannot meet those criteria are not protected.  This meant

5

that though the Refugee Act enhanced predictability and transparency in some respects, it did not eliminate the need for EVD. Persons fleeing serious but generalized forms of harm, including civil war and civil strife, or who could not return to unsafe conditions caused by natural disaster or other crisis, and who could not establish that they had a well-founded fear of persecution on the basis of one of the five grounds for asylum, were left without protection. *See, e.g.*, H.R. Rep. No. 100-627, at 5.

The drafters of the TPS statute and its predecessor proposals recognized this limitation, explaining that, "not everyone who needs protection meets the strict standard of asylum." *See* 136 Cong. Rec. (House) 8686 (1990) (statement of Rep. William H. Gray). The purpose of TPS was to correct this shortcoming by regularizing the process for granting protection on a group basis outside the system of providing for asylum on individualized grounds.

## III. FROM EXTENDED VOLUNTARY DEPARTURE TO TEMPORARY PROTECTED STATUS

In the late 1980s, Congress considered several bills to provide a more regularized process to protect those fleeing serious danger outside the asylum protection scheme. The legislative history of these proposals, and of the TPS statute that eventually became law, reveals congressional intent to create a "more formal and orderly mechanism for the selection, processing and registration of [individuals fleeing turmoil so that they may remain temporarily in the United States]." H.R.

Rep. No. 100-627, at 4 ; *see also* 136 Cong. Rec. (House) 8686 (statement of Rep. Mary Rose Oakar); 136 Cong. Rec. (House) 8687 (statement of Rep. Marcy Kaptur). Legislators repeatedly underscored serious concerns about the lack of criteria to guide the Attorney General's grants of EVD and the lack of transparency in and politicized nature of the process of deciding which nationalities would be granted EVD.

Representative Mazzoli, the sponsor of the Temporary Safe Haven Act of 1987, a predecessor to the TPS statute, praised EVD as "a bona fide attempt to fill an obvious and ongoing need," but listed a number of problems with the process for granting EVD.  In particular, Mazzoli described "the process by which EVD grants are made, extended, or terminated" as "utterly mysterious, since there exist no statutory criteria to guide the administration in its actions."  He was concerned that "EVD decisions are neither publicized nor accompanied by an explanation of how and why they were made."  Mazzoli noted that the absence of any statutory foundation for EVD also meant that "neither statutes nor regulations describe the rights and responsibilities of individuals who are in EVD status."  136 Cong. Rec. (House) 19560 (1990) (statement of Rep. Romano Mazzoli).

Representative Fish expressed similar concerns about the EVD determination process, explaining that "… no criteria is now available which specifies when extended voluntary departure can be granted."  136 Cong. Rec. (House) 19559

(1990) (statement of Rep. Hamilton Fish, Jr.).  He further explained the purpose of the proposed safe haven bill, and in particular the need for statutory standards: "We fill a gap between current immigration law and the Refugee Act of 1980.  We provide rational, freestanding legislative criteria based on the existence of civil strife, environmental catastrophes, along with humanitarian considerations to allow foreign nationals to remain here for temporary refuge until conditions in their respective countries improve."  133 Cong. Rec. (House) 21331 (1987) (statement of Rep. Hamilton Fish, Jr.).

A few years later, discussing an immediate precursor to the TPS statute, legislators reaffirmed their intent to regularize the process of awarding humanitarian protection based on enumerated criteria.  Speaking about a 1989 safe haven bill, Representative Richardson explained that it would "establish an orderly, systematic procedure for providing temporary protected status for nationals of countries undergoing civil war or extreme tragedy, because we need to replace the current *ad hoc*, haphazard regulations and procedures that exist today . . ."  135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. Bill Richardson).  Representative Levine stressed that the legislation was intended to move from solely political determinations to a legally constrained approach.  He stated: "[p]erhaps the most important aspect of this bill is that it will standardize the procedure for granting temporary stays of deportation.  Refugees, spawned by the sad and tragic forces of

8

warfare, should not be subject to the vagaries of our domestic politics as well." 135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine).

Similarly, Representative Brennan emphasized the need to establish a transparent mechanism to protect those who were not granted or did not qualify for individualized asylum status. He explained: "At best, the present process of extended voluntary departure is ambiguous. As a nation, we cannot afford to send the kind of mixed messages which result from a vague or arbitrary policy. As we Americans witness and applaud the great rush of East Germans to gain freedom in the West, we must carefully consider how our country will be viewed by turning away these needy refugees from China, Nicaragua, and El Salvador." 135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. Joseph E. Brennan).

Lawmakers were particularly concerned that the political nature of EVD led to ad-hoc and haphazard decision-making that excluded certain nationals from its protections. Beginning in 1981 and over the course of a decade, legislators requested, to no avail, that the Attorney General award EVD to Salvadorans who fled their country's civil war.[4] The executive's intransigence in this regard provoked Congress to craft a statute that explicitly granted TPS to Salvadorans.[5] Similarly, in response to the Attorney General's refusal of a request from members of Congress

---

[4] Schoenholtz, *supra* note 3 at 5, 11 n.42.
[5] Pub. L. No. 101-649 § 303, 1404 Stat. 5035 (Nov. 29, 1990).

9

to offer a blanket grant of EVD to Lebanese nationals during the civil war, Rep. Mary Rose Oakar stated, "[b]ecause the Justice Department is opposed to helping these people, the only solution is legislative." *See* 136 Cong. Rec. (House) 27,131 (statement of Rep. Mary Rose Oakar).[6]

## IV. CONGRESS CRAFTED TEMPORARY PROTECTED STATUS TO PROVIDE NON-DISCRETIONARY GUIDANCE TO THE EXECUTIVE IN ITS AWARDS OF NATIONALITY-BASED HUMANITARIAN PROTECTION

Congress enacted TPS in response to these concerns about the need for transparency in the criteria and process used by the Executive to confer nationality-based humanitarian protection outside the asylum scheme codified by the Refugee Act. Toward this end, the TPS statute establishes firm criteria for designating countries whose nationals will receive protection. As mandated by Congress, the process includes interagency consultation before the DHS Secretary makes a designation, and also before extending or terminating a designation. 8 U.S.C. §§ 1254a(b)(1), 1254a(b)(3).[7]

In sharp contrast to EVD, then, the TPS statute constrains — as Congress intended to — the DHS Secretary's discretion in designating countries for TPS.

---

[6] While EVD was provided to some Lebanese nationals from 1976 to 1991, Rep. Mary Rose Oakar describes arbitrariness and excessive discretion in the criteria that discouraged many Lebanese from applying. *Id.* at 27,130.

[7] Though DHS Secretary Noem claims to have "vacated" the January 10, 2025 extension of TPS to Venezuelans, this term does not appear in the statute. This brief hews to the language of the TPS statute in relying on the term "terminate."

Under the statute, the DHS Secretary must "consult[] with appropriate agencies of the Government" prior to designation. 8 U.S.C. § 1254a(b)(1).[8] The DHS Secretary may designate a country for TPS "only if" one of three situations exist: ongoing armed conflict that poses a serious threat to individual safety; natural disasters that substantially but temporarily disrupt living conditions such that the country requests assistance because it cannot manage the return of its nationals; or extraordinary and temporary conditions that prevent nationals from returning safely (unless temporary protection is contrary to the national interest). 8 U.S.C. § 1254a(b)(1). Notice of designation must be published in the Federal Register. *Id.* at § 1254a(b)(1)(C).

The statute also requires the DHS Secretary to engage in periodic review of these criteria to determine whether "the conditions for such designation under this subsection continue to be met" and authorizes extensions of the designation (without limiting the number of extensions). Again, the DHS Secretary must consult with "appropriate agencies" and timely publish any determinations in the Federal Register. 8 U.S.C. § 1254a(b)(3)(A).

---

[8] Though the statute references the Attorney General, this role is now played by DHS Secretary. *See* RUTH ELLEN WASEM AND KARMA ESTER, CONG. RSCH. SERV., TEMPORARY PROTECTED STATUS: CURRENT IMMIGRATION POLICY AND ISSUES n.5 (2008), ("Under the Homeland Security Act of 2002 (P.L. 107-296), the former Immigration and Naturalization Service was transferred to the Department of Homeland Security. As a part of this transfer, the responsibility for administering the TPS was transferred from the Attorney General in the Department of Justice to the Secretary of the Department of Homeland Security (DHS). DHS's U.S. Citizenship and Immigrations Services (USCIS) administers TPS.")

Importantly, and especially relevant to the case at hand, the TPS statute does *not* give the DHS Secretary authority to extend or terminate TPS as a matter of unfettered executive discretion. Instead, the statute requires the DHS Secretary to terminate TPS if the periodic review finds that conditions justifying the designation no longer exist. 8 U.S.C. § 1254a(b)(3)(B), (C). And, most pertinent here, the statute provides that a TPS designation "is extended" if the DHS Secretary does not make that finding. The only discretion granted in this respect concerns the length of the required extension. The statute's default provides for six months, but the DHS Secretary has discretion to extend for twelve or eighteen months. Thus, the statute contemplates termination *only* if the DHS Secretary finds that the country no longer meets the conditions for designation. 8 U.S.C. §1254a(b)(3)(C).

This provision, the history of EVD, and the practice of TPS use the term "temporary" to denote that TPS does not provide permanent status (in contrast, for example, to asylum, which provides a path to permanent residence and citizenship). "Temporary" in this context does not mean a short amount of time. The drafters of the TPS statute were aware that, for example, Lebanese nationals had received EVD for fifteen years based on multiple renewals. Presidential administrations have extended TPS consistent with this understanding of the term "temporary." For example, President George H.W. Bush designated Somalia for TPS in 1991; Presidents Bill Clinton, George W. Bush, Barack Obama, Donald Trump, and Joe

Biden extended and re-designated that protection twenty-seven times through March 2026. JILL H. WILSON, CONG. RSCH. SERV. RS 20844, TEMPORARY PROTECTED STATUS AND DEFERRED ENFORCED DEPARTURE (2024) 20.

Moreover, Congress designed the TPS program specifically to prevent a "magnet effect," crafting statutory provisions that would forestall drawing people to the United States who might otherwise not have migrated and increasing the undocumented population:

> "By its specific terms, only people already here today are entitled to temporary protected status . . . By its terms, this measure denies protection to anyone convicted of criminal activity, or who would be inadmissible to the United States under our immigration laws. By its terms, this measure provides no Federal benefits to those it protects. By its terms, this measure requires those who are covered to register with the proper authorities."

136 Cong. Rec. (House) 27,131 (statement of Rep. Mary Rose Oakar).

A 2019 study by one of the authors of this brief, based on metrics including "TPS registrations, inadmissibility determinations, and apprehensions" confirmed that "the designation, re-designation, and multiple extensions of TPS for Haitians did not act as a magnet."[9]

In sum, by enacting the TPS statute, Congress — in order to establish clear criteria and a transparent process — imposed procedures, criteria, and limitations on the Executive's practice of providing nationality-based humanitarian protection.

---

[9] Schoenholtz, *supra* note 3, at 22.

## V. THE HISTORY OF TEMPORARY PROTECTED STATUS CONTRADICTS THE GOVERNMENT'S ARGUMENTS

This history of TPS firmly refutes the government's argument that "Courts may not review the Secretary's decisions" because Congress "enacted a particularly broad bar on judicial review for TPS decisions." (Brief for Appellants, *Nat'l TPS All., et al. v. Noem* (Oct. 16, 2025) (hereinafter "Gov't Brief") at 14, 15.)) To the contrary, the District Court may, in fact, determine whether the DHS Secretary has followed the criteria and process required by the TPS statute. The legislative history shows that Congress enacted TPS to establish a standardized, formal, and orderly process to guide the DHS Secretary. H.R. Rep. No. 100-627, at 4; *see also* 136 Cong. Rec. (House) 8686 (statement of Rep. Mary Rose Oakar); 136 Cong. Rec. (House) 8687 (statement of Rep. Marcy Kaptur).

In fact, judicial enforcement of congressional requirements is essential to ensure that the statute is applied as Congress intended because, as described above, the statute does not give the DHS Secretary unfettered discretion to terminate TPS. Nor does the statute provide the DHS Secretary with authority beyond the designation, extension or termination of TPS. In a statute intended to create constraints for an executive where there previously were none, Congress did not establish any vacatur authority.

The government claims otherwise, relying on Section 1254a(b)(5)(A), which precludes review of the DHS Secretary's "determination[s]" to designate, extend, or

terminate TPS.[10]  But the government's assertion that the TPS statute ". . . forecloses judicial review of 'any' TPS 'determinations,' regardless of the kind of challenge to the determination" (Gov't Brief at 22) is incorrect.  In light of the statute's other provisions and its animating purpose, Section 1254a(b)(5)(A) is properly understood to constrain courts' authority only in those areas that are within the DHS Secretary's unique competency – namely the assessment of whether the ground conditions in any given country meet the applicable statutory criteria.  To read the statute as barring the courts from enforcing general norms against arbitrary decision-making would eviscerate the fundamental congressional intent to impose standards and limits on the DHS Secretary's exercise of authority under the TPS statute.

The well-documented purpose of Congress to put an end to *ad hoc*, opaque, and haphazard actions resulting from the Attorney General's wholly discretionary decisions to grant EVD refutes the government's arguments for unfettered agency discretion.  The legislative history, detailed above, establishes that lawmakers created the TPS statute to put an end to the executive's politicized, ad hoc grants of humanitarian protection that excluded Lebanese and Salvadoran nationals, among others.

---

[10] Gov't Brief at 14, 18–33. That provision (Section 1254(a)(b)(5)(A) states "There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.").

15

Contrary to the government's claim — made without textual or historical support — the statute does not "unequivocally bar[] or "eliminate[] judicial review. (Gov't Brief at 32–33.) Termination is unlawful if it is based on a process or criteria other than the process and criteria that Congress codified. Therefore, the District Court's review to determine whether the DHS Secretary has followed the process required by Congress is required to ensure the DHS Secretary remains faithful to the TPS statute and the aims of the legislators who carefully crafted the law in direct response to a long history of Executive decisions to confer (or, importantly, not confer) humanitarian protection without such a process or criteria.

In this case, the government asserts the existence of a separate authority, not explicitly codified in the statute, to "vacate" TPS designations, extensions, and terminations, apparently for some unspecified period after a decision has already been made, and claims that the courts have no authority to review the DHS Secretary's reasons for issuing such vacaturs. (Gov't Brief at 14). Such authority, if it existed, would undermine the purpose of the statute—to establish clear criteria and a transparent process—because it would not be subject to any of the process constraints of statutory TPS decisions and would eviscerate the time-based certainty that the TPS system normally affords.

16

To offer an example, on July 1, 2024, then-DHS Secretary Mayorkas extended and redesignated TPS for Haitian nationals for a period of 18 months, through February 3, 2026.[11]  On February 20, 2025, DHS Secretary Noem "has determined to partially vacate" this extension and redesignation, cutting the time frame from 18 to 12 months, or through August 3, 2025.[12]  This purported "vacatur" authority would undermine congressional intent to create a standardized, formal, and orderly process for TPS, as it would enable the DHS Secretary to alter the time frames of TPS designations at her whim.

This understanding of the statute's review-limiting provision does not rob the DHS Secretary of all discretion in the TPS decision-making realm.  As Professor Stanley A. DeSmith has explained, discretionary decisions are those that pose a choice between two or more permissibly correct answers.  STANLEY A. DESMITH, LORD WOOLF, AND JEFFREY JOWELL, JUDICIAL REVIEW OF ADMINISTRATIVE ACTION 296 (Sweet & Maxwell 5th ed.1995).  Discretion means that there is no uniquely correct answer.  But discretion does not mean that *any* answer is correct or that some answers are not wrong.  To be sure, Congress did not authorize the courts to substitute their judgment about whether TPS should be granted in any particular

---

[11] Extension and Redesignation of Haiti for Temporary Protected Status, 89 Fed. Reg. 54484 (July 1, 2024).
[12] Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10511 (Feb. 24, 2025).

case, or to second-guess the DHS Secretary's weighing of discretionary factors. But the statute cannot be read to prohibit — in fact, the statute must be read to require — that the courts ensure that TPS determinations follow the process and criteria required by law. To hold otherwise is to disregard the central reason for the TPS statute in the first place: to replace the unstructured and *ad hoc* EVD regime with specific designation criteria.

As Representative Oakar stated in 1990, a month before Congress enacted TPS, "An orderly, systematic procedure for providing temporary protected status for nationals of countries undergoing war, civil war, or other extreme tragedy is needed to replace the current *ad hoc* haphazard procedure." 136 Cong. Rec. (House) 8686 (statement of Rep. Mary Rose Oakar). The Court's exercise of jurisdiction over the claims presented in this case would fulfill that manifest legislative purpose. This Court should enforce the criteria and process that Congress established.

## CONCLUSION

The history, purpose, and text of the TPS statute demonstrate that Congress intended to constrain the DHS Secretary's discretion, to set forth criteria for the designation, extension, and termination of TPS, and to ensure that the decision was orderly, transparent, and guided by the law. The government's assertions in this case

18

that the DHS Secretary enjoys unfettered or unreviewable discretion are contrary to the TPS regime that Congress enacted.

Respectfully submitted,

Dated: November 12, 2025

By: */s/ Anne Lai*                   

*Attorneys for Amici Curiae*
**IMMIGRATION LAW SCHOLARS**

## APPENDIX[13]

| | |
|---|---|
| Jaya Ramji-Nogales<br>Professor of Law<br>Temple University,<br>Beasley School of Law | Andrew Schoenholtz<br>Professor from Practice<br>Georgetown University Law Center |
| Sabrineh Ardalan<br>Clinical Professor of Law; Director,<br>Harvard Immigration<br>and Refugee Clinic<br>Harvard Law School | Jon Bauer<br>Clinical Professor of Law and Richard<br>D. Tulisano '69 Scholar<br>in Human Rights<br>University of Connecticut School of<br>Law |
| Carolyn Patty Blum<br>Clinical Professor of Law, Emerita<br>Berkeley Law, University of California | Richard Boswell<br>Professor of Law<br>UC Law, San Francisco |
| Emily Brown<br>Assistant Clinical Professor of Law<br>The Ohio State University Moritz<br>College of Law | Kristina M. Campbell<br>Professor of Law and Rita G. &<br>Norman L. Roberts Faculty Scholar<br>Director, Beatriz and Ed Schweitzer<br>Border Justice Initiative<br>Gonzaga University School of Law |
| Jennifer M. Chacon<br>Bruce Tyson Mitchell Professor of Law<br>Stanford Law School | Dree K. Collopy<br>Adjunct Professor<br>American University Washington<br>College of Law |
| Sara Cressey<br>Visiting Professor<br>Refugee and Human Rights Clinic,<br>University of Maine School of Law | Jill Family<br>Professor of Law<br>Widener University Commonwealth<br>Law School |
| Maryellen Fullerton<br>Suzanne J. and Norman Miles<br>Professor of Law<br>Brooklyn Law School | Denise Gilman<br>Clinical Professor<br>University of Texas, Austin |

---

[13] University affiliations are provided for identification purposes only.

| | |
|---|---|
| Lindsay M Harris<br>Professor of Law<br>University of San Francisco School of Law | Elizabeth Jordan<br>Visiting Assistant Professor and Director, Immigration Law<br>& Policy Clinic<br>University of Denver Sturm College of Law |
| Michael Kagan<br>Joyce Mack Professor of Law<br>University of Nevada, Las Vegas | Elizabeth Keyes<br>Professor of Law<br>University of Baltimore School of Law |
| Anne Lai<br>Clinical Professor of Law<br>University of California, Irvine School of Law | Katie Meyer<br>Professor of Practice<br>Washington University School of Law |
| Jennifer Moore<br>Professor of Law and University of New Mexico Regents' Professor<br>University of New Mexico School of Law | Nancy Morawetz<br>Professor of Law<br>New York University School of Law |
| Elora Mukherjee<br>Jerome L. Greene Clinical Professor of Law<br>Columbia Law School | Karen Musalo<br>Professor and Chair in International Law<br>UC Law, San Francisco |
| Nina Rabin<br>Clinical Professor of Law<br>UCLA School of Law | Philip Schrag<br>Delaney Family Professor<br>of Public Interest Law<br>Georgetown University Law Center |
| Margaret Taylor<br>Professor of Law<br>Wake Forest Law School | David B. Thronson<br>Professor of Law<br>Michigan State University<br>College of Law |
| Leti Volpp<br>Robert D. and Leslie Kay Raven Professor of Law in Access to Justice<br>UC Berkeley School of Law | Michael J. Wishnie<br>William O. Douglas Clinical Professor of Law<br>Yale Law School |

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-2120

I am the attorney or self-represented party.

**This brief contains** 4,225 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Anne Lai  **Date** 11/12/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*